Nos. 16-1047, -1101

_____

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

**ICON HEALTH & FITNESS, INC., a Delaware corporation,**

*Plaintiff-Appellant,*

v.

**OCTANE FITNESS, LLC, a Minnesota limited liability company,**

*Defendant-Cross-Appellant.*

_____

Appeal from the United States District Court for the District of Minnesota,
case no. 4:09-cv-00319-ADM-SER, Judge Ann D. Montgomery

═══════════════════════════════════

## BRIEF FOR PLAINTIFF-APPELLANT ICON HEALTH & FITNESS, INC.

═══════════════════════════════════

MICHAEL A. JACOBS
ROBERT J. ESPOSITO
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
Telephone:  415.268.7455

DEANNE E. MAYNARD
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: 202.887.8740

LARRY R. LAYCOCK
DAVID R. WRIGHT
MASCHOFF BRENNAN LAYCOCK GILMORE
   ISRAELSEN & WRIGHT
201 South Main Street, Suite 600
Salt Lake City, Utah  84111
Telephone:  435.252.1360

*Counsel for Plaintiff-Appellant ICON Health & Fitness, Inc.*

# CERTIFICATE OF INTEREST

Counsel for appellant ICON Health & Fitness, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

ICON Health & Fitness, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by me are:

HF Holdings, Inc. (owns 100% of ICON Health & Fitness, Inc. and is not a public company)

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or are expected to appear in this court are:

Morrison & Foerster LLP:  Michael A. Jacobs, Deanne E. Maynard, Marc A. Hearron, Robert J. Esposito, Adina L. Witzling*, Dean J. Zipser*

Maschoff Brennan: C J Veverka, David R. Wright, Jared J. Braithwaite, Larry R. Laycock, Sterling A. Brennan, Parish Freeman, Mark W. Ford

Greene Espel PLLP: Jeanette M. Bazis, Lawrence M. Shapiro, Robert J. Gilbertson, X. Kevin Zhao

Workman Nydegger: H. Craig Hall, Jr.

Elkins, Bayard & Hollands:  Andrew D. Winghart, Thomas J. Bayard

*No longer with firm.

Dated:  February 5, 2016                    _____/s/ Deanne E. Maynard_____

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. i

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF RELATED CASES ............................................... viii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUE............................................................1

INTRODUCTION ...............................................................................1

STATEMENT OF THE CASE.............................................................4

      A.     Factual Background.................................................................4

            1.     ICON's '710 patent.......................................................4

            2.     Octane's accused elliptical machines .......................11

      B.     Prior Proceedings ................................................................14

            1.     Transfer of the case from California to Minnesota...................14

            2.     The district court's ruling on the merits and its initial ruling of no exceptional case ....................................15

                  a.     Claim construction...........................................15

                  b.     Summary judgment of non-infringement .......................17

                  c.     Finding of no exceptional case ......................18

             3.     This Court's affirmance .............................................19

             4.     The Supreme Court's decision, and this Court's remand.........20

             5.     The district court's second exceptional-case ruling.................21

      SUMMARY OF ARGUMENT ..............................................................22

STANDARD OF REVIEW ...................................................................25

ARGUMENT ....................................................................................25

NEITHER ICON'S LITIGATION POSITION NOR THE MANNER IN
    WHICH THIS CASE WAS LITIGATED WAS EXCEPTIONAL,
    AND THUS REVERSAL OR VACATUR IS REQUIRED .......................25

    A.    Fee Awards Are Reserved For "Rare" Cases That Stand Out
          From The Norm...................................................................25

    B.    The Substantive Strength Of ICON's Litigation Positions Was
          Well Within The Norm For Patent Disputes And Far From
          "Rare" ................................................................................28

          1.    The district court's assessment of the strength of ICON's
                litigation positions was based on a legally erroneous view
                of what ICON needed to prove to establish infringement ........28

          2.    ICON's contention that the accused devices had "stroke
                rails" was far from exceptional ...................................31

                a.    ICON never argued that a stroke rail "could consist
                      of an unlimited combination of unnamed parts" ............31

                b.    ICON had an objectively reasonable argument that
                      the "stroke rail" needed only to connect to the
                      frame rather than extend to it.........................................33

          3.    ICON also had objectively reasonable contentions that
                the accused products had the "means for connecting"
                element either literally or under the doctrine of
                equivalents ..............................................................38

                a.    ICON reasonably maintained that the "means for
                      connecting" limitation did not require the
                      C-shaped channel and pin.............................................39

                b.    ICON reasonably asserted that "linear
                      reciprocating displacement" is not limited to
                      motion along a straight-line path ...................................46

   c. ICON reasonably contended it could have demonstrated the "means for connecting" limitation under the doctrine of equivalents ................... 48

  4. Viewed in their totality, ICON's infringement contentions were well within the mainstream, not unusual, rare, or out of the ordinary .......................... 51

 C. ICON Did Not Engage In Unreasonable Litigation Tactics ............... 53

  1. The district court erred in concluding that the '710 patent's non-commercialization supports an exceptional-case ruling ................................................................. 53

  2. The district court's inference of improper motive from emails of an employee of an ICON subsidiary was fundamentally flawed ................................................ 56

  3. The district court erroneously supported its ruling by relying on ICON's filing suit in California, a proper forum ........................................................................ 60

  4. The district court legally erred in rejecting the adequacy of the evidence of ICON's pre-suit infringement analysis ....... 62

  5. There was no basis to conclude that ICON litigated in a manner so outside the norm as to warrant an exceptional-case ruling ................................................................. 66

 D. Once The Erroneous Considerations Are Removed, The Exceptional-Case Ruling Must Be Set Aside .................................... 67

CONCLUSION ....................................................................................................... 68

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Addington v. Texas*,
441 U.S. 418 (1979)......................................................................52

*Apple Comput., Inc. v. Articulate Sys., Inc.*,
234 F.3d 14 (Fed. Cir. 2000) .......................................................65

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
632 F.3d 1246 (Fed. Cir. 2011) ...................................................34

*B. Braun Med., Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997) ...................................................40

*Biax Corp. v. Nvidia Corp.*,
No. 2013-1649, 2015 WL 755940 (Fed. Cir. Feb. 24, 2015)...............27, 42, 68

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
296 F.3d 1106 (Fed. Cir. 2002) ...................................................40

*Comput. Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008) ...................................................64

*Eon-Net LP v. Flagstar Bancorp*,
653 F.3d 1314 (Fed. Cir. 2011) ...................................................55

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996) .....................................................46

*Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*,
790 F.3d 1369 (Fed. Cir. 2015) ................... 26, 27, 28, 42, 45, 47, 52, 53, 67, 68

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
134 S. Ct. 1744 (2014)..................................................25, 27, 28, 30

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
78 F.3d 1575 (Fed. Cir. 1996) .....................................................43

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*,
540 F.3d 1337 (Fed. Cir. 2008) ...................................................43

v

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004) ...................................................................35, 47

*Johns Hopkins Univ. v. CellPro, Inc.*,
   152 F.3d 1342 (Fed. Cir. 1998) .........................................................................37

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005) .........................................................................44

*MarcTec, LLC v. Johnson & Johnson*,
   664 F.3d 907 (Fed. Cir. 2012) ...........................................................................66

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011) (Breyer, J., concurring) .................................................52

*Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.*,
   726 F.3d 1359 (Fed. Cir. 2013) .........................................................................66

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014).............................................. 4, 20, 25, 26, 38, 52, 53, 67

*Q-Pharma, Inc. v. Andrew Jergens Co.*,
   360 F.3d 1295 (Fed. Cir. 2004) ...................................................................63, 64

*Salazar v. Procter & Gamble Co.*,
   414 F.3d 1342 (Fed. Cir. 2005) ...................................................................47, 49

*SFA Sys., LLC v. Newegg Inc.*,
   793 F.3d 1344 (Fed. Cir. 2015) ................... 26, 37, 42, 45, 51, 53, 55, 56 n.1, 66

*Source Vagabond Systems Ltd. v. Hydrapak, Inc.*,
   753 F.3d 1291 (Fed. Cir. 2014) ...................................................................64, 65

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015).........................................................................................52

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) .........................................................................35

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) .........................................................................48

**STATUTES**

28 U.S.C. § 1404(a) ................................................................61

35 U.S.C. § 271(a) .................................................................54

35 U.S.C. § 285 ........................................................1, 18, 25

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(3)............................................................61

## STATEMENT OF RELATED CASES

This action was previously before this Court, in case numbers 2011-1521 and 2011-1636. *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, 496 F. App'x 57 (Fed. Cir. 2012) (Rader, C.J., Newman, Lourie, JJ.) (opinion authored by Judge Lourie); *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, 576 F. App'x 1002 (Fed. Cir. 2014) (Newman, Lourie, Mayer, JJ.) (per curiam). Counsel for plaintiff-appellant ICON Health & Fitness, Inc. are unaware of any pending case that will affect or be affected directly by this Court's decision.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. Final judgment was entered on September 25, 2015. Plaintiff-appellant ICON Health & Fitness, Inc. ("ICON") appealed on October 1, 2015. Defendant-cross-appellant Octane Fitness, LLC ("Octane") cross-appealed on October 13, 2015. This Court has jurisdiction under 28 U.S.C. § 1295(a).

## STATEMENT OF THE ISSUE

Whether the exceptional-case determination and fee award under 35 U.S.C. § 285 should be reversed, or vacated and remanded for further consideration, because neither ICON's litigation positions nor the manner in which this case was litigated was uncommon, rare, or out of the ordinary.

## INTRODUCTION

A ruling that a case is "exceptional" under 35 U.S.C. § 285 is supposed to be reserved for cases in which a party's litigation positions are so exceptionally meritless or the manner in which the case was litigated was so unreasonable that the case stands out from the norm as rare or uncommon. This was a routine patent case. Although Octane prevailed on the merits, nothing about this case stands out from regularly litigated patent cases. The district court's ruling to the contrary was an abuse of discretion, as it was based on numerous legal errors and clearly erroneous factual findings.

For starters, the district court's ruling that ICON's substantive infringement case was "exceptionally weak" (A11) was premised on legal error—a fundamental misunderstanding of what ICON needed to prove to establish infringement. The district court reasoned that, to prevail on the merits, ICON needed to prevail on *all* of four different arguments that the court deemed to be weak. But three of those arguments were actually alternatives to each other, and ICON therefore needed to win *only one* of them (and as to one of those arguments, ICON had two paths to success). It was Octane, not ICON, that needed to run the table on all of them. The fourth contention that the district court said was exceptionally weak was not an argument that ICON actually made; it was Octane's caricature of ICON's "stroke rail" position.

ICON's infringement contentions were grounded in the claim language, the intrinsic record, and this Court's precedents. They were well within the range of arguments that litigants in patent suits routinely make. To be sure, with respect to two claim limitations, the district court and this Court ultimately read the claim language and intrinsic record differently from ICON and disagreed with ICON's doctrine-of-equivalents contentions. But ICON prevailed on other legal disputes between the parties. There was nothing unusual or extraordinary about ICON's contentions. ICON's loss on the issues decided against it is not enough to deem its substantive case "exceptionally weak."

The district court made further legal errors and clearly erroneous findings in concluding that ICON engaged in unreasonable litigation tactics.  For example, the district court gave weight to the fact that ICON had not commercialized its patent, and it awarded fees in part to deter such suits.  But a patentee is entitled to enforce its patent rights regardless of whether it has sold the invention.  And there is no sound reason to deter a competitor-on-competitor suit such as this one, where a patentee reasonably asserts that its own invention is being used against it.  Shifting fees in these circumstances risks over-deterrence.

The district court also inferred that ICON had an improper motive for bringing suit from emails written by an employee of ICON's subsidiary five months after suit was filed.  The court attributed the contents of those emails to ICON's lawyers and upper management.  But even if the individuals who made the decision to sue had themselves written those emails, nothing in them suggests that ICON doubted the strength of ICON's suit or acted in bad faith.  At most, the emails reflect eagerness about suing an infringing competitor.

Highlighting the errors in the exceptional-case ruling is the fact that, before the Supreme Court altered the legal standard for holding a case exceptional, the district court had ruled both (1) that ICON's litigation position was not objectively baseless and (2) that ICON did not bring suit in bad faith.  Nothing about the Supreme Court's decision suggests that the outcome would be different under the

3

new standard. The Court emphasized that exceptionality is the touchstone—meaning "uncommon," "rare," or "not ordinary." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). Nor did the Supreme Court call into question the subsidiary conclusions underlying the district court's first unexceptional-case ruling. ICON's arguments and conduct were just as objectively reasonable after the change in the legal standard as they were before. Nothing justifies the district court's about-face.

In similar circumstances under the new standard, this Court has carefully scrutinized the reasons given for a district court's fee award. When those cited reasons have been erroneous, this Court has set the ruling aside. That same outcome is warranted here. Once the district court's legal and factual errors are set aside, there is no basis for an exceptional-case determination or fee award.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. ICON's '710 patent

ICON's U.S. Patent No. 6,019,710 ("'710 patent") is directed to an adjustable elliptical machine requiring minimal space. A47(col.1:60-65). Figure 1 depicts an embodiment:



FIG. 1

Frame
Stroke Rails
Foot Rails

A41 (color added).

ICON asserted independent claim 1 and eight dependent claims. Claim 1 contains five elements: (1) a frame, shown above in pink; (2) a pair of foot rails, shown above in green; (3) a pair of stroke rails, each connected at one end to a foot rail, shown above in yellow; (4) a means for connecting each stroke rail to the frame in a way that results in a substantially elliptical path in one end of the stroke rail; and (5) means for varying the size of the elliptical path. A50(col.7:11-27). Specifically, claim 1 recites:

1. An exercise apparatus comprising:

(a) a frame configured for resting on a ground surface;

(b) a pair of spaced apart foot rails each having a first end and an opposing second end, each foot rail being configured to receive a corresponding foot of a user;

(c) a pair of stroke rails each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail;

(d) means for connecting each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path; and

(e) means for selectively varying the size of the substantially elliptical path that the second end of each stroke rail travels.

A50(col.7:11-27).

***Means for connecting.***  The "means for connecting" limitation is a means-plus-function limitation.  A1422-A1423.  Although the corresponding structure was disputed, the specification explicitly describes a "*connecting means* for connecting each stroke rail 66 and 68 to frame 12 such that linear reciprocating displacement of first end 70 of each stroke rail 66 and 68 results in displacement of second end 72 of each stroke rail 66 and 68 in a substantially elliptical path." A48(col.4:26-31) (emphasis added).  The structure disclosed to accomplish the "connecting means" is a crank, consisting of crank arms that rotate around an axle. A48(col.4:31-41).  One side of the crank is depicted below in blue:



**Fig. 1 (excerpt)**

A41 (excerpted and color added).

During use, an individual alternately exerts pressure on the foot rails, causing the crank to rotate in a path shown by the blue dashed circle below. A48-A49(col.4:62-col.5:14). This continuous motion results in movement in a substantially elliptical path at the point where the stroke rail is attached to the foot rail, as shown by the red dashed line below (A49(col.5:14-18)):



**Fig. 5 (annotated**)

A45 (annotated to add red color to dashed lines in figure and to add the arrow and blue dashed lines for demonstrative purposes).

*Attaching means.* Separate from the discussion of the "connecting means," the specification discloses an "attaching means" for attaching the first end of the stroke rail (70) to the frame (31), which enables linear displacement of the first end of the stroke rail. A48(col.4:3-6). A pin (76) extends through the stroke rail (74) and slides within a C-shaped channel (84) (so named because a cross-section of the channel is shaped like the letter "C") mounted to the frame, causing the stroke rail's first end to move linearly. A48(col.4:6-17). This example of an "attaching means" is depicted below in red:

8



**Fig. 1 (excerpt)**

A41 (excerpted and color added).

***Means for selectively varying.*** Figure 5 depicts a nearly identical embodiment to the one in Figure 1, except it also shows a means for varying the size of the elliptical path—the fifth element of claim 1:



**Fig. 5 (excerpt)**

**Fig. 5**

A45 (excerpted and color added). In this embodiment, because the stroke rail consists of multiple parts, its effective length can be changed. Specifically, an adjustment arm (142) (shown in dark orange above) slides within the main body of the stroke rail (66) (shown in light orange). A49(col.6:11-32). The user inserts a pin to set the stroke rail's effective length, which affects the size of the elliptical path at the stroke rail's other end. A49(col.6:33-42).

There are other ways the elliptical path can be selectively varied. A49(col.6:43-45). For example, Figure 6 shows a motorized means rather than manual (A49(col.6:49-62)):



**Fig. 6 (excerpt)**

A46 (excerpted and color added).

### 2.     *Octane's accused elliptical machines*

ICON accused Octane's Q45 and Q47 elliptical machines of infringement. A2404. The machines' internal linkage systems are shown below:



Octane's Q47 Machine          Octane's Q45 Machine

A2483 (labels, colored dashes, and arrow substituted for numbered labels); *see* A2411, A2460-A2461.

ICON alleged that the "stroke rail" in the Q47 is a single part, the actuator casting (A2483-A2484)—a curved bar (shown in dark orange below) running from a foot rail (shown in green) to a rocker link (shown in red), which connects the actuator casting to the frame:



**Fig. 5, '710 patent**          **Q45**          **Q47**

A45 (color and arrow added); A2483 (dashes, color, and arrows substituted for numbered labels); *see* A2460-A2461.  In the Q45, ICON alleged that two parts make up the stroke rail:  the actuator casting (shown in dark orange above) and the integrated-screw motor (shown in light orange).  A2487-A2490; A2847.  The integrated-screw motor changes the effective length of the actuator casting, which effectively changes the elliptical path experienced by the user.  A1721; A2224-A2225; A2238; A2411.

In both machines, the actuator casting is connected in its middle to a crank (shown in blue above); in the Q47, the connection is via a swing arm.  A2410; A2460-A2461.  When in use, the lower end of the actuator casting moves along a slightly arcuate path, as shown by red, slightly arcuate arrows in the pictures above and on page 12, *supra*.  A2415.  The crank arm moves in a circular motion around the axle, as shown by the blue dashes.  A2410; A2415.  This results in the upper

13

end of the actuator casting moving along a substantially elliptical path, as shown by the red dashes. A2410; A2415-A2416. Video clips of the machines in use are in the record. A5587.

Although Octane suggested that a cursory look at the internal mechanism of its machines would have demonstrated non-infringement (A2918), Octane's own actions belie that notion. Octane originally conceded that its Q47 machine had a stroke rail, and it maintained that concession for nearly a year. A2193, A2201; A2205, A2213. Octane learned of the '710 patent before ICON filed suit, and became sufficiently concerned that it commissioned outside counsel to conduct an infringement analysis. A3008-A3011. One of its licensors also conducted an infringement analysis. A3008-A3011. Octane notified its patent insurance carrier, which also conducted another infringement analysis. A3011. And after ICON sent a cease-and-desist letter, Octane hired a second attorney to conduct yet another infringement analysis. A3010-A3011.

## B.    Prior Proceedings

### 1.    *Transfer of the case from California to Minnesota*

ICON filed this action in the Central District of California against Octane and one of Octane's California distributors, Nellie's Exercise Equipment, Inc. ("Nellie's"). A81-A82. The complaint alleged infringement of two ICON patents, the '710 patent and U.S. Patent No. 5,104,120 ("'120 patent"). A83-A85.

Octane and Nellie's responded by filing a parallel declaratory-judgment action in Minnesota, the forum of Octane's principal place of business. A205; A226-A231. They then asked the California court to sever the claims against Octane from those against Nellie's and to transfer the claims against Octane to Minnesota, asserting it was a "more convenient" forum. A202-A203, A210-A217. The California court granted the motion. A369-A374. Afterward, a Texas district court issued an adverse claim construction in a different case involving the '120 patent, and ICON subsequently voluntarily dismissed with prejudice its claim against Octane regarding that patent. A386; A3596-A3597.

### 2. *The district court's ruling on the merits and its initial ruling of no exceptional case*

#### a.    Claim construction

*Stroke rail.* It was undisputed that the "stroke rail" could consist of more than one part. A1214. One of the central disputes was how to describe this concept. Octane proposed: "A linear or curved bar, which can be made to vary in length, extending from a foot rail to a frame on an elliptical machine." A756. Concerned that "bar" could suggest to a jury that the stroke rail must be a unitary piece, ICON proposed: "A structure comprised of one or more parts that is attached to a foot rail and connected to the frame." A1141; *see* A1097-A1099; A1357-A1358.

15

The court rejected both sides' proposals. A1420-A1421. As to ICON's, the court reasoned that "one or more parts" was too broad, as it theoretically could include "infinite combinations of parts." A1420. The court instead construed "stroke rail" as "A linear or curved rail, which may be made to vary in length, extending from a foot rail to a frame on an elliptical machine." A1421. The court did not explain what it meant by "extending" from the foot rail to the frame. In proposing that language, Octane had suggested only that one end of the stroke rail must be attached to a foot rail and the other end "connected to the frame." A1215.

***Means for connecting.*** ICON contended that the function of the "means for connecting" limitation is to connect the stroke rail to the frame in a manner such that linear reciprocating displacement at one end results in a substantially elliptical path at the other. A1141. Under ICON's construction, the connection need not actually *cause* linear reciprocating displacement. A1107-A1110. ICON also contended that the corresponding structure is the "connecting means" explicitly discussed in the specification—i.e., the crank. A1101-A1107. Additionally, ICON asserted that "linear reciprocating displacement" is not limited to movement along a straight-line path. A1110-A1113.

The district court ruled, however, that the function is "to connect the stroke rail to the frame in such a way as to *cause* the first end of the stroke rail to undergo linear reciprocating displacement (which then causes the second end of the stroke

rail to move in an elliptical path)." A1424 (emphasis added). The court also concluded that the corresponding structure includes not only the crank but also what the specification refers to as the "attaching means"—i.e., the C-shaped channel and pin. A1425. And the court concluded that "no construction of 'linear reciprocating displacement' is necessary." A1422.

### b.    Summary judgment of non-infringement

The district court granted summary judgment of non-infringement, concluding two limitations were missing. But the court found a fact dispute as to a third limitation. A2841-A2850.

***Stroke rail.*** The court concluded that the actuator casting in Octane's machines did not "extend[]" to the frame. A2847-A2848. The court ruled that the rocker link connecting the actuator casting to the frame "is a separate, independently moving, intervening element of the linkage system interposed between the frame and the proposed stroke rail, and its presence prevents the stroke rail from extending to the frame." A2847-A2848.

But the court rejected Octane's argument (A1650) that the combination of the actuator casting and integrated-screw motor could not make up the stroke rail in the Q45. A2847. Agreeing with ICON, the court explained that the patent "contemplates a multi-part" stroke rail. A2847.

***Means for connecting.***    Based on its constructions, the district court concluded the "means for connecting" limitation was not literally present, observing that the actuator casting does not move linearly and that the machines do not have the C-shaped channel and pin.  A2843-A2846.  The court also disagreed with ICON's doctrine-of-equivalents contention that the slightly arcuate movement in Octane's machines is substantially equivalent to linear movement.  A2843-A2846.

***Means for selectively varying the size of the substantially elliptical path.***  The district court sided with ICON on the third disputed limitation.  It found a fact dispute regarding whether Octane's integrated-screw motor satisfies the "means for selectively varying" limitation.  A2849-A2850.

### c.    Finding of no exceptional case

After the grant of summary judgment, Octane moved for attorneys' fees under 35 U.S.C. § 285.  A2901-A2921; *see* A2957-A2983.  The district court denied Octane's motion.  A3152-A3160.

The court found that although ICON's infringement action was "ultimately unsuccessful, Icon's arguments were not objectively baseless."  A3156.  The court rejected Octane's argument that "the Court's rulings should have been a foregone conclusion to anyone who visually inspected its machines' linkage system,"

observing that its non-infringement "conclusions were not so easily reached." A3154-A3155.

The district court also rejected Octane's suggestion that ICON "undertook its lawsuit in bad faith." A3158. The court explained that "Icon represents, and the Court has no reason to doubt, that it purchased and inspected a Q47 machine prior to filing suit, and that it secured opinions from experts and counsel that the machine infringed its patent." A3157. The court also explained that emails sent from an employee of ICON's subsidiary five months after suit was filed, expressing eagerness over the suit, did not show improper motive. And it concluded that it was not "relevant that Icon never commercialized the '710 patent." A3159.

### 3.    *This Court's affirmance*

This Court affirmed the summary judgment of non-infringement. A3167-A3183. The Court concluded that the district court was "correct to require that the stroke rail extend from the foot rail to the frame," and it ruled that Octane's products do not infringe because "the alleged stroke rail extends from the rocker link, not the frame." A3179. The Court also agreed that Octane's machines do not literally have the "means for connecting." A3178-A3179. The Court reasoned that the limitation's function includes enabling the first end of the stroke rail to undergo linear displacement and that the corresponding structure includes the C-shaped

channel and pin, which is not present in Octane's machines.  A3178-A3179.  The Court also rejected ICON's doctrine-of-equivalents contention.  A3179-A3180.

This Court affirmed the unexceptional-case ruling, stating:  "we have reviewed the record and conclude that the court did not err in denying Octane's motion to find the case exceptional."  A3181.

### 4.     The Supreme Court's decision, and this Court's remand

The Supreme Court granted review to consider the legal standard under Section 285 for determining whether a case is exceptional.  Looking to the statutory text, the Supreme Court concluded that the power to award fees is "reserved for 'exceptional' cases," meaning "uncommon," "rare," or "not ordinary."  *Octane*, 134 S. Ct. at 1756.  It held that exceptionality should be considered based on the "totality of the circumstances" and that the evidentiary standard of proof is "a preponderance of the evidence."  *Id.* at 1756-58.

Nothing in the Supreme Court's decision suggests that the new standard would change the outcome of this case.  The Court explained that the substantive strength of ICON's arguments and the manner in which the case was litigated continue to be proper factors in the exceptionality analysis.  *Id.* at 1756.  But the district court already had resolved both of those factors in ICON's favor.  Additionally, the Supreme Court did not grant Octane's request to hold it entitled to fees under the new standard.

On remand, this Court observed that Octane had challenged only the legal standard for exceptionality and "did not challenge the factual findings and conclusions underlying the district court's denial of its § 285 motion."  A3192. The Court vacated the denial of Octane's exceptional-case motion and remanded "that issue to the district court for application in the first instance of the new standard."  A3194.

### 5.    *The district court's second exceptional-case ruling*

On remand, the district court reversed course and ruled the case exceptional. Despite its initial ruling that ICON's claim-construction and infringement contentions were not objectively baseless, the court concluded that ICON's "litigation position stands out as a particularly and unusually weak case on the merits."  A10.

The district court also reversed itself on whether ICON litigated in an unreasonable manner.  The court concluded that it was "more likely than not" that ICON filed suit in California to increase Octane's litigation costs.  A12.  Despite evidence of ICON's extensive pre-suit infringement analysis (which cost over $80,000), the district court ruled the evidence inadequate.  A13-A14.  The court also changed its view of the significance of the emails among employees of an ICON subsidiary, concluding that the emails reflected improper motive.  A15-A16.

Finally, the court ruled that the '710 patent's non-commercialization supported an exceptional-case determination. A17.

Although Octane sought $2,486,579 in fees and $362,583 in costs, (A21), the court ruled that entire amount was not warranted. The court held unexceptional both ICON's defense in the Supreme Court of this Court's longstanding legal standard and its contentions on remand under the new standard. A24. The court ultimately awarded Octane $1,392,188 in attorneys' fees and $167,554 in costs. A38.

## SUMMARY OF ARGUMENT

A.    Fee awards are limited to "exceptional" cases—cases that stand out with respect to substantive strength or the manner of litigation. Although the Supreme Court changed the standard for finding an exceptional case under Section 285, it made clear that fee awards are still reserved for uncommon, unusual cases. Under the new standard, this Court has closely scrutinized the reasons given by district courts for exceptional-case rulings.

B.    Although ICON did not prevail on the merits, its infringement arguments were well within the norm. In ruling to the contrary, the district court made threshold legal errors. The district court's assessment was based on a legally erroneous view that ICON needed to prevail on four separate arguments to prove infringement. But three of those arguments were alternative ways for ICON to

prevail on the "means for connecting" limitation.    And the fourth purportedly essential argument—that a stroke rail could consist of an unlimited number of parts—was not an argument ICON actually made.    Rather, ICON argued that "stroke rail" could not be limited to a single, unitary bar, and the district court *agreed with ICON* on that point.

The reason ICON did not prevail on establishing the presence of a stroke rail is that the accused stroke rail (the actuator casting) does not extend to the frame in Octane's machines.    But ICON had a reasonable claim-construction argument, grounded in the claim language, that the stroke rail need only be connected to the frame, not extend to it.

ICON also had objectively reasonable contentions that Octane's products had the "means for connecting" limitation.    Although this argument did not prevail, it was reasonable for ICON to contend that the corresponding structure was the structure identified in the specification as the "connecting means."    ICON also reasonably contended, based on the claim language, that the limitation's function is merely to convert linear reciprocating displacement into a substantially elliptical path, not to cause linear reciprocating displacement.    And ICON reasonably asserted, based on the claim language and the ordinary meaning in the art, that "linear reciprocating displacement" was not limited to motion along a straight-line path.    All of these contentions are well within the mainstream of claim-

23

construction arguments.  Had ICON prevailed on any of them, it likely could have established the literal presence of the "means for connecting."  ICON also had a reasonable doctrine-of-equivalents argument that slightly arcuate motion is equivalent to linear motion.

C.     The district court also made legal errors and clearly erroneous factual findings in ruling that ICON engaged in unreasonable litigation tactics.

The district court erred in relying on the fact that ICON had not commercialized the '710 patent.  It is hardly rare for patentees to enforce their patent rights against competitors even if the patent has not been commercialized.

The district court clearly erred in finding that emails sent by an employee of ICON's subsidiary showed that ICON had an improper motive in bringing suit. There was no basis to attribute the contents of the emails to ICON's lawyers or management.  In any event, nothing in the emails suggests any doubt regarding the merits of the infringement suit or any improper motive.

The court also erroneously supported its ruling by relying on the fact that ICON originally filed suit in California.  There was nothing unusual about ICON exercising its prerogative as plaintiff to bring suit in its preferred (and a proper) venue.

Finally, the district court legally erred in concluding that ICON had not shown an adequate pre-suit infringement analysis.  ICON submitted evidence that

it performed an extensive pre-suit analysis, and under this Court's decisions, ICON's evidence was sufficient.

D.     Once the district court's incorrect considerations are removed, no basis remains to award fees.   The Court should reverse the exceptionality determination and the fee award outright, without a remand.   At a minimum, the fees award should be vacated and the case remanded for reconsideration.

## STANDARD OF REVIEW

The district court's determination whether a case is exceptional under 35 U.S.C. § 285 is reviewed for abuse of discretion.   *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1749 (2014).   "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence."   *Id.* at 1748 n.2.

## ARGUMENT

**NEITHER ICON'S LITIGATION POSITION NOR THE MANNER IN WHICH THIS CASE WAS LITIGATED WAS EXCEPTIONAL, AND THUS REVERSAL OR VACATUR IS REQUIRED**

### A.     Fee Awards Are Reserved For "Rare" Cases That Stand Out From The Norm

Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."   35 U.S.C. § 285.   An exceptional case is "rare," "uncommon," "unusual," and "out of the ordinary."   *Octane Fitness*, 134 S. Ct. at 1756.   It is one that, considering the totality of circumstances, "stands

out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* "[F]ees are not awarded solely because one party's position did not prevail." *Gaymar Indus., Inc. v. Cincinnati Sub-Zero Prods., Inc.*, 790 F.3d 1369, 1373 (Fed. Cir. 2015).

In determining whether a party's litigation positions stand out, "it is the 'substantive *strength* of the party's litigating position' that is relevant to an exceptional case determination, not the *correctness* or eventual success of that position." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015) (quoting *Octane*, 134 S. Ct. at 1756) (emphasis in *SFA*). "A party's position on issues of law ultimately need not be correct for them to not 'stand[] out,' or be found reasonable." *Id.* (alteration in *SFA*). Thus, objective reasonableness remains a factor in considering whether a case is "exceptional." *Gaymar*, 790 F.3d at 1373.

Litigation misconduct also continues to be relevant, but only in "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Octane*, 134 S. Ct. at 1757. Applying *Octane*, this Court has emphasized that district courts should "be particularly careful" before characterizing litigation choices as misconduct. *Gaymar*, 790 F.3d at 1377. "[A]s the Supreme Court

made clear in *Octane*, fee awards are not to be used 'as a penalty for failure to win a patent infringement suit.'" *Id.* at 1373 (quoting *Octane*, 134 S. Ct. at 1753).

Since the Supreme Court's decisions in this case and *Highmark*, this Court has not hesitated to scrutinize district courts' stated reasons for fees rulings. For example, in *Biax Corp. v. Nvidia Corp.*, this Court examined closely the district court's two grounds for holding that the patentee "Biax had no reasonable theory of infringement after claim construction." No. 2013-1649, 2015 WL 755940, at *2 (Fed. Cir. Feb. 24, 2015). This Court concluded that "[a]s to the first ground, the district court misread the expert's testimony," and as to the second ground, the district court wrongly concluded that its "pre-summary judgment claim construction foreclose[d] Biax's infringement position." *Id.* at *3-4. Thus, this Court concluded that, "even applying the deferential standard of review under *Highmark*, the district court's fee award must be set aside." *Id.* at *4. This Court reversed outright, rather than vacating and remanding, because the only bases suggested for fees had been refuted. *Id.*

Similarly, in *Gaymar*, this Court engaged in a detailed evaluation of each of the four examples of misconduct cited by the district court for denying fees. 790 F.3d at 1373-77. Although some of the party's arguments "could be properly characterized as overstatements," this Court concluded that "none of the cited examples amounts to misrepresentation or litigation misconduct." *Id.* at 1376. The

Court thus held that the district court "committed clear error." *Id.* at 1373. "Because none of the examples cited by the district court constitute[d] litigation misconduct," this Court concluded that "a remand [wa]s required" so that the district court could reassess whether fees were appropriate on the totality of the circumstances. *Id.* at 1377.

Applying these standards here, the district court's fees award should be set aside. As shown below, the cited bases for its about-face regarding the unexceptional nature of this case do not withstand scrutiny. The district court made legal errors, which this Court continues to review de novo, and clearly erroneous factual determinations—thereby "necessarily abus[ing] its discretion." *Highmark*, 134 S. Ct. at 1748 n.2.

**B.    The Substantive Strength Of ICON's Litigation Positions Was Well Within The Norm For Patent Disputes And Far From "Rare"**

*1.    The district court's assessment of the strength of ICON's litigation positions was based on a legally erroneous view of what ICON needed to prove to establish infringement*

As an initial matter, the district court made threshold legal errors that are alone reason to set aside its exceptional-case determination. The section of its decision assessing the overall strength of ICON's litigation position began with the fallacy that ICON's case "*depended on* accepting" the following four arguments: "'linear reciprocating displacement' does not require movement along a linear path; the C-shaped channel and pin are not part of the corresponding structure;

arcuate motion produced by a lever-based design is equivalent to linear motion produced by a C-channel design; *and* a 'stroke rail' can consist of a limitless number of parts." A10 (emphases added). Because the district court deemed those four arguments "highly questionable," it concluded that ICON's litigation position was "exceptionally weak." A10. But that conclusion rested on a legally erroneous view of what ICON needed to prove to establish infringement, in two respects.

*First*, ICON did not have to establish all four of the identified arguments. ICON's infringement case ultimately faltered on two claim limitations: (1) "a pair of stroke rails" and (2) the "means for connecting." A50(col.7:16-23); *see* A2841-A2850. Although the district court acknowledged only those limitations were at issue (A5), the first three arguments it identified as essential to ICON's infringement case were *alternative* ways of establishing the "means for connecting" limitation. And as discussed below, as to the second of those three alternatives—that the C-shaped channel and pin are not part of the corresponding structure—ICON had two paths to success. *See* Part B.3.a *infra*. Therefore, to establish the "means for connecting" limitation, ICON needed to prevail only on *one* of those arguments. It was *Octane*'s case that "depended on" winning all of them.

*Second*, ICON did not have to establish the fourth argument identified by the district court—that a stroke rail "can consist of a limitless number of parts."

As explained further below, that was never ICON's argument.  A1097-A1099; A1357-A1358.  Nor was that the reason that "stroke rails" were held not literally present in Octane's machines.  A2846-A2848.  As to the actual issue, ICON had a reasonable claim-construction position based on the claim language, and had that position been adopted, Octane's machines would have had "stroke rails."  *See* Part B.2 *infra*.  Indeed, for nearly a year, Octane conceded its Q47 product had stroke rails.  A2193.

Accordingly, contrary to the district court's rationale, ICON needed to prevail on only one of several alternative "means for connecting" arguments and to have "stroke rail" construed in accordance with the claim's plain language.  The district court's foundational legal error is alone sufficient to set aside its exceptional-case ruling.  *See Highmark*, 134 S. Ct. at 1748 n.2 (legal error constitutes an abuse of discretion).  Moreover, as explained below (Parts B.2 & 3 *infra*), ICON's arguments that the accused products had both the "stroke rail" and the "means for connecting" limitations were more than reasonable—and certainly do not stand out from others this Court regularly reviews.

**2.    *ICON's contention that the accused devices had "stroke rails" was far from exceptional***

### a.    ICON never argued that a stroke rail "could consist of an unlimited combination of unnamed parts"

In concluding that ICON's stroke-rail arguments were "highly unreasonable," the district court pointed only to ICON's supposed argument that "a 'stroke rail[]' could consist of an unlimited combination of unnamed parts." A9. Not only was that not ICON's argument, that was not the basis of the summary-judgment ruling.

There was no dispute before the district court as to whether the "stroke rail" could consist of multiple parts: all parties agreed that "stroke rail" encompassed a multi-part structure. A1097-A1099; A1214. The dispute centered on the words that would best capture this concept for claim-construction purposes. Octane proposed that "stroke rail" be construed as "[a] linear or curved *bar*, which can be made to vary in length, extending from a foot rail to a frame on an elliptical machine." A756 (emphasis added). ICON countered that Octane's proposed construction using "bar" would "impl[y] that the stroke rail must be unitary" and "would simply result in an argument at trial over the meaning of 'bar,' thereby creating confusion rather than clarity for the jury." A1097. ICON therefore proposed a construction making it explicit that "stroke rail" is not limited to a

unitary structure: "A structure comprised of one or more parts that is attached to a foot rail and connected to the frame." A1141; *see* A1097-A1099; A1357-A1358.

The district court ultimately rejected both Octane's word "bar" and ICON's phrase "one or more parts." A1420-A1421. The court explained that "it serves no meaningful purpose to substitute the word 'bar' for the word 'rail,'" and it reasoned that "one or more parts" was too broad because it could include "infinite combinations of parts." A1420-A1421.

But *ICON* never argued it could cobble together any combination of an unlimited number of parts to make up the stroke rail. Nor did it need such a construction. The accused stroke rail in Octane's Q47 machine was a *single* part—the actuator casting. A2483-A2484. And in the Q45 machine, ICON contended (as the district court expressly observed in its summary-judgment decision) that "*two parts* of Octane's linkage system, the actuator casting and the integrated screw motor, are a 'stroke rail.'" A2847 (emphasis added); *see* A2487-A2490.

As to the claim-construction argument that ICON actually made—that "stroke rail" is not limited to "a unitary structure" (A1097)—the district court expressly and repeatedly *agreed* with ICON. In its summary-judgment decision, the court explained that the patent "contemplates a multi-part structure." A2847. And in its first unexceptional-case ruling, the district court recognized that "the specification clearly indicates it is comprised of more than one part." A3155.

32

Nor was any "unlimited number of parts" argument the reason ICON lost at summary judgment. The only reason stroke rails were found not present is that the district court construed "stroke rail" as "extending from a foot rail to a frame," and this Court and the district court concluded that Octane's actuator casting extends to the rocker link rather than the frame. A2846-A2848; *see* A3179.

The notion that the "stroke rail" could consist of an unlimited number of parts is simply *Octane's* caricature of ICON's claim-construction position. A3226 & n.7. Because that supposed argument was the sole reason given for the district court's conclusion that ICON's "stroke rail" argument was "highly unreasonable" (A9-A10), that alone warrants setting aside the district court's ruling.

### b. ICON had an objectively reasonable argument that the "stroke rail" needed only to connect to the frame rather than extend to it

Furthermore, the contention that ICON actually made was objectively reasonable, and the district court did not suggest otherwise. A9-A10. Indeed, the objective reasonableness of ICON's position is confirmed by Octane's year-long concession that the Q47 has a stroke rail. A2193.

The dispositive issue on "stroke rail" turned on a question well within the norm of patent disputes: whether "stroke rail" should be interpreted according to the plain language of the claims or instead limited by the descriptions in the specification. This Court regularly hears claim-construction disputes in which one

side contends that the ordinary meaning of the claim language governs and the other side contends that the specification limits the meaning. These questions are difficult ones: "This court has often acknowledged the fine line between reading a claim in light of the specification and importing a limitation from the specification into the claim." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1255 (Fed. Cir. 2011); *see also id.* at 1257 (Lourie, J., dissenting based on language in the specification, while noting that "[o]ne of the most difficult tasks in adjudicating patent cases is interpreting patent claims").

Here, ICON contended that the plain language of the claims required that the stroke rail merely be connected to the frame, rather than "extend" to it. A2481-A2486; Br. for ICON at 51-54, No. 2011-1521 (Fed. Cir.). The district court, however, read into the claim language a requirement that the stroke rail "extend" to the frame (A2848), and it applied that construction at summary judgment as precluding the existence of "a separate, independently moving, intervening element of the linkage system interposed between the frame and the proposed stroke rail." A2848. On review, this Court looked to the specification and found only one "location and type of connection to the frame": "[t]hat connection is depicted in each figure as the C-shaped channel and pin." A3178-A3179. The Court thus held that "the claims, when read in light of the specification, require that a stroke rail

extend from the foot rail to the frame," with the end that is attached to the frame being attached with a C-shaped channel.  A3179.

Although ICON's claim-construction position did not ultimately prevail, its position was objectively reasonable and far from out of the ordinary.  The claim language itself recites only that the stroke rail must be connected to the frame.  Claim 1 recites "a pair of stroke rails each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail," and a "means for *connecting* each stroke rail to the frame."  A50(col.7:16-20) (emphasis added).  Nothing in the claim language states that the stroke rail must "extend" to the frame, much less that it must be connected by the C-shaped channel of the embodiment.

The reasonableness of ICON's view is supported by multiple decisions of this Court.  This Court has explained that it is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation" because "[i]t is the claims that define the metes and bounds of the patentee's invention." *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366-67 (Fed. Cir. 2012).  "[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004).

ICON also reasonably contended that its position was supported by the prosecution history. In concluding otherwise, this Court reasoned that "the examiner found the claims novel over the prior art in his reasons for allowance in part because the stroke rails have 'one end hingedly connected to a respective foot rail and having the opposite end *connected to the frame*.'"    A3179 (emphasis added). But that the stroke rail must be "connected to the frame" is *ICON's* construction. A1141.

Moreover, it was objectively reasonable for ICON to contend that the claims did not preclude an intervening part (such as the rocker link in Octane's products) between the stroke rail and the frame. Every figure in the specification shows intervening parts between the stroke rail and the frame. Indeed, the C-shaped channel (84) and pin (76) on which this Court focused were interposed between the stroke rail (70) and the frame (31):



A41 (excerpted and color added). ICON thus reasonably contended that if claim 1 were construed to preclude intervening parts, all disclosed embodiments would be excluded. As this Court has explained, an interpretation that fails to read on any disclosed embodiment is "rarely, if ever, correct." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1355 (Fed. Cir. 1998). That this Court disagreed with ICON's claim-construction (A3178-A3179) does not make this case extraordinary. *See SFA*, 793 F.3d at 1348 (holding that "the *correctness* or eventual success" of a party's position is not the proper inquiry).

Had "stroke rail" been construed as only needing to be connected to the frame rather than extending to it, ICON would have had a strong argument that this element is literally present in Octane's machines. Octane's machines each have actuator castings (shown below in dark orange). In each machine, the rocker link (shown in red) connects the bottom end of the actuator casting to the frame:



Fig. 5, '710 patent          Q45          Q47

A45 (color and arrow added); A2483 (dashes, color, and arrows substituted for numbered labels); *see* A2460-A2461. The other end of the actuator casting is connected to the foot rail (shown in green) in the Q47. A2410. In the Q45, the other end of the actuator casting, together with the integrated-screw motor (shown in light orange), is connected to the foot rail. A2410.

In short, ICON's arguments with respect to the presence of the "stroke rail" limitation were reasonable and far from "exceptionally meritless." *See Octane*, 134 S. Ct. at 1757. Indeed, the district court did not conclude otherwise with respect to the arguments that ICON actually made. The district court thus abused its discretion in basing its exceptional-case ruling on the "stroke rail" arguments.

### 3.    *ICON also had objectively reasonable contentions that the accused products had the "means for connecting" element either literally or under the doctrine of equivalents*

ICON's contentions that Octane's machines met the "means for connecting" limitation also were well within the norm of arguments that patent litigants regularly assert. In its initial decision rejecting exceptionality, the district court ruled that ICON's arguments, while not ultimately successful, "were not objectively baseless." A3156. That initial ruling was right, and nothing about the intervening change in the legal standard should have affected it.

As noted in Part B.1 *supra*, ICON presented three alternative arguments, any one of which would have been independently sufficient to establish the "means for

connecting" limitation: "[1] 'linear reciprocating displacement' does not require movement along a linear path; [2] the C-shaped channel and pin are not part of the corresponding structure; [3] arcuate motion produced by a lever-based design is equivalent to linear motion produced by a C-channel design." A10. As to the second argument, which is discussed in depth below in (a), ICON had two independent paths to success: (a)(i) the corresponding structure is the crank, and (a)(ii) the function is merely to convert linear reciprocating displacement into substantially elliptical movement, not to cause linear reciprocating displacement. None of these arguments is rare or out of the ordinary.

> ### a. ICON reasonably maintained that the "means for connecting" limitation did not require the C-shaped channel and pin

For two independent reasons, ICON reasonably contended that the "means for connecting" limitation required only the crank disclosed in the specification (which is found in Octane's machines), not the C-shaped channel and pin (which are not present in Octane's machines). A1101-A1110.

> ### i. It was reasonable for ICON to contend that the corresponding structure is the crank

*First*, Icon reasonably contended that it is the crank, not the C-shaped channel and pin, that is the corresponding structure for the "connecting means." This Court's decisions have used different formulations to explain how one identifies the corresponding structure for a means-plus-function limitation. On the

one hand, this Court has emphasized that "structure disclosed in the specification is 'corresponding' structure *only* if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (emphasis added). In *B. Braun*, the Court reviewed the specification and stated that "we immediately find clear and unambiguous reference to such structure." *Id.* The Court concluded that such explicitly disclosed structure was the corresponding structure, and it rejected the argument that an additional element discussed in the specification but not expressly linked to the recited function also was corresponding structure. *Id.* at 1424-25. On the other hand, this Court has explained that "corresponding structure must include all structure that actually performs the recited function." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002).

Here, as in *B. Braun*, the specification clearly and expressly links the "means for connecting" limitation to a "crank" structure, depicted below in blue. The specification teaches: "The present invention also includes *connecting means* for connecting each stroke rail to frame such that linear reciprocating displacement of first end of each stroke rail results in displacement of second end of each stroke rail in a substantially elliptical path." A48(col.4:26-31) (emphasis added) (reference numbers omitted). The specification continues: "By way of example and not by limitation, as depicted in FIGS. 1 and 2, a crank is disclosed. Crank includes an

axle extending through support stand and being rotatably mounted thereto." A48(col.4:31-34) (reference numbers omitted). The specification teaches that the rotation of the "crank" and the downward pressure on the foot rails "enabl[es] continuous reciprocating displacement" and results in the second end of each stroke rail rotating in a substantially elliptical path (A49(col.5:8-21)):



A41 (excerpted and color added).

Given the specification's express linkage between the means for connecting and the crank structure, ICON reasonably contended that the C-shaped channel and pin are not part of the corresponding structure. The specification discusses the C-shaped channel and pin separately, referring to them as "attaching means," and never linking them to the means for connecting. A48(col.4:3-16). It does not suggest that these parts convert linear displacement at one end of the stroke rail into elliptical motion at the other. It is the crank that does that conversion. A49(col.5:8-21).

Ultimately, the district court and this Court disagreed, concluding that the corresponding structure also includes the C-shaped channel and pin.  In so ruling, this Court cited the *Cardiac Pacemakers*' formulation of the law.  A3174.  But ICON had good reasons for concluding that that view would not carry the day.  And the mere fact that ICON's position did not prevail is not enough to make this case exceptional.  *See SFA*, 793 F.3d at 1348; *Gaymar*, 790 F.3d at 1373.

In nevertheless pointing to this issue in support of its conclusion that ICON's merits positions were "exceptionally weak," the district court stated that ICON's position was "at odds with the deposition testimony of the patent's inventor, William Dalebout, who stated that if the C-channel were taken out, the mechanism would not work and he would not have a patent."  A8.  But just as the district court in *Biax* "misread the expert's testimony," 2015 WL 755940, at *3, the district court here misread the inventor's testimony.  Dalebout never testified that the specific C-shaped channel is required to connect the stroke rail to the frame.  He was asked what would happen if there were *nothing at all* attaching the upper end of the stroke rail to the frame—i.e., if the stroke rail were attached only to the foot rail at the lower end and the crank in the middle.  A3321 ("Q. . . . There is no C channel.  All you have is [stroke rail] 66 attached to the footrail and attached to this crank arm."); A3322 ("Q.  Let me restate it.  I want you to assume that [the stroke rail] is not attached to anything.  It is floating in the air.").   Dalebout

responded that that would be an incomplete mechanism and that the end of the stroke rail must be attached to "something."  A3322.  He never testified that this connection was part of the structure for the "means for connecting."  Asking an inventor about a design for an actual product is different from asking him whether a claim limitation requires a particular element.

For that very reason, ICON had a reasonable contention that Dalebout's inventor testimony was "irrelevant to the issue of claim construction."  *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1347 (Fed. Cir. 2008); *see Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1580 (Fed. Cir. 1996) ("*Markman* requires us to give no deference to the testimony of the inventor about the meaning of the claims.").  Indeed, the inventor's deposition testimony appears nowhere in either the district court's or this Court's rationale for construing the claim as requiring the C-shaped channel and pin.  A1425; A3178-A3179.

If ICON's reasonable claim-construction argument had prevailed, and the corresponding structure included only the crank, ICON had a strong argument that this element was present in Octane's machines.  As depicted in the pictures on page 37, *supra*, the actuator casting (in dark orange) in Octane's machines is attached in its middle to a crank arm and axle structure (in blue).

> **ii.   It was reasonable for ICON to contend that the function of the "means for connecting" was not to cause linear reciprocating displacement**

***Second***, ICON reasonably contended that the function of the "means for connecting" was not to *cause* linear reciprocating displacement.   Had this construction been accepted, there would have been no basis to conclude that the C-shaped channel and pin are required, and their absence in Octane's machines would have been no impediment to infringement.

The parties agreed that one function of the "means for connecting" limitation is to connect the stroke rail in such a way that when linear reciprocating displacement occurs at one end, the connection converts that movement into substantially elliptical movement at the stroke rail's other end.  The parties' dispute centered over whether this conversion was the only function, as ICON contended, or whether there was an additional function:   to cause linear reciprocating displacement in the stroke rail's first end, as Octane contended.  This type of dispute over the function of a means-plus-function limitation is commonplace. *See, e.g.*, *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1328, 1330-31 (Fed. Cir. 2005).

As the district court recognized in its initial non-exceptional case ruling (A3155-A3156), ICON's contention that the function did not include causing linear reciprocating motion was not objectively baseless.  The limitation recites:

44

"means for connecting each stroke rail to the frame *such that* linear reciprocating displacement of the first end of each stroke rail *results in* displacement of the second end of each stroke rail in a substantially elliptical path."  A50(col.7:19-23) (emphases added).  One reasonable reading of the plain language of this limitation is that the function is simply to connect the stroke rail to the frame in a manner so that (i.e., "such that") when linear reciprocating displacement occurs at the first end of the stroke rail, the consequence of that displacement is (i.e., "results in") a substantially elliptical path at the other end.  A50(col.7:19-23).  Nothing in the claim language dictates that the connecting means must be the structure that causes the linear reciprocating displacement.  And ICON reasonably contended that the claim language merely required *conversion* of linear reciprocating displacement to a substantially elliptical path rather than *generation* of linear reciprocating displacement and a substantially elliptical path.

In reversing itself on the reasonableness of this contention, the district court stated that ICON's position "completely ignored the claim language."  A8.  But that is simply not so:  ICON's position was based on the claim language.  Although this Court disagreed with ICON's reading (A3174-A3175), that is not enough to make this case exceptional.  *See SFA*, 793 F.3d at 1348; *Gaymar*, 790 F.3d at 1373.  Yet this Court's ruling against ICON on this issue is essentially all that the district court relied upon.  A8.

45

### b.   ICON reasonably asserted that "linear reciprocating displacement" is not limited to motion along a straight-line path

ICON also reasonably contended that "linear reciprocating displacement" is broader than motion along a straight-line path.  A1110-A1113; A1359-A1360.  Had ICON's construction been accepted, the actuator castings' slightly arcuate path would not have precluded literal infringement.

In support of its construction, ICON explained that the claim language distinguishes between "displacement" and "path":   "linear reciprocating *displacement* of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical *path*."  A50(col.7:20-23) (emphases added).  That argument was reasonable, as the use of different terms within close proximity in the same claim suggests they have a different meaning. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996).   ICON also asserted that "displacement" has a well-understood ordinary meaning to skilled artisans:  change of position from a first point to a second point.  In support, ICON submitted six dictionary definitions, five from technical dictionaries.  A1111-A1112; A1147-A1181.  By contrast, Octane had no dictionary support for its position that "displacement" means "path."

In ruling ICON's position unreasonable, the district court pointed only to its reasons for rejecting ICON's construction.  The court described ICON's contention

as "wholly at odds with the text" of the patent (A6), but (as discussed above) ICON reasonably contended that the differences in the claim terms *supported* its position. Although the court stated that ICON's construction "reads the word 'linear' out of the patent" (A6), that is not so: "linear" described the difference between the first point and the second point. While the court noted that the specification and figures show the stroke rail's first end moving in a straight line (A6-A7), ICON reasonably contended (A1359) that the embodiments were not limiting. *See Innova*, 381 F.3d at 1117. And the court pointed to the examiner's statement that the stroke rail undergoes "linear reciprocating movement" (A7 (emphasis omitted)), but ICON reasonably asserted (A1359-A1360), as this Court has held, that an "examiner's unilateral remarks alone do not affect the scope of the claim." *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).

Finally, the court stated that ICON's expert, Dr. Rasty, had testified that the invention "convert[s] the reciprocating motion of one end along a *linear path* to an essentially elliptical path." A7 (alteration and emphasis in opinion). But ICON's expert actually testified that the invention converts "reciprocating motion of one end along the linear *displacement* to essentially elliptical path." A1818 (emphasis added). He never suggested movement along a linear *path* was required. The court's reliance on this misquotation was clearly erroneous. *Gaymar*, 790 F.3d at 1375.

### c.    ICON reasonably contended it could have demonstrated the "means for connecting" limitation under the doctrine of equivalents

Even under the district court's and this Court's claim construction, ICON had a reasonable doctrine-of-equivalents contention to establish the presence of the "means for connecting" limitation.  Parties routinely make doctrine-of-equivalents arguments for infringement after not prevailing on literal infringement, and ICON was no different.

Infringement under the doctrine of equivalents exists if the differences between the claim and the accused device are insubstantial."  *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1352 (Fed. Cir. 1999).  Here, ICON had a strong argument of substantial equivalence.  A2498-A2506.  Rather than a C-shaped channel and pin that enable perfectly linear motion in the first end of the stroke rails, Octane's machines use a rocker link that results in slightly arcuate movement.  While not perfectly linear, the movement is substantially linear.  As demonstrated in the figure below, ICON's expert, Dr. Rasty, determined that the slightly arcuate path in the first end results in substantially the same elliptical path in the second end (A2415-A2417):



**Dr. Rasty's Kinematic Computer Models**

A2462-A2464.

Although this Court nevertheless rejected ICON's equivalents contention, ICON's arguments were reasonable. First, this Court pointed to a statement by the examiner, in his reasons for allowance, distinguishing the prior art as lacking "a pair of stroke rails each having one end hingedly connected to a respective foot rail and *having the opposite end connected to the frame for linear reciprocating movement* and for producing an elliptical path." A3176. But ICON reasonably contended that an examiner's unilateral remarks do not "show a surrender of claimed subject matter that cannot be recaptured under the doctrine of equivalents." *Salazar*, 414 F.3d at 1347.

Second, this Court relied on a misquotation of Dr. Rasty's deposition testimony (*see supra* p. 47): that the invention supposedly was patentable in part

because it "convert[s] the reciprocating motion of one end *along a linear path* to [an] essentially elliptical path." A3176. Here, too, ICON reasonably contended that this testimony did not preclude doctrine-of-equivalents infringement. For one thing, Dr. Rasty actually said "linear displacement," not "linear path." A1818. Under the construction that Dr. Rasty was applying at his deposition, "linear reciprocating displacement" would have included movement along an arcuate path. A2410. Additionally, Dr. Rasty's testimony was simply that one of the novel things in the invention was the ability to *convert* linear displacement into substantially elliptical movement, not the ability to cause linear displacement, which is the function of the C-shaped channel and pin. A1818. In any event, Dr. Rasty did not testify that the movement had to be *perfectly* linear to be novel, nor did he testify that *substantially* linear (or slightly arcuate) movement was in the prior art.

In ruling that ICON's equivalents argument was "conspicuously flawed," the district court pointed only to the reasons that this Court gave for ruling against ICON. A8-A9. The district court cited the examiner's statement of allowance and Dr. Rasty's testimony. A9. And it quoted this Court's statement that ICON "could have simply omitted the term 'linear' to broaden the claims," and this Court's ultimate conclusion that "arcuate motion, at least in this case, is not equivalent to linear motion." A9 (quoting A3175-A3176). While those were the reasons ICON

did not prevail, the issue before the district court was not the *correctness* of ICON's theory but its *reasonableness*. *See SFA*, 793 F.3d at 1348. Nothing in the district court's ruling explains why ICON's contentions purportedly were outside the norm of equivalents arguments that parties regularly make. As the district court explained in its first ruling, "the mere fact that a court found no infringement" does not demonstrate unreasonableness. A3154.

### 4. *Viewed in their totality, ICON's infringement contentions were well within the mainstream, not unusual, rare, or out of the ordinary*

In the end, the reasons the district court gave for concluding that ICON's "litigation position stands out as a particularly and unusually weak case on the merits" cannot withstand scrutiny. A10. The court erred at the threshold by misstating what ICON had to show to prevail on its infringement claims. *See* Part B.1 *supra*. Then it was simply wrong in stating that ICON's arguments "bore no relation to what the '710 patent disclosed and covered" and that the "claim language, specification, prosecution history, inventor testimony, and Icon's own expert testimony posed major obstacles to ICON's success on the merits." A10. As demonstrated above, although ICON did not ultimately prevail on the "stroke rail" and "means for connecting" limitations, its arguments were well within the mainstream of arguments that patent litigants regularly make. *See* Parts B.2 & B.3 *supra*. ICON cannot be penalized simply because it did not prevail in its suit,

*Gaymar*, 790 F.3d at 1373, and imposing that penalty would over-deter the enforcement of presumptively valid patents.

The district court correctly concluded in its initial ruling that this case was unexceptional, reasoning that "the conclusions during claim construction and at summary judgment were not easily reached." A10-A11. The reason that the district court gave for changing its view was that, "although Octane, in its original motion for attorney's fees, did not establish by *clear and convincing evidence* that Icon's claims were objectively baseless, it has shown by a *preponderance of the evidence* that Icon's litigation position was exceptionally weak." A11 (emphasis added).

But the change in the standard of proof should have not have changed the outcome here. The arguments the district court labeled "weak" were mostly claim-construction arguments that turned on the intrinsic record and therefore presented purely legal issues. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015). It thus is the strength of those legal arguments that matters. *Octane*, 134 S. Ct. at 1756. The strength of legal arguments does not turn on evidentiary proof: the "evidentiary standard of proof applies to questions of fact and not to questions of law." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2253 (2011) (Breyer, J., concurring); *see Addington v. Texas*, 441 U.S. 418, 423 (1979). And in its revised discussion of each of those legal arguments, the district court concluded

little more than that the arguments turned out to be incorrect. But that is insufficient to make this case "rare," "unusual," or stand out from others. *See SFA*, 793 F.3d at 1348; *Gaymar*, 790 F.3d at 1373.

Accordingly, because the reasons the district court gave do not support its conclusion, this Court should set aside the conclusion that ICON's arguments were "exceptionally weak."

## C.    ICON Did Not Engage In Unreasonable Litigation Tactics

Nothing about the way in which this case was litigated stands out from routine patent litigation. In concluding otherwise, the district court made both legal errors and clearly erroneous factual findings. Once these erroneous considerations are removed, there is no basis for concluding that this is "the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so 'exceptional' as to justify an award of fees." *Octane*, 134 S. Ct. at 1757. At a minimum, a remand would be required for the district court to reassess the totality of circumstances, as the district court expressly acknowledged that it relied on the combination of all of these factors in holding the case exceptional. A17.

### 1.    *The district court erred in concluding that the '710 patent's non-commercialization supports an exceptional-case ruling*

In ruling that ICON engaged in unreasonable litigation tactics, the district court relied in part on the fact that the '710 patent was an "[u]ncommercialized

[p]atent." A16-A17. The court pointed to an email from Pat McGinnis, an employee of ICON's subsidiary, in which he described the '710 patent as "an old patent 'sitting on the shelf' [that] had never been commercialized." A16. In its initial ruling, the district court explained that it is not "relevant that Icon never commercialized the '710 patent. Simply bringing suit to gain a competitive advantage is not evidence of bad faith." A3159. Yet in its second decision, the district court ruled that the patent's non-commercialization was part of what made the case exceptional.

The district court was right the first time: ICON's enforcement of a non-commercialized patent does not make this case stand out. A patentee's right to sue for infringement of its patent rights during the patent term does not turn on whether the invention has ever been sold commercially. 35 U.S.C. § 271(a). Suing on a non-commercialized patent is far from unusual. For example, this Court regularly sees lawsuits from non-practicing entities that have been assigned patent rights and that pursue infringement actions seeking royalties despite never having competed in the market.

This competitor-versus-competitor case is even more in the mainstream. ICON has every right to keep its competitors from using ICON's own inventions to compete against it in the market for exercise machines. Patentees should be able to enforce their patent rights to prevent competitors from freely exploiting their

invention, without fear that, if they ultimately do not prevail, having sued will be deemed "exceptional" because they are not practicing the patent themselves.

The district court reasoned that because the '710 patent had not been commercialized, ICON "had little to lose" by putting the validity of the patent at risk in this infringement action against Octane. A16. But that is wrong. The risk to ICON was the same regardless of whether the patent had been commercialized. ICON had a presumptively valid patent; by seeking to enforce its rights against Octane, it was putting at risk its ability to enforce its rights against Octane and other competitors in the future. Moreover, by filing suit against a competitor, ICON risked the possibility of a counterclaim for patent infringement, antitrust, or unfair competition—risks that non-practicing entities do not face.

The district court also reasoned that "the non-commercialization of the '710 patent is relevant to whether awarding fees to Octane is necessary to deter Icon from future attempts to extract royalties to which it is not entitled from a competitor who might rather settle a meritless patent infringement suit than pay the high cost to defend it." A17. It is true that, in very different circumstances, this Court has held that "a pattern of litigation abuses characterized by the repeated filing of patent infringement actions for the sole purpose of forcing settlements, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination." *SFA*, 793 F.3d at 1350; *see Eon-Net LP v.*

*Flagstar Bancorp*, 653 F.3d 1314, 1326 (Fed. Cir. 2011) (suit "had 'indicia of extortion' because it was part of Eon-Net's history of filing nearly identical patent infringement complaints against a plethora of diverse defendants, where Eon-Net followed each filing with a demand for a quick settlement at a price far lower than the cost to defend the litigation").[1]

That is far from what happened here. This action never settled, and ICON continued to test the merits of its infringement claims and to put the validity of its patent at risk. Those are not the hallmarks of a vexatious litigant seeking a settlement from a meritless claim, but rather of a patentee seeking to prevent its invention from being unlawfully used to compete with it in the marketplace. There is no reason to deter such a suit.

### 2.    *The district court's inference of improper motive from emails of an employee of an ICON subsidiary was fundamentally flawed*

The district court concluded that McGinnis's emails, which were sent long *after* suit was filed, were evidence of ICON's improper motivation for bringing suit. A15. But the district court clearly erred in finding that those emails from an employee of an ICON subsidiary reflected the views of ICON's management. More importantly, even assuming arguendo that they did, the court erred as a

---

[1] This Court's pre-*Octane* decisions remain as guidance for determining whether a party litigated in an unreasonable manner. *SFA*, 793 F.3d at 1349.

matter of law in concluding that the emails' substance suggested any improper motivation.

Nothing in the emails suggests that the infringement suit lacked merit; to the contrary, they suggest that McGinnis believed Octane would be held liable for royalties. In the first email, which was sent five months after suit was filed, McGinnis stated: "We are suing Octane. Not only are we coming out with a great product to go after them, but throwing a lawsuit on top of that." A15. In the second email, McGinnis stated: "ICON Health & Fitness does not mess around with this. They are going to end up paying royalty plus compensation. Funny thing is—this patent is over 10 years old!" A15. Then in the third email—sent a year and a half after suit was filed—McGinnis stated: "Yes. Old patent we had for a long time that was sitting on the shelf. They are just looking for royalties." A15.

In its first decision, the district court evaluated the import of these emails and determined that even "[v]*iewed in the light most favorable to Octane*, these remarks are stray comments by employees with no demonstrated connection to the lawsuit." A3158 (emphasis added). The court explained: "These statements do not reflect advice to Icon by its counsel or experts, nor are they evidence of Icon's official position on the merits of the lawsuit. A company salesman's opinion of a lawsuit does not tend to prove that the company's leadership and counsel pursued the lawsuit in bad faith. There is no evidence the remarks were ever seen, much

less adopted by, those in a position to decide whether to pursue an infringement action against Octane." A3158-A3159.

In its second ruling, however, the district court stated that "the record has now been supplemented to give fuller context to these emails." A15. The district court pointed to McGinnis's deposition testimony, which was not new. It predated the initial no-exceptional-case ruling (A3936-A3943); Octane simply failed to introduce it in its initial Section 285 motion. McGinnis testified in his deposition that he learned of the lawsuit from an industry article. A3940-A3941. The court also pointed to a declaration from ICON's General Counsel, Everett Smith, in which he averred that McGinnis "had no part in ICON's decision to bring a lawsuit for patent infringement against Octane." A16; A3576.

The district court observed that the industry article did not contain all the details in McGinnis's emails—e.g., the patent's age and ICON's goal of royalties—so McGinnis must have learned of them from elsewhere. A15-A16. The court also reasoned that Smith's declaration did not state whether Smith was the person from whom McGinnis had "learned of the specific legal facts in the lawsuit." A16. The court stated that the record on how McGinnis learned of these details is "silent." A16. It inferred not only that those details "were shared with him by a member of Icon's legal department or upper management" but also that

they "reflected the views of those in Icon's management who were involved in the decision to sue Octane."  A16.

That analysis is fundamentally flawed.  As an initial matter, the record of how McGinnis learned of the details in his emails was not "silent."  *Contra* A16.  McGinnis testified:  "I know I didn't learn it from lawyers," and "I never have talked to lawyers about this prior to last week."  A3940.  Moreover, Octane's counsel acknowledged at McGinnis's deposition:  the emails were "not marked as privileged so my guess is that that information doesn't come from something you learned from lawyers or else [ICON] wouldn't have produced it."  A3940.  To the extent the district court made factual findings to the contrary, they were clearly erroneous.

More importantly, even accepting that it is "more likely than not that McGinnis' email comments reflected the views of those in Icon's management who were involved in the decision to sue Octane" (A16), none of the details in the emails comes close to showing that anyone at ICON brought suit in bad faith or with an improper motive.  Nor do the emails express any doubt about the merits of ICON's infringement claims.

At most, the emails reflect excitement that an allegedly infringing competitor may have to pay royalties.  There is nothing unusual or nefarious about that.  As the district court correctly explained in its first ruling, "[s]imply bringing

suit to gain a competitive advantage is not evidence of bad faith." A3159. That the patent was ten years old does not show improper motivation; a patentee can sue as long as the alleged infringement occurred during the life of the patent. As for the goal of seeking royalties, that (if anything) shows restraint, as ICON's goal could have been to obtain an injunction. In short, as the district court originally correctly concluded, even reading the emails in the way most favorable to Octane, they provide no basis for holding this case exceptional.

### 3.   *The district court erroneously supported its ruling by relying on ICON's filing suit in California, a proper forum*

The district court erroneously relied on the fact that ICON originally filed suit in California against both Octane and Nellie's, concluding that ICON's "inclusion of a peripheral party to establish venue in an inconvenient and high-cost district—particularly where the claim that supposedly provided the basis for including the peripheral party was voluntarily dismissed with prejudice shortly after the action was transferred—is highly suspicious" and more likely than not "was to increase litigation costs to Octane." A12. That is not a basis to deem this case "rare" or "out of the ordinary."

The choice of forum is a plaintiff's prerogative. And California was a proper forum: Nellie's was a California company that could not be sued elsewhere, and California had personal jurisdiction over Octane. A288. Indeed, Octane never suggested that California was an *improper* forum. Octane argued

only that "Minnesota is *more convenient*." A210 (emphasis added). Nor did the California district court dismiss the action, which would have been the proper course had California been an "improper venue." Fed. R. Civ. P. 12(b)(3). Rather, relatively soon after the case was filed, the California court concluded that "Minnesota is a more convenient forum" (A373), and it transferred the case "[f]or the convenience of parties and witnesses." 28 U.S.C. § 1404(a). That convenience-transfer cannot support an exceptional-case ruling.

Nor can the inclusion of Nellie's as a defendant or the dismissal of the '120 patent support an award of fees. ICON originally asserted two patents—the '710 patent directed to a patented article and the '120 patent directed to a patented method. ICON alleged that Octane's end users directly infringed the methods claimed in the '120 patent and that Octane and Nellie's indirectly infringed. A286. As ICON contended, Nellie's was important to ICON's inducement theory because Nellie's interacted with end users. A285-A288. Although the district court called Nellie's a "peripheral" party (A12), that is belied by Nellie's and Octane's own actions: they together filed a declaratory-judgment action in Minnesota, to establish personal jurisdiction over Nellie's in Minnesota, thereby facilitating the transfer of the case to Minnesota. A205.

Moreover, as Octane previously has acknowledged, ICON dismissed the '120 patent after a Texas district court in a different case issued a claim

construction that was adverse to ICON. A3596-A3597, A3648-A3649. Far from demonstrating bad faith, ICON's voluntary dismissal in the face of an adverse claim construction is precisely the type of litigation conduct courts should encourage.

### 4. The district court legally erred in rejecting the adequacy of the evidence of ICON's pre-suit infringement analysis

The district court also concluded that ICON had not shown an adequate pre-suit infringement analysis. A13-A14. In doing so, the district court erred as a matter of law, requiring much more than this Court requires for a pre-suit analysis. Moreover, the district court relied on the combination of the supposed "absence of a pre-filing analysis" and ICON's purportedly "exceptionally weak litigation position." A14. To the extent this Court disagrees with the latter conclusion (as it should, *see* Part B *supra*), that alone would remove this factor as a basis for the district court's decision.

In its first unexceptional-case ruling, the district court explained that "Icon represents, and the Court has no reason to doubt, that it purchased and inspected a Q47 machine prior to filing suit, and that it secured opinions from experts and counsel that the machine infringed its patent." A3157. On remand from this Court, ICON put in additional evidence of its pre-suit infringement analysis. ICON's General Counsel, Smith, explained in a declaration that, months before filing suit, ICON hired outside counsel with extensive experience in patent matters

to perform an infringement analysis. A3575-A3576. Outside counsel obtained and analyzed a Q47 elliptical machine to determine whether it infringed. A3576. ICON also hired a consulting expert to assist outside counsel. A3576. All told, outside counsel spent over 270 hours, incurring over $80,000 in costs to ICON, to investigate infringement before suing. A3576. After the analysis was complete, outside counsel explained to Smith how Octane's Q47 machine infringed. A3576. Smith believed the "analysis to be reasonable and a legitimate basis on which to file a complaint against Octane in protection of ICON's patent rights." A3576.

This evidence of an extensive amount of time by patent counsel and a hired expert comparing the patent claims against one of Octane's physical machines should have been more than enough to show a reasonable pre-suit inquiry. "[T]he key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302 (Fed. Cir. 2004). "And an infringement analysis can simply consist of a good faith, informed comparison of the claims of a patent against the accused subject matter." *Id.*

Nevertheless, the district court quibbled with numerous aspects of ICON's evidence and concluded there was an "absence of a pre-filing analysis." A14. The court was unsatisfied with the fact that outside patent counsel orally explained their infringement analysis to ICON's General Counsel rather than providing a written

report.  A13-A14.  The court criticized the General Counsel's declaration for not naming the outside expert whom patent counsel had hired.  A14.  And the court suggested that the General Counsel's declaration needed to "explain *why* he or Icon's attorneys believed the pre-suit analysis to be reasonable."  A14.

But this Court's decisions do not require such evidence to establish a reasonable pre-suit infringement analysis.  For example, in *Q-Pharma*, one of the plaintiff's attorneys submitted a declaration that he and a colleague analyzed the patent, obtained a sample of the accused product, and compared the patent claims against the product, and this Court concluded that was sufficient evidence of a pre-suit analysis.  360 F.3d at 1301-02.  The Court rejected the defendant's suggestion that the attorney should have produced claim charts showing his contemporaneous analysis of the patent.  *Id.* at 1301; *see Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1380 (Fed. Cir. 2008) (documentation was adequate where plaintiff submitted "affidavits from its employees and its in-house and outside counsel, who attested to CDSC's pre-filing investigation of the patent").

In concluding that more documentation of the analysis was needed, the district court relied on *Source Vagabond Systems Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291 (Fed. Cir. 2014).  A14.  But in that decision, which arose in the Rule 11 context, the attorney submitted only a conclusory declaration that "simply restated the claim construction arguments and asserted the conclusory statement that he

'analyzed the sample to ascertain whether or not it infringes . . . .'" 753 F.3d at 1302. Here, by contrast, when the adequacy of ICON's analysis was challenged, ICON submitted much more detailed evidence, including the number of hours spent, the hiring of the outside counsel and expert, and the obtaining of a sample accused product.

The district court also stated that ICON had claimed its communications with outside counsel were privileged but that ICON's privilege log does not reflect written communications or reports concerning the pre-suit investigation. A13. But as the court itself noted, outside counsel "*orally* shared the results of the investigation and infringement analysis with" Smith. A13 (emphasis added). Moreover, ICON's counsel offered to share the time records detailing the time spent on the analysis with the district court *in camera*, and the district court responded: "If I decide I need that, we'll let you know." A4102. The court thus should have given ICON a chance to submit that information before concluding that it was not satisfied. *Cf. Apple Comput., Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 27 (Fed. Cir. 2000) ("We note, however, that Apple offered to produce this document for the court's *in camera* inspection, and the court declined Apple's offer. We conclude, therefore, that the court must have been satisfied based on all of the evidence, including the declaration of counsel for Apple and the court's

familiarity with the parties based on their conduct during the entire course of the trial, that Apple conducted an adequate pretrial investigation.").

Finally, the district court paradoxically faulted ICON for spending an "extensive amount of time and money" on the pre-suit analysis, stating that it was "perplexing given that the lawsuit involves only one independent claim." A14. But the suit as originally filed included two patents directed to different technology, not merely a single independent claim. And a proper pre-suit analysis often takes considerable time and expense.

### 5.   *There was no basis to conclude that ICON litigated in a manner so outside the norm as to warrant an exceptional-case ruling*

In short, none of the hallmarks of abusive or vexatious litigation conduct is present here. The district court did not find that ICON made any misrepresentation or misleading statements during the course of this litigation. *Cf. Monolithic Power Sys., Inc. v. O2 Micro Int'l, Ltd.,* 726 F.3d 1359, 1367 (Fed. Cir. 2013) (patentee misrepresented the date of key evidence and tried to hide its false testimony through motions practice); *MarcTec, LLC v. Johnson & Johnson,* 664 F.3d 907, 920 (Fed. Cir. 2012) (patentee "misrepresented both the law of claim construction and the constructions ultimately adopted by the court"). Nor is this a case brought solely for its settlement value, without any intention of testing the merits of ICON's infringement contentions or the validity of its patent. *Cf. SFA*, 793 F.3d at 1350. This is a classic competitor-versus-competitor case—brought only after a

thorough infringement analysis—that turned out to be unsuccessful. Even if the district court thought ICON could or should have made different litigation choices, that does not mean ICON's choices were unreasonable or amounted to misconduct. *See Gaymar*, 790 F.3d at 1376-77. There simply was no basis for the district court to conclude that ICON engaged in unreasonable litigation tactics.

## D.    Once The Erroneous Considerations Are Removed, The Exceptional-Case Ruling Must Be Set Aside

Once the incorrect considerations relied upon by the district court are removed, no basis remains to hold this case exceptional. Although ICON's arguments did not ultimately carry the day, they were well within the mainstream of arguments that patent litigants regularly make. As the district court correctly concluded in initially holding this case unexceptional, the claim-construction issues were neither objectively unreasonable nor easily resolved. A3155-A3157. In the end, its about-face rested on nothing more than that ICON failed to prevail. But that is not enough to justify an award of fees. *Gaymar*, 790 F.3d at 1373.

Nor did any of the litigation conduct cited by the district court come close to what would be required to make this "the rare case in which a party's unreasonable conduct . . . is . . . so 'exceptional' as to justify an award of fees." *Octane*, 134 S. Ct. at 1757. As the district court correctly concluded in its first ruling, that is true even if the evidence is considered in the light most favorable to Octane. A7-A8. The district court reasoned then: "Enforcement of patent rights that are

reasonably believed to be infringed does not entail special penalty when the patentee is unsuccessful." A8. As this Court has recognized, the Supreme Court made clear that remains equally true after its decision. *Gaymar*, 790 F.3d at 1373 (citing *Octane*, 134 S. Ct. at 1753).

Accordingly, this Court should reverse outright both the exceptionality determination and the fee award. As in *Biax*, there is no need for a remand. *See* 2015 WL 755940, at *4. At the very least, the fees award should be vacated and the case remanded for the district court to reconsider whether the case is exceptional under a totality of the properly considered circumstances and, even if so, whether and how many fees should be awarded. *See Gaymar*, 790 F.3d at 1377.

## CONCLUSION

The judgment awarding fees should be reversed with no remand. In the alternative, the judgment should be vacated and the exceptional-case determination and fee award remanded for reconsideration.

Respectfully submitted,

FEBRUARY 5, 2016

MICHAEL A. JACOBS
ROBERT J. ESPOSITO
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105
Telephone:  415.268.7455


LARRY R. LAYCOCK
DAVID R. WRIGHT
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT
201 South Main Street, Suite 600
Salt Lake City, Utah  84111
Telephone:  435.252.1360

/s/ Deanne E. Maynard

DEANNE E. MAYNARD
MARC A. HEARRON
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone:  202.887.8740

*Counsel for Plaintiff-Appellant*
*ICON Health & Fitness, Inc.*

**ADDENDUM**

# TABLE OF CONTENTS

**Page**

District Court's Exceptional-Case Ruling under 35 U.S.C. § 258, 7/1/2015 ...................................................................................A1

District Court's Opinion and Order Awarding Attorneys' Fees and Costs, 9/1/2015 ...............................................................................A20

District Court's Opinion and Order Denying Octane's Request for Reconsideration and Amending the Award of Attorneys' Fees and Costs, 9/24/2015 ...............................................................A33

Amended Judgment, 9/25/2015 ............................................................A39

U.S. Patent No. 6,019,710....................................................................A40

Order from U.S. District Court for Northern District of California Granting Motion to Sever and Transfer to the District of Minnesota, 11/3/2008 ...............................................................A369

District Court's Claim Construction Order, 12/22/2010 ...................A1414

District Court's Order Granting Summary Judgment of Non-Infringement, 6/17/2011 .........................................................A2827

District Court's Initial Ruling that Case is not Exceptional, 9/6/2011 .............A3152

Federal Circuit's Opinion Affirming Summary Judgment of Non-Infringement and Unexceptional-Case Ruling, 10/24/2012..................A3167

Federal Circuit's Opinion Vacating and Remanding for Application of New Exceptional-Case Standard, 8/26/2014.........................................A3188

Supreme Court's Opinion, 4/29/2014................................................A5575

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Icon Health & Fitness, Inc.,

        Plaintiff,

   v.

                           **MEMORANDUM OPINION
AND ORDER**

                         Civil No. 09-319 ADM/SER

Octane Fitness, LLC,

        Defendant.

_____

Larry R. Laycock, Esq., Maschoff Brennan, Salt Lake City, UT; and Lawrence M. Shapiro, Esq., and X. Kevin Zhao, Esq., Greene Espel, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Rudolph A. Telscher, Jr., Esq., and Daisy Manning, Esq., Harness, Dickey & Pierce, P.L.C., St. Louis, MO, on behalf of Defendant.

_____

# I.  INTRODUCTION

On April 1, 2015, the undersigned United States District Judge heard oral argument on Defendant Octane Fitness, LLC's ("Octane") Renewed Motion for Attorney's Fees and Costs [Docket No. 260] and Motion to Strike or, in the Alternative, Motion to Reopen Discovery [Docket No. 272].  Octane argues that it is entitled to attorney's fees under § 285 of the Patent Act based on the new standard announced by the Supreme Court in this case.  See Octane Fitness, LLC v. Icon Health & Fitness, Inc., 134 S.Ct. 1749 (2014).  The Federal Circuit has remanded the case to this Court for consideration of whether, under the newly-announced standard, this is an exceptional patent case that warrants an award of attorney's fees.  See Icon Health & Fitness, Inc. v. Octane Fitness, LLC, 576 F. App'x 1002 (Fed. Cir. 2014).  Plaintiff Icon Health & Fitness, Inc. ("Icon") opposes the motions.  For the reasons set forth below, the

Court finds this case to be exceptional under § 285 and grants the renewed motion for attorney's

fees and costs.  The motion to strike is denied as moot.

## II.  BACKGROUND[1]

In this patent infringement case, Icon alleged that Octane infringed Icon's U.S. Patent

No. 6,019,710 (the "'710 patent").  See Telscher Decl. [Docket No. 262] Ex. S ("'710 patent").

The '710 patent covers an elliptical machine designed to minimize floor space needed and allow

for adjustable stride length.  Although the '710 patent was issued in 2000, it was never

commercialized due to the lack of buyer interest and the complexity and expense of the machine.

Id. Ex. D ("Dalebout Dep.") 28:15–31:4; 34:23–36:14.

Icon alleged that two models of elliptical machines manufactured and sold by Octane, the

Q45 and Q47, infringed claims 1-5, 7, and 9-11 of the '710 patent.  These claims are all directed

to the elliptical machine's linkage system that connects the foot rail to the frame via the "stroke

rail."  Octane denied the infringement allegations and counterclaimed for declaratory judgment

of non-infringement, invalidity, and unenforceability of the '710 patent.

On December 22, 2010, this Court issued a Claim Construction Order [Docket No. 144].

Thereafter, on June 17, 2011, this Court granted summary judgment of noninfringement to

Octane.  See Mem. Op. & Order [Docket No. 187] ("Summary Judgment Order).

In July 2011, Octane moved for an award of attorney's fees under § 285 of the Patent

Act, which authorizes a court to award reasonable attorney's fees to the prevailing party in

---

[1] The full background of this patent infringement case is set forth in the Court's
Memorandum Opinion and Order dated December 22, 2010 [Docket No. 144] ("Claim
Construction Order"), Memorandum Opinion and Order dated June 17, 2011 [Docket No. 187]
("Summary Judgment Order"), and Memorandum Opinion and Order dated September 6, 2011
[Docket No. 220] ("Fee Order").  These Orders are incorporated by reference.

A002

"exceptional" patent cases.  35 U.S.C. § 285.  In determining whether Octane was entitled to

attorney's fees under the statute, the Court applied the then-prevailing standard from Brooks

Furniture Mfg., Inc. v. Dutailier Intern., Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005).  Absent

misconduct in litigation or in securing a patent, a case was deemed "exceptional" under Brooks

Furniture only if a party can show by clear and convincing evidence "both (1) the litigation is

brought in subjective bad faith, and (2) the litigation is objectively baseless."  Id. at 1381.  Based

on this standard, this Court concluded that Octane had not established by clear and convincing

evidence that the litigation was brought in subjective bad faith and was objectively baseless.

Mem. Op. & Order, Sept. 6, 2011 [Docket No. 220] ("Fee Order") at 2-8.  As a result, this Court

held that the case was not exceptional and that an award of attorney's fees was not warranted.

Id. at 8.  The Federal Circuit affirmed this holding.  See Icon Health & Fitness, Inc. v. Octane

Fitness, LLC., 496 F. App'x 57, 65 (Fed. Cir. 2012) (reh'g en banc denied, Dec. 27, 2012).

     The Supreme Court granted certiorari on the § 285 issue and reversed, rejecting the

Brooks Furniture framework as "unduly rigid" and "so demanding that it would appear to render

§ 285 largely superfluous."  Octane, 134 S.Ct. at 1755, 1758.  As a result, the Supreme Court

announced a new standard for determining whether a case is "exceptional" under § 285 and

remanded the case to the Federal Circuit for further proceedings.  Id. at 1758.  In turn, the

Federal Circuit vacated this Court's judgment on the § 285 issue and remanded "for application

in the first instance of the new standard whether, under the totality of the circumstances, this case

'stands out from others with respect to the substantive strength' of ICON's litigation position or

was litigated in an unreasonable manner."  Icon, 576 F. App'x at 1005 (quoting Octane, 134

S.Ct. at 1756).

# III. DISCUSSION

## A. Renewed Motion for Attorney's Fees

Section 285 of the Patent Act provides:  "The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  The "patently clear" text of § 285 "imposes one and only constraint on district courts' discretion to award attorney's fees in patent litigation:  The power is reserved for 'exceptional' cases."  Octane, 134 S.Ct. at 1755–56.

Because the Patent Act does not define "exceptional," it is given its ordinary meaning of "uncommon, rare, or not ordinary."  Id. (quotations omitted).  Thus,

> an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

Id. at 1756.

There is "no precise rule or formula" for determining whether a case is exceptional.  Id. Instead, district courts are to exercise discretion in considering the non-exclusive list of factors: "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  Id. at 1756 n.6.

In addition to adopting a discretionary, flexible approach for determining whether a case is exceptional under § 285, the Supreme Court rejected the clear and convincing standard of evidence required under Brooks Furniture and held instead that a patent litigant may establish entitlement to fees by a preponderance of the evidence.  Id. at 1758.

1. **Substantive Strength of Litigation Position**

Octane argues that this case "stands out" in terms of the weakness of Icon's infringement allegations because Octane's machines did not have any of the patentable features of the '710 patent, and because the '710 patent would have been invalid under Icon's overly broad interpretation of the claims.  Icon responds that its litigation position was not unreasonable because the Court found that Octane's devices lacked only two elements of the disputed patent claims, and Octane conceded the presence of one of those elements (a "stroke rail") during a significant portion of the litigation.

"[C]ourts have awarded attorneys' fees under Section 285 where a party advances arguments that are particularly weak and lack support in the record or seek only to re-litigate issues the court has already decided."  Intex Recreation Corp. v. Team Worldwide Corp., — F. Supp. 3d —, No. 4-1785, 2015 WL 135532, at *3 (D.D.C. Jan. 9, 2015).  As explained below, Icon's arguments with regard to two critical elements of claim 1 (the only independent claim in the '710 patent) were particularly weak because they were wholly at odds with the patent text, prosecution history, and inventor testimony, and would have resulted in impermissibly broad claims.

     a.  **Claim 1, Element (d)**

A core element of the '710 patent was claim 1(d), which claims:

> means for connecting each stroke rail to the frame such that <u>linear reciprocating displacement</u> of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path.

'710 patent 7:19-23 (emphasis added).  In arguing that Octane's machines met this element, Icon advanced the following non-meritorious arguments.

### i. "Linear reciprocating displacement" does not require movement along a linear path

Octane's accused machines "reciprocate along a slightly arcuate path rather than along a straight path." Telscher Decl. Ex. U ("Rasty Expert Report") 12. During claim construction, Icon proposed a construction of "linear reciprocating displacement" that did not require movement along a linear path:

> A change in position from a first point to a second point followed by a change in position from the second point back to the first point, where the change in position from one point to the other results in a net change in position along a line. Linear reciprocating displacement does not require movement along a linear path.

Br. Supp. Icon's Claim Construction [Docket No. 131] Ex. B ("Disputed Claims Chart") 3 (emphasis added).

Courts have found cases exceptional where patent owners' arguments are inconsistent with the text of their own patent. See Intex Rec. Corp, 2015 WL 135532, at *3–4 (finding case exceptional and fees warranted where patent owner's litigation position "directly contradicted . . . the patent specification"); Lakim Indus., Inc. v. Linzer Prods. Corp., No. 12-4976, 2013 WL 1767799, at *5 (C.D. Cal. Apr. 24, 2013) aff'd, 552 F. App'x 989 (Fed. Cir. 2014) (awarding fees where patent owner's argument was "contrary to all the intrinsic evidence"). Additionally, a case may be exceptional where a patent owner's arguments contradict the prosecution history stating why the invention is distinguishable from prior art. Lugus IP, LLC v. Volvo Car Corp., No. 12-2906, 2015 WL 1399175, at *5 (D.N.J. March 26, 2015).

Icon's argument that linear reciprocating displacement did not require movement along a linear path was wholly at odds with the text of the '710 patent and reads the word "linear" out of the patent. The '710 patent's claims and specification make clear that one end of a stroke rail

6

slides back and forth (i.e., reciprocates) in a linear path by means of a straight "C-channel." See '710 patent 2:12–13, 4:3–17, 5:46–48, 6:14–18; Figs. 1–6. The specification describes a pin with a flared head that is "slidably captured within a C-shaped channel . . . mounted on [the] support stand." '710 patent 4:14–16. The first end of the stroke rail "is thus linearly displaced as [the] pin . . . is slidably moved within the channel." Id. 4:16–17 (emphasis added).

Nothing in the '710 patent's claims, specifications, or drawings indicate that the first end of the stroke rail moves in anything other than a straight line.

Moreover, there is no evidence that the patentees intended the C-channel to be non-linear, or that the first end of the stroke rail be connected to the support stand by anything other than a straight C-channel. To the contrary, the prosecution history shows the patent examiner's allowance of the '710 patent was in part because prior art failed to show an exercise apparatus "having the opposite end [of a stroke rail] connected to the frame for linear reciprocating movement and for producing an elliptical path." Telscher Aff. Ex. T ("Notice of Allowability") ¶ 3 (emphasis added). Icon's own expert similarly testified at his deposition that a reason the linkage system was patentable was that it "convert[s] the reciprocating motion of one end along a linear path to an essentially elliptical path . . . ." Icon, 496 F. App'x at 62 (emphasis added).

### ii. The C-channel and pin are not corresponding structure

Octane's machines do not have a C-channel and pin to attach to the frame, but instead use a "rocker link," which is a lever-based design that moves in an arcuate path. Icon, 496 F. App'x at 60. During claim construction and at summary judgment, Icon argued that the "means for connecting" phrase in claim 1(d) is a means-plus-function limitation where the function is "connecting," and the corresponding structure does not include the C-channel and pin. Disputed

Claims Chart 2.

"[C]orresponding structure must include all structure that actually performs the recited function." Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1119 (Fed. Cir. 2002). Icon's position that the straight C-channel was not required to perform the recited function in claim 1(d) completely ignored the claim language. As the Federal Circuit determined, "the claim language makes clear that the function of the 'means for connecting' is to connect 'each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path.'" Icon, 496 F. App'x at 61 (quoting '710 patent 7:19–23) (emphases added). Icon's position was also at odds with the deposition testimony of the patent's inventor, William Dalebout, who stated that if the C-channel were taken out, the mechanism would not work and he would not have a patent. Dalebout Dep. 52:11–53:13.

### iii. Arcuate motion is equivalent to linear motion

At summary judgment, Icon also argued that Octane infringed under the doctrine of equivalents because the slightly arcuate motion of Octane's rocker link produced a substantially equivalent path in much the same way as the linear motion of the C-channel. See Mem. Opp'n Renewed Mot. Attorney's Fees [Docket No. 267] 10. However, the doctrine of equivalents "is not allowed such broad play as to effectively eliminate [an] element in its entirety." DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1016–17 (Fed. Cir. 2006) (quoting Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997)).

Icon's doctrine of equivalents argument was conspicuously flawed because, once again, the argument contradicted the testimony of its own expert, the patent's prosecution history, and

the clear text of the patent itself.  As referenced earlier, Icon's expert testified at his deposition that a reason the linkage system was patentable was that it "convert[s] the reciprocating motion of one end along a linear path to [an] essentially elliptical path . . . ."  Icon, 496 F. App'x at 62.  Additionally, the patent examiner stated that a reason for allowance was that the prior art failed to show an "exercising apparatus comprising . . . a pair of stroke rails each having one end hingedly connected to a respective foot rail and having the opposite end connected to the frame for linear reciprocating movement."  Notice of Allowability ¶ 3 (emphasis added).  Perhaps most importantly, "[i]f ICON had wanted the claim to cover other types of nonlinear motion, such as an arcuate path, it could have simply omitted the term 'linear' to broaden the claims."  Icon, 496 F. App'x at 62–63.  It did not, and thus "arcuate motion, at least in this case, is not equivalent to linear motion."  Icon, 496 F. App'x at 62.

**b.  Claim 1, Element (c)**

Even if Icon overcame the significant hurdles in claim 1(d), it still would have had to establish that Octane's machines satisfied claim 1(c), which describes:  "a pair of stoke rails each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail."  '710 patent 7:15–18.

This Court construed "stroke rail" to be:  "A linear or curved rail, which may be made to vary in length, extending from a foot rail to a frame on an elliptical machine."  Claim Construction Order at 8.  Throughout this litigation, Icon argued a "stroke rail," could consist of an unlimited combination of unnamed parts.  See Br. Supp. Icon's Claim Construction 13-15.[2]

---

[2] The page number references for the cited document are to the page numbers appearing at the bottom of the page and not to the page numbers appearing in the CM/ECF citation at the top of the page.

This broad construction is highly unreasonable in that it excludes other inventors from the use of infinite combinations of parts that link a foot rail and a frame on an elliptical machine.[3]

### c. Arguments Exceptionally Weak

Icon's litigation position on the critical elements of claim 1 of the '710 patent depended on accepting the following highly questionable arguments: "linear reciprocating displacement" does not require movement along a linear path; the C-channel and pin are not part of the corresponding structure; arcuate motion produced by a lever-based design is equivalent to linear motion produced by a C-channel design; and a "stroke rail" can consist of a limitless number of parts.

In comparing this case to the many patent cases over which this Court has presided during the past 22 years as a federal judge, Icon's litigation position stands out as a particularly and unusually weak case on the merits. The arguments advanced by Icon bore no relation to what the '710 patent disclosed and covered. The claim language, specification, prosecution history, inventor testimony, and Icon's own expert testimony posed major obstacles to Icon's success on the merits. Icon must have known that the odds of winning this lawsuit were very slim.

This Court, when first ruling on the § 285 issue, did state that the conclusions during

_____

[3] Icon initially included only Octane's Q47 model in this lawsuit; the Complaint was later amended to add Octane's Q45 model to the case. Before Icon added the Q45 model to the suit, Octane admitted that the Q47 model met the stroke rail limitation in claim 1(c), because the Q47 model had an actuator casting (what Icon was calling a "stroke rail") that was connected to the foot rail. Def.'s Mem. Supp. Renewed Mot. Attorney's Fees [Docket No. 261] 20 n.7. However, once Icon added the Q45 model, which has an actuator casting with a motor that is attached to the foot rail with an integrated screw, Octane realized that Icon's position was that a "stroke rail" could consist of a limitless number of unrelated parts. As a result, Octane withdrew its concession.

claim construction and at summary judgment were not easily reached. However, even extraordinarily thin arguments require a court to expend considerable effort in parsing through highly technical and abstract language before claims can be construed and infringement determinations can be made. Therefore, although Octane, in its original motion for attorney's fees, did not establish by clear and convincing evidence that Icon's claims were objectively baseless, it has shown by a preponderance of the evidence that Icon's litigation position was exceptionally weak.

### 2. Unreasonable Manner of Litigation

Octane argues that this lawsuit is also exceptional in that it was contrived by industry giant Icon to punish Octane for its success in the market and to bully Octane into paying royalties to which Icon was not entitled. The following circumstances are relevant to the inquiry of whether Icon litigated this case in an exceptionally unreasonable manner.

### a. Litigation Tactics Designed to Increase Costs

When Icon initially file this case, it named two defendants: Octane and a single Octane distributor, Nellie's Exercise Equipment, Inc. ("Nellie's"). Nellie's is a California business that sells exercise machines. See Civil Mins. [Docket No. 57] Attach. 51 at 1. By naming Nellie's as a defendant, Icon was able to file the lawsuit in California, a venue known for heightened litigation costs. Octane is a Minnesota company with only two employees in California; both are sales people who work out of their homes. Id. at 5. Icon's principal place of business is in Utah. The claims against Nellie's were premised on alleged infringement of U.S. Patent No. 5,104,120 (the "'120 patent"), which was not limited to elliptical machines but instead described a method for adjusting the resistance of an exercise machine to vary the intensity of a workout. Id. at 3.

On November 3, 2008, the district court in California determined that Icon's claims against Nellie's, a distributor and not a manufacturer, were peripheral to Icon's claims against Octane. See Icon Health & Fitness Inc. v. Octane Fitness LLC, Civil No. 8-437 (C.D. Cal. 2008). The California district court further found that the main issue in the case—whether the machines designed by Octane infringe Icon's patents—was to be resolved between the two manufacturers. Thus, the California district court severed Nellie's from the Octane case. Id. at 3.

The California district court then transferred the case against Octane to Minnesota, finding that Minnesota was a more convenient forum, the relevant witnesses and pertinent documents were in Minnesota, and the bulk of the suit bore little relation to California. Id. at 5; see also Stipulation for Entry of J. [Docket No. 189] ¶ 4 (stipulating that the California district court transferred the case between Icon and Octane to this Court and left the case between Icon and Nellie's in California). A mere two months after the initial pretrial scheduling conference was held in this district, and before Icon was required to provide Octane with a claim chart showing the bases for its infringement contentions, Icon agreed to dismiss the allegations relating to the '120 patent. See Stipulation for Dismissal [Docket No. 77].

The inclusion of a peripheral party to establish venue in an inconvenient and high-cost district—particularly where the claim that supposedly provided the basis for including the peripheral party was voluntarily dismissed with prejudice shortly after the action was transferred—is highly suspicious. On the present record, this Court finds it more likely than not that the reason for including Nellie's and the '120 patent in this litigation was to increase litigation costs to Octane.

### b. No Articulated Pre-Filing Infringement Analysis

In opposing Octane's renewed motion for attorney's fees, Icon produced a declaration by Icon's general counsel, Everett Smith, that provided limited information about a pre-suit analysis of Octane's Q47 machine and Icon's patents that Icon performed before it filed suit against Octane. See Smith Decl. [Docket No. 268]. Smith avers that Icon's outside patent counsel, along with an unnamed expert retained by Icon, obtained an Octane elliptical machine and expended over 270 hours and incurred over $80,000 in fees and costs in conducting a pre-suit infringement investigation. Id. ¶¶ 3–5. Smith further states that Icon's outside counsel and expert explained to him how Octane's machine infringed the '710 patent, and Smith believed the analysis "to be a reasonable and legitimate basis on which to file a complaint against Octane." Id. ¶¶ 6–7.

Icon has produced no documentary evidence of any written communications relating to the substantial investigation and pre-suit analysis. Icon contends its counsel's communications about the results of the investigation and infringement analysis are protected by the attorney-client privilege. However, each party in this case is required to maintain a privilege log that lists and describes documents withheld on the basis of privilege. Pretrial Scheduling Order [Docket No. 75] 7. Icon's privilege log does not reflect written communications or reports concerning the substantial pre-suit investigation. Def.'s Mem. Supp. Renewed Mot. 1. Smith has testified in a deposition that outside patent counsel orally shared the results of the investigation and infringement analysis with him: "They [outside counsel] talked to me and discussed claims about the case and what they are going to do, etc., and I say [sic] okay. But they – I don't know that they ever said, hey, this is what we're doing right here. You know, and gave me a document

to read and say, are you okay with this? . . . . They didn't do it in this case." Telscher Decl. Ex.
J ("Smith Decl.") 96:12–18.

Smith's declaration is troubling for a number of reasons. First, the absence of written
documents relating to such a lengthy and expensive pre-suit investigation suggests that the
results of the investigation showed exceptionally weak bases for alleging infringement. Second,
the extensive amount of time and money spent on the investigation is perplexing given that the
lawsuit involves only one independent claim (claim 1). These contentions suggest Icon was
scouring its patent portfolio in search of a basis for bringing a lawsuit against Octane. Third,
Smith does not provide the name or qualifications of the expert retained by Icon to assist in the
pre-suit investigation, and it is unclear from the declaration whether the expert who was retained
for the pre-suit investigation is the same person as the expert who was retained for the litigation.

Most telling is that Smith does not explain <u>why</u> he or Icon's attorneys believed the pre-
suit analysis to be reasonable. "A patent holder, if challenged, must be prepared to demonstrate
to both the court and the alleged infringer exactly why it believed before filing the claim that it
had a reasonable chance of proving infringement." <u>Source Vagabond Sys. Ltd. v. Hydrapak,
Inc.</u>, 753 F.3d 1291, 1302 (Fed. Cir. 2014) (quotations omitted) (holding in Rule 11 context that
a declarant's conclusory statements that a pre-suit infringement analysis had been performed was
not evidence to support a reasonable belief by plaintiff that it had a meritorious infringement
claim). The absence of a pre-filing analysis, when combined with Icon's exceptionally weak
litigation position, leads to the inference that the pre-filing investigation resulted in a conclusion
that probable success on the merits was remote.[4]

---

[4] Icon argues the pre-filing communications are protected by the attorney-client privilege.
Icon, however, has not attempted to waive privilege or submit any redacted documentation that

### c. Emails Reflect Improper Motivation

In late August 2008, approximately five months after this case was filed, Pat McGinnis, who serves as Vice President of Global Sales for FreeMotion (an Icon subsidiary), sent the following email to two other FreeMotion employees:  "We are suing Octane.  Not only are we coming out with a great product to go after them, but throwing a lawsuit on top of that."  Telscher Decl. Ex. A at 2.  The next day, McGinnis sent a second email to one of the two employees.  Id. at 1.  The second email states:  "ICON Health & Fitness does not mess around with this.  They are going to end up paying royalty plus compensation.  Funny thing is – this patent is over 10 years old!"  Id.  In September 2009, McGinnis sent another email relating to the lawsuit that stated:  "Yes.  Old patent we had for a long time that was sitting on the shelf.  They are just looking for royalties."  Telscher Decl. Ex. F ("McGinnis Dep.") 65:2-5.

When this Court originally ruled on Octane's initial motion for attorney's fees, the Court viewed these emails as "stray comments by employees with no demonstrated connection to the lawsuit" and concluded that "[a] company salesman's opinion of a lawsuit does not tend to prove that the company's leadership and counsel pursued the lawsuit in bad faith."  Id. at 8.

However, the record has now been supplemented to give fuller context to these emails.  McGinnis was deposed on how he learned of the specifics concerning the age of the patent and the goal of the lawsuit.  McGinnis testified that he learned about the lawsuit from an August 22, 2008 news article.  McGinnis Dep. 67:5–69:7.  However, the article did not include details about

---

substantiates its claimed infringement determinations.  Icon's failure to avail itself of any available means to disclose relevant material to the Court while protecting sensitive information belies the depth and conclusion of its pre-suit infringement analysis.

the patent's age or that Icon's goal in suing Octane was to collect royalties.  When pressed on where he learned this information, McGinnis stated he could not remember.  Id. 65:14–66:5.

McGinnis' knowledge that the '710 patent was an old patent that was "sitting on the shelf" and that Icon was seeking royalties are not the types of details generally known by company sales employees.  McGinnis' knowledge of this these items suggests they were shared with him by a member of Icon's legal department or upper management.

The record regarding McGinnis' emails is also supplemented by the declaration of Icon's in-house counsel, Smith, who avers:  "Pat McGinnis, who was a Vice President of Global Sales at Free Motion in 2008, had no part in ICON's decision to bring a lawsuit for patent infringement against Octane."  Smith Decl. ¶ 9.  However, the issue is not whether McGinnis was involved in the decision to bring the lawsuit.  Rather, the issue is how McGinnis learned of the specific legal facts in the lawsuit.  Only McGinnis and Icon know the answer to that question, and the record on the issue is silent.  Had Smith not shared his views of the lawsuit with McGinnis, he had the opportunity to say so in his declaration, but did not.

The additional evidence of the McGinnis deposition and the Smith declaration, when combined with the emails reflecting McGinnis' knowledge of the lawsuit that were not widely known make it more likely than not that McGinnis' email comments reflected the views of those in Icon's management who were involved in the decision to sue Octane.

### d.  Uncommercialized Patent

As described by McGinnis in the emails, the '710 patent was an old patent "sitting on the shelf" and had never been commercialized.  Thus, Icon had little to lose by injecting the validity of the '710 patent into a lawsuit.  Although this Court determined earlier that the non-

commercialization of the '710 patent was not relevant to a bad faith analysis under the Brooks Furniture framework, the new standard announced in Octane allows a court to consider whether there is a "need . . . to advance considerations of compensation and deterrence." Octane, 134 S.Ct. at 1756 n.6. Here, the non-commercialization of the '710 patent is relevant to whether awarding fees to Octane is necessary to deter Icon from future attempts to extract royalties to which it is not entitled from a competitor who might rather settle a meritless patent infringement suit than pay the high cost to defend it.

### e. Totality of Circumstances

Viewed individually, each of these circumstances might not suffice to make the case exceptional. However, when viewed cumulatively, these circumstances demonstrate that the case was litigated in a manner that stands out from more routine patent cases. The preponderance of the evidence shows that Icon spent substantial time and expense searching its patent portfolio for a lawsuit to "throw" at Octane, and ultimately landed on a 10-year old patent that was never commercialized and was merely "sitting on the shelf." Additionally, Icon employed litigation tactics designed to accelerate Octane's litigation costs in an effort to force Octane to settle rather than defend the suit. Icon's motive and behavior in litigating this lawsuit were "'uncommon,' 'rare,' [and] 'not ordinary.'" Octane, 134 S.Ct. at 1756. The Court thus concludes that the manner of litigation was exceptionally unreasonable and that the imposition of fees is appropriate.

### 3. Reasonableness of Fees

Having determined that this case is exceptional and that fees are warranted under § 285, the Court must determine the amount of the award. Eon-Net v. Flagstar Bancorp, 653 F.3d 1314,

1323–24 (Fed. Cir. 2011).  Octane contends it has incurred nearly $2 million in connection with this case, including appeals, and requests that it be awarded all of its attorney's fees.  However, Octane has not provided evidence to establish the amount of its attorney's fees and reasonableness of the fees.

The type of evidence typically analyzed in determining a reasonable attorney's fee includes:  "hourly time records, full expense statements, documentation of attorney hourly billing rates in the community for the particular type of work involved, the attorney's particular skills and experience, and detailed billing records or client's actual bills showing tasks performed in connection with the litigation."  Junker v. Eddings, 396 F.3d 1359, 1366 (Fed. Cir. 2005).  Therefore, Octane shall file documentation of attorney's fees and shall include itemized billing statements, expense reports, documentation of local billing rates for the type of work involved, and other evidence demonstrating the amount of attorney's fees and costs reasonably incurred by Octane in litigating this case.

**B.  Motion to Strike**

Octane moves to strike portions of the Smith Declaration relating to Icon's pre-suit investigation or, alternatively, to reopen discovery relating to issues raised in the Smith Declaration.  The motion to strike is rendered moot by the Court's conclusion that this is an exceptional case that warrants an award of attorney's fees.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.  Defendant Octane Fitness, LLC's Renewed Motion for Attorney's Fees and Costs

[Docket No. 260] is **GRANTED** to the extent that the Motion requests a finding that this case is

exceptional.

2.  Octane's Motion to Strike or, in the Alternative, Motion to Reopen Discovery [Docket

No. 272] is **DENIED** as moot.

3.  Octane shall file documentation in support of its request for reasonable attorney's fees

on or before July 15, 2015.  The documentation shall include itemized billing statements,

expense reports, documentation of local billing rates for the type of work involved, and other

evidence demonstrating the amount of attorney's fees and costs reasonably incurred by Octane in

litigating this case.  Icon may file a response on or before July 22, 2015.  The Court will issue an

order awarding reasonable attorney's fees without further oral argument.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  July 1, 2015.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Icon Health & Fitness, Inc.,

        Plaintiff,

  v.

                                    **MEMORANDUM OPINION**
                                    **AND ORDER**
                                    Civil No. 09-319 ADM/SER

Octane Fitness, LLC,

        Defendant.

_____

Larry R. Laycock, Esq., David R. Wright, Esq., and Jared J. Braithwaite, Esq., Maschoff Brennan, Salt Lake City, UT; and Lawrence M. Shapiro, Esq., Robert J. Gilbertson, Esq., and X. Kevin Zhao, Esq., Greene Espel, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Rudolph A. Telscher, Jr., Esq., Kara R. Fussner, Esq., and Daisy Manning, Esq., Harness, Dickey & Pierce, P.L.C., St. Louis, MO, and Michael A. Lindsay, Esq., Dorsey & Whitney, LLP, Minneapolis, MN, on behalf of Defendant.

_____

**I. INTRODUCTION**

    This matter is before the undersigned United States District Judge for a ruling on

Defendant Octane Fitness, LLC's ("Octane") Application for Reasonable Attorney's Fees and

Expenses [Docket No. 286] ("Application"). Plaintiff Icon Health & Fitness, Inc. ("Icon") has

filed a Response [Docket No. 292] objecting to the Application. For the reasons set forth below,

Octane's Application is granted in part and denied in part.

**II. BACKGROUND**[1]

    On July 1, 2015, the Court granted Octane's renewed motion for attorney's fees and costs

---

[1] A more complete background of this patent infringement case is recited in the Court's Memorandum Opinion and Orders dated June 17, 2011 [Docket No. 187]; September 6, 2011 [Docket No. 220]; and July 1, 2015 [Docket No. 284], which are incorporated by reference.

[Docket No. 260], holding that this patent case is exceptional under the Patent Act's fee-shifting statute, 35 U.S.C. § 285.  <u>See</u> Mem. Opinion & Order, July 1, 2015.  Based on this ruling, the Court directed Octane to file documentation supporting its request for reasonable attorney's fees by July 15, 2015, and allowed Icon to file a response by July 22, 2015.  In the Application, Octane requests $2,486,578.50 in attorney's fees and $362,582.95 in expenses.  Fussner Decl. [Docket No. 287] ¶ 52.  Icon raises several objections to the Application and argues that any award to Octane should total no more than $1,055,613.35 in fees and $129,711.23 in expenses.

### III. DISCUSSION

**A.  Legal Standard**

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."  35 U.S.C. § 285.  District courts are afforded considerable discretion in determining the amount of reasonable attorney's fees under § 285.  <u>Homeland Housewares, LLC v. Sorensen Research</u>, 581 F. App'x 877, 881 (Fed. Cir. 2014).  Federal Circuit law controls claims for attorney's fees under § 285 because the statute addresses an area of substantive law within the Federal Circuit's exclusive jurisdiction.  <u>Bywaters v. United States</u>, 670 F.3d 1221, 1227 (Fed. Cir. 2012); <u>see also</u> <u>Q Pharma, Inc. v. Andrew Jergens Co.</u>, 360 F.3d 1295, 1299 (Fed. Cir. 2004) ("We apply Federal Circuit law to the issue of attorney fees in patent infringement cases.").

The starting point for determining reasonable attorney's fees is the "lodestar" calculation, which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983); <u>Bywaters</u>, 670 F.3d at 1228–29.  A reasonable hourly rate considers the rates commonly charged by attorneys for similar work in the forum court.  <u>Bywaters</u>, 670 F.3d at 1228.  In calculating a reasonable fee amount, courts should

exclude hours that were not "reasonably expended," such as excessive or redundant hours or

instances where overstaffing or poor billing judgment has occurred.  Hensley, 461 U.S. at 434.

## B.  Icon's Objections

Icon argues the Application includes fees and expenses that are not compensable under

applicable law or are unreasonable.  Each of Icon's objections is addressed below.

### 1.  Fees and Expenses Related to Appeals

Icon first contends that Octane should not recover its fees and expenses in connection

with any appeal in this litigation.  Briefly, the appellate and remand proceedings in this case are

as follows.  In 2011, Icon appealed this Court's claim construction and summary judgment

rulings.  See Icon Health & Fitness, Inc. v. Octane Fitness, LLC., 496 F. App'x 57 (Fed. Cir.

2012) reh'g en banc denied (Dec. 27, 2012).  Octane cross-appealed this Court's decision that

under the Federal Circuit's Brooks Furniture standard,[2] Octane had not shown that this case was

exceptional to allow fee shifting under § 285.  See Icon Health & Fitness, Inc. v. Octane Fitness,

LLC, No. 09-319, 2011 WL 3900975, at *1 (D. Minn. Sept. 6, 2011) (denying Octane's first

motion to find case exceptional).  Icon's appeal and Octane's cross-appeal were consolidated by

the Federal Circuit.

The Federal Circuit affirmed this Court's claim construction and summary judgment

rulings as well as the ruling on the § 285 fee issue.  Icon, 496 F. App'x at 61–65.  Thereafter,

Octane appealed the § 285 issue to the Supreme Court, which reversed.  See Octane Fitness,

---

[2] In the absence of misconduct in litigation or in securing a patent, a case was deemed "exceptional" under Brooks Furniture only if a party could show by clear and convincing evidence "both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless."  Brooks Furniture Mfg., Inc. v. Dutailier Intern., Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005).

LLC v. Icon Health & Fitness, Inc., 134 S. Ct. 1749 (2014).  The Supreme Court held that the

Brooks Furniture standard was unduly rigid, and stated that an exceptional case under § 285 was

"simply one that stands out from others with respect to the substantive strength of a party's

litigating position . . . or the unreasonable manner in which the case was litigated.  Id. at 1756.

The Supreme Court then remanded the case to the Federal Circuit, which in turn remanded to

this Court.  This Court thereafter held that the case is exceptional based on Icon's exceptionally

weak litigation position and its unreasonable manner of litigation.  See Mem. Op. & Order, July

1, 2015.

     The Application submitted by Octane includes $851,432.34 in attorney's fees and

$100,153.86 in costs incurred in the appeal and remand proceedings.  Fussner Decl. ¶ 13, Ex. C.

Icon argues that those fees and costs should not be included in the award because the appeal and

remand proceedings were not exceptional.

     The fee-shifting statute of § 285 does not prohibit a district court from awarding fees for

the entire case, including subsequent appeals.  Therasense, Inc. v. Becton, Dickinson & Co., 745

F.3d 513, 517 (Fed. Cir. 2014).  Thus, appellate and remand fees may be awarded "where those

stages of litigation are deemed independently exceptional within the meaning of § 285."  Id.

(citing Rohm & Haas Co. v. Crystal Chem. Co., 736 F.2d 688, 692–93 (Fed. Cir. 1984)).

     Here, Icon's appeal of this Court's claim construction and summary judgment rulings are

independently exceptional.  In its appeal, Icon repeated the same exceptionally weak

infringement arguments that had been squarely rejected by this Court.  Therefore, Octane is

entitled to recover the attorney's fees and costs it expended in defending against Icon's appeal of

the claim construction and summary judgment rulings.

The appellate and remand proceedings related to the § 285 issue were not exceptional. In defending against Octane's appeals, Icon relied on longstanding Federal Circuit precedent to argue the case was not exceptional under the <u>Brooks Furniture</u> standard. Significantly, Icon prevailed on this issue in the Federal Circuit appeal. In the Supreme Court appeal, the Supreme Court broke new ground on this subject by rejecting the <u>Brooks Furniture</u> standard and announcing a new and more flexible standard for determining whether a case is exceptional under § 285. Thus, Icon's litigation position on the § 285 issue in the Federal Circuit and Supreme Court appeals was not exceptional. Similarly, the remand proceedings were not exceptional because Icon was not unreasonable in arguing that the case was not exceptional under the newly announced standard.

The claim construction and summary judgment issues comprised two-thirds of the issues involved in the Federal Circuit consolidated appeal (the third being the § 285 issue). Accordingly, the Court will award Octane $130,000 in fees and $15,800 in costs relating to the Federal Circuit appeal, which equals two thirds of the $195,140 in fees and $23,696 in costs requested by Octane in relation to that proceeding. <u>See</u> Fussner Decl. Ex. C. The fees and costs relating to all other appeal and remand proceedings are denied.

**2. Fees and Expenses Related to '120 Patent**

Icon argues Octane is not entitled to attorney's fees and expenses related to Icon's United States Patent No. 5,104,120 (the "'120 Patent"). On May 27, 2009, Icon and Octane filed a Stipulation [Docket No. 77] in which the parties agreed to "the dismissal with prejudice of any and all claims against the other, asserted or unasserted," relating to the '120 Patent. Stipulation at 1. Icon argues, and this Court agrees, that Octane could have but did not preserve its claim for

attorney's fees under § 285 with respect to the '120 Patent.  Therefore, this claim has been

released under the terms of the Stipulation, and Octane's request for an award of $125,719 in

fees relating to the '120 Patent is denied.

### 3.  Distribution of Work to Senior Level Attorneys

Icon further argues that Octane's fees must be reduced because Octane overstaffed this

case with partner-level attorneys that were performing tasks typically performed by lower

billing-rate associates.  Icon contends that 85% of attorney billings before appeal were

attributable to partner-level attorneys, and that high level attorneys engaged in routine tasks such

as document review and legal research.

The Court has reviewed the billing statements supporting Octane's Application and

concludes that the requested reduction is not warranted.  This case was also aggressively

litigated by Icon, and Octane properly employed skilled and experienced attorneys to defend

itself against Icon's claims.  Although partner-level attorneys performed some document review

and legal research, a substantial majority of the time entries identified by Icon as purported

examples of overstaffing were performed by a partner whose hourly rate was $300 to $320

during the course of this litigation.  See Laycock Decl. [Docket No. 293] Table 4; Fussner Decl.

¶ 31f.  A survey conducted by the American Intellectual Property Law Association lists the

average hourly rate in 2012 for an intellectual property litigator practicing in the Minneapolis

area as $413 for partners and $287 for associates.  Fussner Decl. ¶¶ 33–34; Ex. S.  Thus, the rate

charged by this partner were more commensurate with that of an associate than a partner.

Indeed, the third quartile (75%) average for intellectual property associates in Minneapolis in

2012 was $339 per hour, which exceeds the hourly rate charged by this partner.  Additionally,

this partner was responsible for conducting fact and expert discovery, and thus it is neither

surprising nor unreasonable for the partner to engage in some level of document review.  Id. ¶

31f.

As further assurance that this matter was neither overstaffed nor unreasonably billed,

Octane's attorney rates and monthly bills were scrutinized by its patent insurance carrier,

Intellectual Property Insurance Services Corporation ("IPISC").  Id. ¶¶ 15, 39.  IPISC has a

vested business interest in ensuring it does not pay above-market rates or overspend on patent

litigation.  For these reasons, no reduction for alleged overstaffing is warranted.

### 4. Expert Witness Fees

Icon objects to Octane's request for $110,714.89 in expert witness fees.  Expert fees are

not authorized under § 285.  Amsted Indus. Inc. v. Buckeye Steel Castings Co., 23 F.3d 374, 377

(Fed. Cir. 1994).  "[A]n award under section 285 encompasses only attorney fees; expert witness

fees fall under 28 U.S.C. § 1920, subject to the 28 U.S.C. § 1821(b) limitation."  Id.  Although

the Federal Circuit has held that a district court may exercise its inherent power to award expert

fees as a sanction for a patent litigant's egregious conduct, such power is reserved for conduct

involving fraud on the court or an abuse of the judicial process.  Id. at 378–79.

Icon did not commit fraud on the Court or engage in other conduct that warrants a

remedy beyond that provided in § 285.  Therefore, Octane's recovery of expert witness fees is

limited by 28 U.S.C. § 1821(b), which provides a $40 per day attendance fee for traveling to and

attending federal court or a deposition.[3]  The billing statements underlying Octane's Application

---

[3] Section 1821(a) and (b) provide in relevant part:

(a)(1) Except as otherwise provided by law, a witness in attendance

7

show that Octane's expert traveled to Chicago and had his deposition taken on May 5, 2010. Fussner Decl. Ex. BB-10. Thus, Octane may recover $40 in expert fees, and the remaining balance of expert fees requested ($110,674.89) is denied.

### 5. Consulting Fees

Octane paid $27,513.24 in consulting fees to assist Octane's counsel in briefing and presenting the § 285 issue to the Supreme Court. Fussner. Decl. ¶¶ 47-51; Ex. BB-9. As discussed above, Icon's defense of Octane's appeals—both to the Federal Circuit and the Supreme Court—was not exceptional, because Icon was relying on the longstanding Brooks Furniture standard in arguing that Octane had not met the demanding burden required for an award of attorney's fees under § 285. Therefore, it is not unjust for Octane to bear the costs of the consulting fees it incurred in connection with the Supreme Court appeal. Accordingly, Octane's request for $27,513.24 in consulting fees is denied.

### 6. Fees Related to Co-Defendant

Icon also objects to Octane's request for $3,186.50 in attorney's fees related to the defense of Nellie's Exercise Equipment, Inc. ("Nellie's"), a California entity that was initially

---

> at any court of the United States, or before a United States Magistrate Judge, or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States, shall be paid the fees and allowances provided by this section.
> . . .
> (b) A witness shall be paid an attendance fee of $40 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance.

28 U.S.C. § 1821.

named as a defendant in this action but who was later dismissed. Icon argues that Nellie's has

not moved for fees, and that even if Octane paid Nellie's legal fees, it cannot assert a claim for

fees on behalf of a third-party co-defendant.

In support, Icon cites In re AmericanWest Bancorporation, in which a bank sought to

recover attorney's fees it paid to defend a third party co-defendant. No. 10-6097-PCW11, 2013

WL 3010822, at *4-5 (Bankr. E.D. Wash. Oct. 4, 2013). The court in that case held that the

bank could not recover such fees from the plaintiff because the entitlement to attorney's fees was

governed by a contract between the plaintiff and the bank, and the co-defendant was not a party

to that contract. Id. at *5. Unlike AmericanWest Bancorporation, the entitlement to attorney's

fees here is governed by statute rather than contract. The governing statute entitles the

prevailing party in an exceptional patent case to attorney's fees. 35 U.S.C. § 285. Nellie's was a

prevailing party, as the claims against it were successfully terminated. The Court sees no reason

to disallow Nellie's reasonable attorney's fees merely because they were paid by a prevailing co-

defendant, rather than Nellie's itself. Therefore, Icon's objection to this category of fees is

overruled.

### 7. Law Firm Overhead

Icon contends the Application improperly requests recovery of two categories of

expenses associated with law firm overhead. First, the Application includes $6,095 for time

billed by administrative staff, and approximately $1,614 in fees for time entries that Icon

characterizes as secretarial-type work or administrative tasks. See Fussner Decl. Ex. A at 5

(reflecting $6,095 in administrative staff fees); Laycock Decl. Table 7 (listing time entries).

Generally, the cost of a law firm's overhead is incorporated into the attorney's hourly rate and is

not separately recoverable under § 285.  <u>Codex Corp. v. Milgo Elec. Corp.</u>, 541 F. Supp. 1198,

1201 n.1 (D. Mass. 1982); <u>CTS Corp. v. Electro Materials Corp. of Am.</u>, 476 F. Supp. 144, 145

(S.D.N.Y. 1979).  Therefore, the requested amount of $6,095 for administrative staff fees will

not be awarded.  However, the Court disagrees with Icon's characterization of time entries

amounting to $1,614 that are described by Icon as secretarial-type work or administrative tasks.

<u>See</u> Laycock Decl. Table 7.  Most of these entries were performed by a paralegal and involved

monitoring case activity and providing updates to the legal team.  <u>See id.</u>  Therefore, these tasks

were not merely administrative and will be compensated.

The second expense category that Icon argues is non-compensable is computerized legal

research.  Icon contends that legal research expenses are firm library service expenses which are

not recoverable under § 285.  "The prevailing view among . . . circuits is to permit awards to

reimburse counsel for the reasonable costs of online legal research."  <u>In re UnitedHealth Grp.</u>

<u>Inc. S'holder Deriv. Litig.</u>, 631 F.3d 913, 918–19 (8th Cir. 2011).  It is customary in many

communities to bill separately for computerized legal research.  <u>Ludlow v. BNSF Ry. Co.</u>, 788

F.3d 794, 805 (8th Cir. 2015).  This billing practice "can be readily defended because the cost of

online research is normally matched with reduction in the amount of time an attorney researches,

or with better quality research."  <u>Id.</u> (internal quotation marks and alterations omitted).  As such,

online legal research expenses are properly included in an award under § 285.  <u>See, e.g.</u>,

<u>Kilopass Tech., Inc. v. Sidense Corp.</u>, No. 10-cv-2066, — F. Supp. 3d —, —, 2015 WL

1065883, at *14 (awarding § 285 costs of $125,131.03 related to online legal research).

The Application requests $48,137 in computerized legal research expenses.  <u>See</u>

Application 20; Fussner Decl. ¶ 44, Ex. AA.  However, the underlying documentation for these

expenses consists of invoices amounting to only $6,108.70.  See Fussner Decl. ¶ 45, Ex. BB-8.

Therefore, the Court awards $6,109 for electronic research costs.

### 8.  Other Miscellaneous Expenditures

Icon also objects to three miscellaneous categories of expenditures that Icon argues are

not compensable.  First, Icon contends that the Application includes $41,607.50 billed for time

entries that Icon argues were duplicative or vague.  See Laycock Decl. Table 8.  The Court has

reviewed the identified time entries and concludes that the identified time entries are not

duplicative or vague.

Second, Icon argues that $1,296 in fees for Octane's paralegal to attend the Supreme

Court oral argument were not necessary.  This objection is mooted by the Court's denial of fees

related to Octane's appeal to the Supreme Court.

Third, Icon objects to $667.93 in expenses related to the construction of a demonstrative

prototype of an elliptical machine.  Icon argues that although the demonstrative may have been

helpful, it was not necessary for the resolution of the case and was therefore not compensable.

The Court finds the prototype was beneficial in assisting an understanding mechanical aspects of

the devices, and as such contributed to resolution of the case.  Therefore, under the

circumstances of this case, the relatively modest expense for the prototype was both reasonable

and necessary.

### 9.  Enhancement

Finally, Icon opposes Octane's request that the Court consider an enhancement of the

attorney's fee award.  Octane contends an enhancement may be appropriate "to deter Icon from

further misuse of the patent system."  Application 24.  Upward or downward adjustments to the

lodestar calculation should be made "in only 'rare' and 'exceptional' cases."  Bywaters, 670 F.3d

at 1229-30.  An enhancement is not warranted here because the fees awarded under the lodestar

calculation are substantial and will deter Icon from bringing similar patent cases in the future.

## C.  Amount of Award

Having thoroughly reviewed Octane's Application and supporting documentation, as well as Icon's objections, the Court concludes that Octane is entitled to attorney's fees of $1,633,333 and costs of $144,697.  The attorney fee award consists of the total fees requested in Octane's Application ($2,486,579), minus fees related to the § 285 issue in the appeal and remand proceedings ($721,432), minus fees pertaining to the '120 Patent ($125,719), minus fees charged for administrative personnel ($6,095).  The cost award consists of the total costs requested ($362,583), minus costs related to the § 285 issue in the appeal and remand proceedings ($84,354), minus expert witness fees ($110,675), minus undocumented computerized legal research costs ($22,857).[4]

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that**:**

1.  Defendant Octane Fitness LLC's Application for Reasonable Attorney's Fees and Expenses [Docket No. 286] is **GRANTED in PART** and **DENIED in PART**;

2.  Plaintiff Icon Health & Fitness, Inc. shall pay Defendant $1,633,333 in attorney's fees and $144,697 in costs.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

                                    BY THE COURT:


                                    _____s/Ann D. Montgomery_____
                                    ANN D. MONTGOMERY
                                    U.S. DISTRICT JUDGE

Dated:  September 1, 2015.

_____

[4] Of the $48,137 in requested computerized legal research costs, $19,171 were deducted from the costs of the appeal and remand proceedings and $6,109 were allowed, leaving a balance of $22,857 in undocumented online research costs to be deducted.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Icon Health & Fitness, Inc.,

        Plaintiff,

    v.

                                    **MEMORANDUM OPINION**
                                    **AND ORDER**
                                    Civil No. 09-319 ADM/SER

Octane Fitness, LLC,

        Defendant.

_____

Larry R. Laycock, Esq., Maschoff Brennan, Salt Lake City, UT, on behalf of Plaintiff.

Rudolph A. Telscher, Jr., Esq., Harness, Dickey & Pierce, P.L.C., St. Louis, MO, on behalf of
Defendant.

_____

## I.  INTRODUCTION

      This matter is before the undersigned United States District Judge for a ruling on

Defendant Octane Fitness, LLC's ("Octane") letter dated September 11, 2015 Letter [Docket No.

298] ("Octane Letter") requesting permission to move for reconsideration of the Court's

September 1, 2015 Order [Docket No. 296] (the "Attorney Fee Order").  Plaintiff Icon Health &

Fitness, Inc. ("Icon") has filed a letter dated September 21, 2015 [Docket No. 299] ("Icon

Letter") opposing the request.  For the reasons set forth below, Octane's request is denied.

However, the Court, acting on its own under Federal Rule of Civil Procedure 60(a), will amend

the Judgment [Docket No. 297] to correct two errors.

## II.  DISCUSSION

**A.  Request for Leave to File Motion for Reconsideration**

      Octane's request for leave to file a motion for reconsideration is made pursuant to Local

Rule 7.1(j), which requires a party to show "compelling circumstances" before filing a motion to reconsider.  D. Minn. L.R. 7.1(g).  Motions to reconsider "serve a limited function:  to correct manifest errors of law or fact or to present newly discovered evidence."  Hagerman v. Yukon Energy Corp., 839 F.2d 407, 414 (8th Cir. 1988).  Such motions "cannot be used to raise arguments which could have been raised prior to the issuance of judgment."  Id.

Octane argues there are three compelling circumstances which support its request for leave to file a motion for reconsideration.  Each argument is addressed below.

**1. Fees on Fees**

Octane contends that the Court committed legal error by not awarding Octane the fees it incurred in pursuing the appeal and remand proceedings related to the new exceptionality standard under 35 U.S.C. § 285.  See Attorney Fee Order at 4.  The Court denied those fees because Icon's litigation position in the appeals was based on the longstanding Brooks Furniture[1] standard and was thus not exceptional under § 285.  Id.  Indeed, Icon prevailed in the Federal Circuit appeal, and the Supreme Court's rejection of the Brooks Furniture standard broke new ground in the law of fee recovery in patent matters.  See id.; Octane Fitness , LLC v. Icon Health & Fitness, Inc., 134 S. Ct. 1749, 1756 (2014).

Octane contends that "[f]ees on fees litigation is not a 'stage' requiring separate § 285 analysis," and that "[f]ees reasonably incurred in obtaining fees ordinarily should be awarded as part of the work on a patent case."  Octane Letter at 1.  However, "no award of fees is automatic."  Therasense, Inc. v. Becton, Dickinson & Co., 745 F.3d 513, 518 (Fed. Cir. 2014) (quotation omitted).  In assessing a reasonable award under § 285, "[t]he district court's inherent

---

[1] Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378 (Fed. Cir. 2005).

equitable power and informed discretion remain available in determining the level of

exceptionality rising out of the offender's particular conduct, and in then determining, in light of

that conduct, the compensatory quantum of the award." Mathis v. Spears, 857 F.2d 749, 754

(Fed. Cir. 1988).  Thus, it was not legal error for the Court, in exercising its informed discretion,

to limit the award of § 285 appeal and remand fees based on Icon's reasonable conduct and

position in those proceedings.  Even with these reductions, Octane received a fee award that was

fair and substantial.

### 2. Fees Pertaining to '120 Patent

In determining the amount of Octane's fee award, the Court excluded $125,719 in fees

related to Icon's United States Patent No. 5,104,120 (the "'120 Patent").  Octane argues that this

amount was arbitrary and excessive, and that only $41,359 (the sum of all time entries

specifically referencing the '120 Patent) should have been excluded.

The Court's allocation of fees related to the '120 Patent was neither arbitrary nor

erroneous.  The '120 Patent was one of two claims at issue in this litigation.  In arriving at the

amount of fees related to the '120 Patent, the Court deducted 100% of the time entries that

related entirely to the '120 Patent, 50% of the time entries that were reasonably related to both

patents at issue, and 0% of the time entries related to the other patent.  Therefore, the Court did

not err by excluding fees for time entries that did not specifically reference the '120 Patent.

### 3. Electronic Research Charges

Octane argues the Court erroneously determined that $22,857 in computer research

charges were undocumented.  In requesting expenses related to electronic legal research, Octane

referenced Exhibit BB-8 of its Fee Application.  See Def.'s Fee Application [Docket No. 286] at

20.  As Icon noted in its Response [Docket No. 292] to Octane's Fee Application, the invoices provided in Exhibit BB-8 total only $6,108.  Therefore, the Court awarded only this amount. Octane now argues that documentation for the additional $22,857 is found in Exhibits B1 and B2 of the Fussner Declaration.[2]  Because the electronic research charges were documented and submitted in conjunction with Octane's Fee Application, the Court will view the denial of $22,857 as an error resulting from oversight and amend the Judgment to correct the mistake.

In sum, no compelling circumstances exist to warrant a motion to reconsider, and Octane's request to file such a motion is denied.

**B.  Amended Judgment**

Federal Rule of Civil Procedure 60(a) provides that a "court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record.  The court may do so . . . on its own, with or without notice."

The Judgment for attorney's fees entered by the Court on September 2, 2015 must be amended to correct two mistakes arising from oversight.  First, both parties have alerted the Court that $241,145.41 in fees should have been excluded from the total fee award.  See Octane Letter at 1, n.1; Icon Letter at 2.[3]  These fees represent hours of attorney and paralegal time expended by Octane's counsel in the Supreme Court proceedings but not billed to Octane due to an insurance policy cap and other reasons.  See Fussner Decl. [Docket No. 287] ¶ 18.  The amounts were included in the total sum requested in Octane's Fee Application, but were not

---

[2] Only after the Attorney Fee Order was issued did Octane direct the Court to these Exhibits.

[3] The Court commends Octane for its candor in noting the error.

included in Exhibit C to the Fussner Declaration, which is titled "Total Fees and Costs by Matter Number." See id. ¶ 52, Ex. C.  In the Attorney Fee Order, the Court allowed $130,000 of the fees related to the appeal and remand proceedings and denied the remainder of the requested appeal and remand fees.  Attorney Fee Order at 4.  The Court erroneously assumed that all appeal and remand fees were reflected in Exhibit C which, despite its title, includes only fees actually billed ($851,432), and does not include the unbilled fees of $241,145 in Supreme Court fees.  Thus, in denying the balance of appeal and remand fees, the Court deducted $721,432 from the requested fee award ($851,432 requested in Exhibit C less $130,000 in allowed fees), when it should have deducted $962,577 ($851,432 requested in Exhibit C, plus $241,145 in unbilled fees, minus $130,000 in allowed fees).  Accordingly, the amount of fees awarded in the Judgment must be reduced by $241,145.[4]

Second, the Judgment will be amended to include $22,857 in computerized legal research expenses that were erroneously denied based on lack of documentation.  As discussed above, although the documentation supporting the expenses could have been more clearly identified, the expenses were documented in the record before the Court and thus, will be awarded.

### III.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant Octane Fitness, LLC's request [Docket No. 298] for permission to move for reconsideration of the Court's September 1, 2015 Order is **DENIED**; and

---

[4] Icon argues that the Court also should also have deducted $49,277 in fees Octane incurred in preparing its Fee Application.  These fees do not pertain to the appeal and remand proceedings, were not objected to by Icon in its Response to Octane's Fee Application, and were properly awarded.

2.      The September 2, 2015 Judgment [Docket No. 297] is **AMENDED** as follows: Plaintiff Icon Health & Fitness, Inc. shall pay Defendant $1,392,188 in attorney's fees and $167,554 in costs.

**LET AMENDED JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 24, 2015.

# UNITED STATES DISTRICT COURT
## District of Minnesota

Icon Health & Fitness, Inc.,


Plaintiff,                                    **JUDGMENT IN A CIVIL CASE**

v.


Octane Fitness, LLC,


Defendant,

                                           Case Number:  09-319 ADM/SER


☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:
1.  Defendant Octane Fitness, LLC's request [Docket No. 298] for permission to move for reconsideration of the Court's September 1, 2015 Order is **DENIED**; and

2.  The September 2, 2015 Judgment [Docket No. 297] is **AMENDED** as follows: Plaintiff Icon Health & Fitness, Inc. shall pay Defendant $1,392,188 in attorney's fees and $167,554 in costs.

Date: September 25, 2015                    RICHARD D. SLETTEN, CLERK

                                                    s/J. Midtbo
                                      (By)            J. Midtbo, Deputy Clerk



US006019710A

# United States Patent [19]

## Dalebout et al.

| [11] | Patent Number: | **6,019,710** |
|---|---|---|
| [45] | **Date of Patent:** | **Feb. 1, 2000** |

[54] **EXERCISING DEVICE WITH ELLIPTICAL MOVEMENT**

[75] Inventors: **William T. Dalebout**, Logan; **Steven Mott**, Clinton, both of Utah

[73] Assignee: **ICON Health & Fitness, Inc.**, Logan, Utah

[21] Appl. No.: **09/003,322**

[22] Filed: **Jan. 6, 1998**

[51] Int. Cl.[7] .............................. **A63B 22/04**; A63B 69/16

[52] U.S. Cl. ......................................... **482/70**; 482/51

[58] Field of Search ................................. 482/51–53, 57, 482/70, 79, 80, 71

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,316,898 | 5/1967 | Brown . | |
| 5,242,343 | 9/1993 | Miller ........................................ | 482/57 |
| 5,383,829 | 1/1995 | Miller ........................................ | 482/57 |
| 5,518,473 | 5/1996 | Miller ........................................ | 482/57 |
| 5,527,246 | 6/1996 | Rodgers, Jr. ............................... | 482/57 |
| 5,529,555 | 6/1996 | Rodgers, Jr. ............................... | 482/57 |
| 5,540,637 | 7/1996 | Rodgers, Jr. ............................... | 482/52 |
| 5,549,526 | 8/1996 | Rodgers, Jr. ............................... | 482/57 |
| 5,562,574 | 10/1996 | Miller ........................................ | 482/51 |
| 5,573,480 | 11/1996 | Rodgers, Jr. ............................... | 482/57 |
| 5,577,985 | 11/1996 | Miller ........................................ | 482/52 |
| 5,591,107 | 1/1997 | Rodgers, Jr. ............................... | 482/57 |
| 5,593,371 | 1/1997 | Rodgers, Jr. ............................... | 482/51 |
| 5,593,372 | 1/1997 | Rodgers, Jr. ............................... | 482/52 |
| 5,595,553 | 1/1997 | Rodgers, Jr. ............................... | 482/51 |
| 5,611,756 | 3/1997 | Miller ........................................ | 482/52 |
| 5,611,757 | 3/1997 | Rodgers, Jr. ............................... | 482/57 |
| 5,611,758 | 3/1997 | Rodgers, Jr. ............................... | 482/57 |
| 5,637,058 | 6/1997 | Rodgers, Jr. ............................... | 482/51 |
| 5,653,662 | 8/1997 | Rodgers, Jr. ............................... | 482/52 |
| 5,683,333 | 11/1997 | Rodgers, Jr. ............................... | 482/57 |
| 5,685,804 | 11/1997 | Whan-Tong et al. ....................... | 482/51 |
| 5,690,589 | 11/1997 | Rodgers, Jr. ............................... | 482/57 |
| 5,743,834 | 4/1998 | Rodgers, Jr. ............................... | 482/57 |
| 5,788,610 | 8/1998 | Eschenbach ............................... | 482/52 |
| 5,919,118 | 7/1998 | Stearns et al. ............................. | 482/70 |

### FOREIGN PATENT DOCUMENTS

29 19 494 A1  11/1980  Germany .

*Primary Examiner*—S. Crow
*Attorney, Agent, or Firm*—Workman, Nydegger & Seeley

[57] **ABSTRACT**

An exercise apparatus includes a base having a support stand upstanding therefrom. A pair of spaced apart foot rails each have a first end and opposing second end. The second end of each foot rail rests on the base of the frame. A pair of stroke rails each have a first end and an opposing second end. The first end of each stroke rail is slidably attached to the support stand of the frame while the second end of each stroke rail is hingedly attached to a corresponding foot rail. An axle of a crank is rotatably mounted to the support stand. A pair of crank arms each orthogonally project from the corresponding ends of the axle in opposing directions. Each remote end of the crank arm is rotatably mounted to a corresponding stroke rail between the ends thereof.

**34 Claims, 6 Drawing Sheets**





FIG. 1



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6

6,019,710

## 1

## EXERCISING DEVICE WITH ELLIPTICAL MOVEMENT

### BACKGROUND OF THE INVENTION

1. The Field of the Invention

The present invention relates to exercise equipment, and, more specifically exercise equipment having elliptical foot displacement.

2. The Relevant Technology

A variety of indoor exercising equipment has been develop to exercise leg muscles commonly used in running, skiing, and other outdoor activities. Such machines include treadmills, stepping machines, and various types of sliding machines. Although effective to some extent, each of these machines has select disadvantages. For example, most treadmills wear quickly under the jarring of heavy jogging or running. Furthermore, treadmills have the drawback of producing high impact on the user's legs and knees. One approach that minimizes jarring is to use a stair stepper. Stair steppers, however, do not develop all of the muscles commonly used in running. Furthermore, such machines are difficult to use in sprint type exercises. Finally, sliding machines require the user to slide their feet back and forth along a horizontal plane. Such movement does not mimic running and thus exercises only a limited range of muscles.

Recent designs in exercise equipment have attempted to resolve some of the above problems by having a pair of spaced apart foot rails wherein each front end rotates in an elliptical path while each rear end moves along a horizontal plane. The center of each foot rail, on which the user's feet are positioned, also rotates in an elliptical path. This elliptical path is substantially similar to that commonly encountered during running. Likewise, since the user's feet never leave the foot rails, minimal impact is produced.

Several problems, however, have been encountered with such designs. For example, such apparatus commonly include a complexity of interrelated moving parts. This complexity increases the cost and time of manufacturing. An additional problem with such machines is that the foot rails operate by traveling over a relatively long transverse distance. As a result, the exercise machine requires a relatively large area to operate, thereby making the machines less practical for home use.

Finally, conventional apparatus are designed so that the foot rails move along a set, predefined path. Users of different heights whose stride does not correspond to the predetermined path of the apparatus can find use of the apparatus to be uncomfortable or even impossible.

### OBJECTS AND BRIEF SUMMARY OF THE INVENTION

Accordingly, it is an object of the present invention to provide improved exercise apparatus that produce elliptical foot movement similar to that of running.

Another object of the present invention to provide the above exercise apparatus that have a simpler mechanical design than corresponding prior art designs.

Yet another object of the present invention to provide the above exercise apparatus which require minimal space to operate.

Finally, another object of the present invention is to provide the above exercising apparatus which can be selectively adjusted to match the stride of the user.

To achieve the foregoing objectives, and in accordance with the invention as embodied and broadly described

## 2

herein, an exercise apparatus is provided. The exercise apparatus includes a frame having a base configured for resting on a ground surface and a support stand upstanding from the base. A hand rail extends from the top of the support stand to each side of the base. Mounted on top of the hand rail above the support stand is a display board. The exercise apparatus further includes a pair of spaced apart, linear foot rails each having a first end and an opposing second end. The second end of each foot rail slidably rests on the base of the frame. The first end of each foot rail is hingedly attached to the second end of a corresponding stroke rail. Each stroke rail also has a first end slidably attached to the support stand of the frame.

A rotatable crank is also mounted to the support stand. The crank includes an axle rotatably attached to the support stand. A pair of crank arms each orthogonally project from a corresponding end of the axle in opposing directions. Outwardly projecting from each end of the crank arms is a rotatable sleeve. The sleeve is welded or otherwise attached to a corresponding stroke rail between the first and second ends thereof.

During operation, an individual stands on the foot rails and moves their feet in opposing but reciprocating motions. The front end of each foot rail rotates in a substantially elliptical pattern as the result of being hingedly attached to the crank. The second end of each foot rail reciprocates back and forth along the base. The user's feet, disposed between the ends of the foot rails, move in an elliptical pattern, thereby simulating a running motion.

In the preferred design, each stroke rail is formed of a curved member with the crank being mounted at or adjacent to the apex of the curve. By using this configuration, the length of the foot rails is minimized, thereby minimizing the space required to operate the exercise apparatus. In an alternative design, a flywheel can be attached to the axle so as to conserve energy produced by the exerciser.

In alternative embodiments, rather than having the stroke rails curved and the foot rails linear, the stroke rails can be linear and each of the foot rails can be curved. The resulting design operates in substantially the same fashion and produces the same effect. Furthermore, rather than having the first end of each stroke rail directly attached to the frame, an adjustment arm can be positioned therebetween. Each adjustment arm includes a first end slidably attached to the frame and a second end slidably received within a corresponding first end of a stroke rail. By extending or retracting the adjustment arm within the corresponding stroke rail, the effective length of the stroke rail is varied. By varying the effective length of the stroke rail, the stride over which the foot rails travel is varied. Accordingly, by selectively positioning each adjustment arm, the path of the foot rails can configured to match the user's stride.

These and other objects, features, and advantages of the present invention will become more fully apparent from the following description and appended claims, or may be learned by the practice of the invention as set forth hereinafter.

### BRIEF DESCRIPTION OF THE DRAWINGS

In order that the manner in which the above-recited and other advantages and objects of the invention are obtained, a more particular description of the invention briefly described above will be rendered by reference to specific embodiments thereof which are illustrated in the appended drawings. Understanding that these drawings depict only typical embodiments of the invention and are not therefore

6,019,710

**3**

to be considered to be limiting of its scope, the invention will be described and explained with additional specificity and detail through the use of the accompanying drawings in which:

FIG. 1 is a left side perspective view of an exercise apparatus;

FIG. 2 is a right side perspective view of the exercise apparatus shown in FIG. 1;

FIG. 3 is a left side view of the exercise apparatus shown in FIG. 1;

FIG. 4 is a left side perspective view of an alternative embodiment of an exercise apparatus having curved foot rails;

FIG. 5 is a left side view of an alternative embodiment of an exercise apparatus having extendable crank arms; and

FIG. 6 is a perspective view of an alternative embodiment for moving the adjustable crank arms as depicted in FIG. 5.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Depicted in FIG. 1 is one embodiment of an inventive exercise apparatus 10 incorporating features of the present invention. Exercise apparatus 10 includes a frame 12 comprising a base 14 and a support stand 16 upstanding therefrom. Base 14 includes a pair of spaced apart, elongated tracks 18 and 20. Each of tracks 18 and 20 has a top surface 26 extending between a first end 22 and an opposing second end 24. An alignment ridge 28 upstands from top surface 26 of each track 18 and 20 along the lengths thereof. A cross rail 30 rigidly connects tracks 18 and 20 together.

Support stand 16 has a substantially rectangular transverse cross section with opposing sidewalls 31 and 33. Sidewalls 31 and 33 longitudinally extend between a base end 32 and an opposing top end 34. Base end 32 is securely mounted to cross rail 30.

Mounted to frame 12 is a hand rail 36. Hand rail 36 has a substantially U-shaped configuration with a first end 38 mounted to the outside of track 18 and a second end 40 mounted to the outside of track 20. Hand rail 36 also has a center portion 42 secured to top end 34 of support stand 16. Mounted to center portion 42 over support stand 16 is a display board 44.

Exercise apparatus 10 further includes a linear foot rail 46 positioned on track 18 and a linear foot rail 48 positioned on track 20. Each of foot rails 46 and 48 has a top surface 51 extending between a first end 50 and an opposing second end 52. Positioned on top surface 51 of each foot rail 46 and 48 is a wedge shaped foot pad 58. Each foot pad 58 is configured such that when attached to the corresponding foot rail 46 and 48, a top surface 60 of each foot pad 58 is substantially parallel with the ground.

Rotatably mounted to second end 52 of each foot rail 46 and 48 is a wheel 54. A recessed annular groove encircles each wheel 54. Wheel 54 of foot rail 46 is positioned on top surface 26 of track 18 such that alignment ridge 28 is received within groove 56. Wheel 54 of foot rail 48 is likewise positioned on top surface 26 of track 20 such that alignment ridge 28 thereof is received within groove 56. In this configuration, second end 52 of each foot rail 46 and 48 is free to longitudinally roll along corresponding track 18 and 20 in maintained alignment.

Mounted to first end 50 of foot rail 46 is a curved stroke rail 66. Curved stroke rail 66 has a first end 70, an opposing second end 72, and a curved apex 71 formed therebetween. Curved apex has an inside angle $\theta_1$ in a range between about

**4**

120° to about 170° with about 140° to about 160° being preferred. Second end 72 is hingedly mounted to first end 50 of foot rail 46 by a pin 73. The present invention also provides attaching means for attaching first end 70 to support stand 16 so as to simultaneously enable annular rotation and linear displacement of first end 70. By way of example and not by limitation, a pin 76 has a first end 74 transversely extending through first end 70 of stroke rail 66. A nut 78 attaches to first end 74 of pin 76 to prevent separation of stroke rail 66 therefrom. In this position, first end 70 of stroke rail 66 can freely rotate relative the longitudinal axis of pin 76.

Pin 76 also has a second end 80 with a flared head 82 positioned thereat. Flared head 82 is slidably captured within a C-shaped channel 84 that is mounted on support stand 16. First end 70 of stroke rail 66 is thus linearly displaced as pin 76 is slidably moved within channel 84.

As depicted in FIG. 2, a curved stroke rail 68 extends between first end 50 of foot rail 48 and support stand 16. Stroke rail 68 has the same configuration as stroke rail 66 and is attached to foot rail 48 and support stand 16 using the same structures as discussed above with regard to stroke rail 66. Accordingly, like structural elements between stroke rails 66 and 68 and how they are attached are identified by like reference characters.

The present invention also includes connecting means for connecting each stroke rail 66 and 68 to frame 12 such that linear reciprocating displacement of first end 70 of each stroke rail 66 and 68 results in displacement of second end 72 of each stroke rail 66 and 68 in a substantially elliptical path. By way of example and not by limitation, as depicted in FIGS. 1 and 2, a crank 90 is disclosed. Crank 90 includes an axle 92 extending through support stand 16 and being rotatably mounted thereto. Axle 92 has a first end 94 projecting from side 31 of support stand 16 and an opposing second end 96 projecting from side 33 of support stand 16.

A first crank arm 98 is rigidly attached to and orthogonally projects from end 94 of axle 92. A second crank arm 100 is rigidly attached to and orthogonally projects from end 96 of axle 92. Crank arms 98 and 100 project in opposing directions.

The connecting means also includes coupling means for coupling each crank arm 98 and 100 to a corresponding stroke rail 64 and 66 so as to enable free rotation of axle 92. By way of example and not by limitation, each crank arm 98 and 100 terminates at a distal end 102. Outwardly projecting from distal end 102 of first crank arm 98 in substantial parallel alignment with axil 92 is a pin 104. Freely encircling pin 104 is a collar 106. In turn, collar 106 is spot welded or otherwise secured to stroke rail 66 at or adjacent to apex 71.

In like manner, outwardly projecting from distal end 102 of second crank arm 100 in substantial parallel alignment with axil 92 is a pin 105. Freely encircling pin 105 is a collar 107. Collar 107 is spot welded or otherwise secured to stroke rail 68 at or adjacent to apex 71. Crank 90 thus interconnects stroke rails 64 and 66 while still enabling annular rotation of axil 92. As a result of stroke rails 66 and 68 being curved, as opposed to straight, the effective length of foot rails 46 and 48 can be decreased, thereby minimizing the space that exercise apparatus 10 occupies.

During use, an individual faces display board 44 with their feet positioned on corresponding foot pads 58. Foot rails 46 and 48 on which foot pads 58 are mounted are located in displaced or offset position relative to each other as a result of crank arms 98 and 100 projecting in opposing directions. Specifically, as depicted in FIG. 1, with crank

6,019,710

5

arm **98** rotated into a forward position, second end **52** of foot rail **46** is advanced into a forward position while first end **70** of stroke rail **66** is disposed into a lowered position. Simultaneously, second crank arm **100** is oriented in a rearward position with second end **52** of foot rail **48** advanced into a rearward position and first end **70** of stroke rail **68** advanced into an upward position.

As a user applies a down and rearward force on foot pad **58** overlying foot rail **46**, crank **90** rotates 180° causing stroke rail **66** and **68** and foot rails **46** and **48** to simultaneously reverse their relative positioned as depicted in FIG. **2**. A similar force can then be applied to foot pad **58** overlying foot rail **48**, thereby enabling continuous reciprocating displacement of the relative components. During this continued reciprocating motion, the hinged connection between first end **50** of each foot rail **46** and **48** and second end **72** of each stroke rail **66** and **68** rotates in a substantially elliptical path as depicted by dash line **108** in FIG. **3**. This elliptical path results in each foot pad **58** also traveling in a substantially elliptical path similar to that occurring during walking or jogging.

In one embodiment of the present invention, means are also provided for conserving momentum generated by rotation of crank **90**. As depicted in FIG. **2**, by way of example and not by limitation, mounted on axle **92** is an enlarged annular flywheel **110** having a grooved annular edge **112**. A weighted wheel **114** is rotatably attached to frame **12** adjacent to flywheel **110**. Attached to the side of weighted wheel **114** in axle alignment therewith is a drive wheel **116**. A belt **118** loops between flywheel **110** and drive wheel **116**. Accordingly, as axle **92** is rotated, flywheel **110** is simultaneously rotated. This force is transferred through belt **118** to drive wheel **116**. In turn, weighted wheel **114** is rotated. As a result of the increased weight of wheel **114**, once wheel **114** begins to rotate, the force produced therein is transferred back into flywheel **110** to maintain even, continued reciprocating displacement of stroke rails **64** and **66**.

Depicted in FIG. **4** is an alternative embodiment of an inventive exercise apparatus **120**. Exercise apparatus **10** and **120** operate in substantially the same way and share many of the same structural elements. Accordingly, like structural elements between exercise apparatus **10** and **120** are identified by like reference characters. In contrast, however, curved stroke rails **66** and **68** of exercise apparatus **10** are replaced by corresponding linear stroke rails **122** and **124**. Stroke rails **122** and **124** each have a first end **121** slidably attached to support stand **16** and an opposing second end **123**. Furthermore, linear foot rails **46** and **48** of exercise apparatus **10** are replaced by corresponding curved foot rails **126** and **128**. Each curved foot rail **126** and **128** has a first end **130**, an opposing second end **132**, and a curved apex **134** positioned therebetween. First end **130** of each foot rail **126** and **128** is hingedly attached to a second end **123** of a corresponding stroke rail **122** and **124**. Curved apex **134** has an inside angle $\theta_2$ in a range between about 120° to about 170° with about 140° to about 160° being preferred. Mounted at or adjacent to apex **134** is wheel **54** which rides on a corresponding track **18** or **20**. Mounted on second end **132** of each foot rail **126** and **128** is a foot pad **136** for receiving a corresponding foot of a user.

Exercise apparatus **120** has many of the same benefits as exercise apparatus **10**. For example, compared to conventional apparatus, exercise apparatus **120** has a relatively simple mechanical configuration and requires minimal operating space. Furthermore, operation of exercise apparatus **120**, which is the same as that previously discussed with exercise apparatus **10**, produces a substantially elliptical

6

displacement of foot pads **136**, thereby simulating the movement of walking or running.

Depicted in FIG. **5** is yet another alternative embodiment of an exercise apparatus **140**. Exercise apparatus **140** is substantially similar to exercise apparatus **10**. Accordingly, like structural elements between exercise apparatus **10** and **140** are identified by like reference characters.

In one embodiment of the present invention, means are provided for selectively varying the size of the substantially elliptical path that second end **72** of each stroke rail **66** and **68** travels. By way of example and not by limitation, in contrast to exercise apparatus **10**, slidably received with first end **70** of each curved stroke rail **66** and **68** is an adjustment arm **142**. Each adjustment arm **142** has a first end **144** from which pin **76** projects for slidable attachment with channel **84**. Each adjustment arm **142** also has an opposing second end **146** that is slidably disposed within first end **70** of each stroke rail **66** and **68**.

The present invention also includes means for selectively positioning each adjustment arm **142** relative to a corresponding stroke rail **66** and **68**. By way of example and not by limitation, a plurality of holes **148** extend through adjustment arm **142** along the length thereof. A complementary hole **150** likewise passes through first end **70** of each stroke rail **66** and **68**. Once adjustment arm **142** is slid to a desired position, a pin **152** is passed through aligned holes **150** and **148** so as to securely retain adjustment arm **142** in the desired position.

By selectively extending each adjustment arm **142** out of a corresponding stroke rail **66** and **68** or retracting each adjustment arm **142** into a corresponding stroke rail **66** and **68**, the effective length of each stroke rail **66** and **68** varies. As the effective length varies, the size of the elliptical path that second end **72** of stroke rails **66** and **68** travel varies. That is, as the effective length increases, the diameter of the elliptical path increases. Conversely, as the effective length decreases, the diameter of the elliptical path decreases. The size of the elliptical path that foot pads **58** travel varies correspondingly to the elliptical path at second end **72** of stroke rails **66** and **68**. Accordingly, by varying the effective length of stroke rails **66** and **68**, the path that foot pads **58** travel can be selected to correspond to the stride of the user.

There are a variety of alternative embodiments of the means for selectively varying the size of the substantially elliptical path that second end **72** of each stroke rail **66** and **68** travels. By way of example, stroke rails **66** and **68** can be extended at either end or in the middle. Furthermore, the lengths of foot rail **46** and **48** can also be selectively varied.

Depicted in FIG. **6** is an alternative embodiment of the means for positioning adjustment arm **142** relative to a corresponding stroke rail. As disclosed therein, an electric motor **154** is mounted to second end **70** of stroke rail **66** by a bracket **156**. Rotatably extending from motor **154** is a gear **158**. An elongated engagement bar **160** has a first end **162** secured to adjustment arm **142** and a plurality of teeth **164** extending along the length thereof. Engagement bar **160** is biased against gear **158** such that teeth **164** engage with gear **158**. Accordingly, as motor **154** is energized by a switch, gear **150** is selectively rotated clockwise or counter clockwise. In turn, this rotation selectively raises or lowers engagement bar **160** which in turn selectively raises or lowers adjustment arm **142** relative to stroke arm **66**.

In the preferred embodiment, a complementary assembly of the motor **154** and engagement bar **160** are attached to stroke rail **68**. Each of the motors **154** can thus simultaneously engage to simultaneously adjust each adjustment arms **142** a desired distance.

6,019,710

7

The present invention may be embodied in other specific forms without departing from its spirit or essential characteristics. The described embodiments are to be considered in all respects only as illustrative and not restrictive. The scope of the invention is, therefore, indicated by the appended claims rather than by the foregoing description. All changes which come within the meaning and range of equivalency of the claims are to be embraced within their scope.

What is claimed and desired to be secured by United States Letters Patent is:

1. An exercise apparatus comprising:

(a) a frame configured for resting on a ground surface;

(b) a pair of spaced apart foot rails each having a first end and an opposing second end, each foot rail being configured to receive a corresponding foot of a user;

(c) a pair of stroke rails each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail;

(d) means for connecting each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path; and

(e) means for selectively varying the size of the substantially elliptical path that the second end of each stroke rail travels.

2. An exercise apparatus as recited in claim 1, wherein the means for connecting comprises:

(i) an axle having opposing ends, the axil being rotatably mounted to the frame;

(ii) a crank arm rigidly mounted on each opposing end of the axil; and

(iii) means for coupling each crank arm to a corresponding stroke rail so as to enable free rotation of the axle.

3. An exercise apparatus as recited in claim 2, wherein the means for coupling comprises:

(i) a pin projecting from each crank arm; and

(ii) a tubular sleeve rotatably disposed over each pin, each tubular sleeve being rigidly secured to a corresponding stroke rail.

4. An exercise apparatus as recited in claim 2, further comprising means for conserving momentum generated by rotation of the axil.

5. An exercise apparatus as recited in claim 4, wherein the means for conserving momentum comprises:

(a) a flywheel mounted to the axis;

(b) a weighted wheel rotatably mounted to the frame; and

(c) a belt extending from the flywheel to the weighted wheel.

6. An exercise apparatus as recited in claim 1, wherein the means for selectively varying comprises a pair of adjustment arms each having a first end slidably mounted to the frame and an opposing second end adjustably mounted to the first end of a corresponding stroke rail.

7. An exercise apparatus as recited in claim 1, wherein the frame comprises a pair of spaced apart tracks and a support stand upstanding therebetween.

8. An exercise apparatus as recited in claim 1, wherein the first end of each stroke rail is slidably attached to the frame.

9. An exercise apparatus as recited in claim 1, wherein each stroke rail is curved.

10. An exercise apparatus as recited in claim 1, wherein each foot rail is curved.

11. An exercise apparatus as recited in claim 1, further comprising a wheel mounted on each foot rail and disposed on the frame.

8

12. An exercise apparatus comprising:

(a) a frame configured for resting on a ground surface and having an support stand;

(b) a pair of spaced apart foot rails each having a first end and an opposing second end, each foot rail being configured to receive a corresponding foot of a user;

(c) a pair of stroke rails each having a first end and an opposing second end, the first end of each stroke rail being slidably attached to the support stand of the frame, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail; and

(d) means for connecting each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path.

13. An exercise apparatus as recited in claim 12, wherein the means for connecting comprises:

(i) an axle having opposing ends, the axil being rotatably mounted to the frame;

(ii) a crank arm rigidly mounted on each opposing end of the axle; and

(iii) means for coupling each crank arm to a corresponding stroke rail so as to enable the axil to continue to freely rotate.

14. An exercise apparatus as recited in claim 13, wherein the means for coupling comprises:

(i) a pin projecting from each crank arm; and

(ii) a tubular sleeve rotatably disposed over each pin, each tubular sleeve being rigidly secured to a corresponding stroke rail.

15. An exercise apparatus as recited in claim 13, further comprising means for conserving momentum generated by rotation of the axle.

16. An exercise apparatus as recited in claim 12, wherein each stroke rail is curved.

17. An exercise apparatus as recited in claim 12, wherein each foot rail is curved.

18. An exercise apparatus as recited in claim 12, further comprising a wheel mounted on each foot rail and disposed on the frame.

19. An exercise apparatus as recited in claim 12, wherein the second end of each foot rail is freely suspended above a portion of the frame.

20. An exercise apparatus as recited in claim 12, further comprising a foot pad mounted on each foot rail.

21. An exercise apparatus as recited in claim 12, further comprising a hand rail attached to the support stand of the frame.

22. An exercise apparatus as recited in claim 12, further comprising a pair of adjustment arms each having a first end slidably mounted to the frame and an opposing second end adjustably mounted to the first end of a corresponding stroke rail.

23. An exercise apparatus comprising:

(a) a frame configured for resting on a ground surface and having a support stand;

(b) first and second crank arms rotatably mounted to the support stand of the frame, the crank arm rotating about a fixed axis;

(c) first and second foot rails having a first end and an opposing second end, a portion of the first foot rail movably resting on the frame;

(d) stroke means extending between the crank arms and the hingedly attached to said four rails & for rotating

6,019,710

**9**

the end of the first foot rails in a substantially elliptical path when the crank arms are rotated in a circular path.

**24**. An exercise apparatus as recited in claim **23**, wherein the stroke means comprises a first stroke rail having a first end and an opposing second end, the second end of the first stroke rail being hingedly attached to the first end of the first foot rail, the crank arm being attached to the first stroke rail between the first end and the second end thereof, the crank arm being attached so as to enable rotation of the crank arm.

**25**. An exercise apparatus as recited in claim **24**, further comprising an adjustment arm having a first end slidably mounted to the frame and an opposing second end adjustably mounted to the first stroke rail.

**26**. An exercise apparatus as recited in claim **23**, further comprising means for conserving momentum generated by rotation of the crank arm.

**27**. An exercise apparatus as recited in claim **24**, wherein the first stroke rail is linear and the first foot rail is curved.

**28**. An exercise apparatus as recited in claim **24**, wherein the first stroke rail is curved and the first foot rail is linear.

**29**. An exercise apparatus as recited in claim **23**, further comprising:

(a) a second crank arm rotatably mounted to the support stand of the frame, the second crank arm rotating about a fixed axis;

(b) a second foot rail having a first end and an opposing second end; and

(c) a second stroke rail having a first end slidably attached to the support stand of the frame and a second end hingedly attached to the first end of the second foot rail, the second crank being attached to the second stroke rail between the first and second ends thereof.

**30**. An exercise apparatus comprising:

(a) a frame comprising a base configured for resting on a ground surface and an support stand;

**10**

(b) a pair of spaced apart foot rails each having a first end and an opposing second end, a portion of each foot rail resting on the base of the frame;

(c) a pair of adjustment arms each having a first end slidably attached to the support stand and an opposing second end;

(d) a pair of stroke rails each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail; and

(e) means for adjustably attaching the second end of the adjustment arm to a corresponding stroke rail.

**31**. An exercise apparatus as recited in claim **30**, wherein the means for adjustable attaching comprises the second end of each adjustment arm being configured to be received within the first end of a corresponding stroke rail.

**32**. An exercise apparatus as recited in claim **30**, further comprising a rotatable crank including:

(i) an axil having opposing ends, the axle being rotatably mounted to the support stand of the frame;

(ii) a pair of crank arms each orthogonally projecting from a corresponding end of the axle in opposing directions; and

(iii) means for coupling each crank arm to a corresponding stroke rail between the first and second end of the corresponding stroke rail such that as the second end of each foot rail reciprocates in a lateral movement, the first end of each foot rail moves in an elliptical path.

**33**. An exercise apparatus as recited in claim **30**, wherein each of the stroke rails are curved.

**34**. An exercise apparatus as recited in claim **30**, wherein each of the foot rails are curved.

\*   \*   \*   \*   \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   **6,019,710**

DATED        :   **Feb. 1, 2000**

INVENTOR(S) :   **William T. Dalebout; Steven Mott**

Page 1of 2

It is certified that error appears in the above-identified patent and that said Letters Patent are hereby corrected as shown below:

**Col. 1, line 12, change "develop" to --developed--**

**Col. 1, line 56, after "invention" insert --is--**

**Col. 1, line 60, after "invention" insert --is--**

**Col. 2, line 52, after "can" insert --be--**

**Col. 4, line 40, after "from" insert --second--**

**Col. 4, line 49, after "with" change "axil" to --axle--**

**Col. 4, line 58, change "axil" to --axle--**

**Col. 5, line 11, after "relative" change "positioned" to --position--**

**Col. 6, line 62, after "stroke" change "arm" to --rail--**

**Col. 6, line 67, change "arms" to --arm--**

**Col. 7, line 29, change "axil" to --axle--**

**Col. 7, line 32, change "axil" to --axle--**

**Col. 7, line 44, change "axil" to --axle--**

**Col. 8, line 3, after "having" change "an" to --a--**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   :   **6,019,710**

DATED        :   **Feb. 1, 2000**

INVENTOR(S) :   **William T. Dalebout; Steven Mott**

Page 2 of 2

It is certified that error appears in the above-identified patent and that said Letters Patent are hereby corrected as shown below:

Col. 8, line 20, change "axil" to --axle--

Col. 8, line 25, change "axil" to --axle--

Col. 8, line 67, after "said" change "four rails &" to --first foot rail--

Col. 9, line 1, after "the" insert --first-- and after "foot" change "rails" to   --rail--

Col. 9, line 2, after "circular" change "path." to --path; wherein said stroke means is slidably mounted in the frame--

Col. 9, line 36, after "and" change "an" to --a--

Col. 10, line 20, after "an" change "axil" to --axle--

Signed and Sealed this

Third Day of April, 2001

*Attest:*

Nicholas P. Godici

**NICHOLAS P. GODICI**

*Attesting Officer*          *Acting Director of the United States Patent and Trademark Office*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 08-00437-CJC(RNBx)                    Date:  November 3, 2008

Title: ICON HEALTH & FITNESS INC. v. OCTANE FITNESS LLC, and NELLIE'S EXERCISE EQUIPMENT, INC.

═══════════════════════════════════════════════

PRESENT:

**HONORABLE CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE**

Michelle Urie                                        N/A
Deputy Clerk                                      Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:     ATTORNEYS PRESENT FOR DEFENDANT:

None Present                                      None Present

**PROCEEDINGS: (IN CHAMBERS) ORDER GRANTING DEFENDANTS' MOTIONS TO SEVER AND DEFENDANTS' MOTION TO TRANSFER [**filed 10/10/08**]**

Defendants Octane Fitness, LLC, ("Octane") and Nellie's Exercise Equipment, Inc. ("Nellie's") (collectively "Defendants") move pursuant to Federal Rule of Civil Procedure 21 to sever their cases and transfer the case against Octane to the District of Minnesota.  For the following reasons, the motions are GRANTED.

**FACTUAL BACKGROUND**

This case arises from a patent suit filed by Plaintiff Icon Health & Fitness ("Icon") against the Defendants.  Icon alleges that Octane infringed two patents for exercise equipment, U.S. Patent No. 5,104,120 (the " '120 Patent") and U.S. Patent No. 6,019,710 (the " '710 Patent") (collectively the "Patents"), by designing, manufacturing and marketing infringing exercise equipment.  (Compl.)  Icon also alleges that Nellie's infringed the Patents by marketing and teaching customers how to use Octane's infringing equipment.  (Compl. ¶ 23.)  Icon has its principal place of business in Utah and is a Delaware corporation.  (Compl. ¶ 1.)  Octane has its principal place of business in Minnesota and is chartered in Minnesota.  (Compl. ¶ 2.)  Nellie's, a business that sells exercise equipment to individuals and companies, has its principal place of business in and is chartered in California, with no locations in other states.  (Compl. ¶ 3.)  Defendants

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 08-00437-CJC(RNBx)                    Date: November 5, 2008
                                                                        Page 2

---

have filed suit against Icon in the District of Minnesota for a declaratory judgment on the same patent issues.  Defendants now move to sever the cases against Octane and Nellie's, and transfer the action between Octane and Icon to the District of Minnesota, leaving the action between Nellie's and Icon in the Central District of California.

**ANALYSIS**

    **1) Severance**

    The Court may grant a severance of a peripheral defendant so the primary defendant in an action may be transferred to a more convenient forum.  *See Wyndham Assoc. v. Bintliff*, 398 F.2d 614, 618-20 (2nd Cir. 1968).   In *Wyndham*, the Second Circuit allowed the severance and transfer of a securities law case so that the bulk of the issues in the case could be heard in a court where a concurrent action on the same facts was already being heard.  *Wyndham*, 398 F.2d at 619.  The actions at the heart of the suit—a market-manipulation conspiracy—largely occurred in Texas while the suit to be transferred was filed in New York.  The Second Circuit explained that its decision was in the interests of justice:

> We believe that where the administration of justice would be materially advanced by severance and transfer, a district court may properly sever the claims against one or more defendants for the purpose of permitting the transfer of the action against the other defendants, at least in cases where, as here, the defendants as to whom venue would not be proper in the transferee district are alleged to be only indirectly connected to the manipulations which form the main subject matter of the action.

*Wyndham,* 398 F.2d at 619-20.

    Courts have reached similar results in patent cases involving designer/manufacturers and distributors or users of products, finding that the distributors were peripheral to designer/manufacturers in order to transfer the case to a district geographically closer to the designer manufacturer.  The Fourth Circuit, in *Leesona Corp. v. Cotwool Mfg. Corp., Judson Mills Division*, severed a licensor and user of an allegedly infringing machine—in a suit that alleged infringement of both patents on the design of a machine and a method patent—so

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 08-00437-CJC(RNBx)                    Date: November 5, 2008
                                                                                    Page 3

---

it could transfer the action against the machine's manufacturer to a location closer
to that manufacturer's home district, where a declaratory judgment had been filed.
*Leesona*, 308 F.2d 895, 896-99 (4th Cir. 1962).  In *Corry v. CFM Majestic Inc.*,
the court severed a distributor from a manufacturer when "the distributor (i) was
only secondarily involved, (ii) did not manufacture the alleged infringing device
and (iii) would be liable only if the main defendant was found to be infringing the
patent." *Corry*, 16 F. Supp. 2d 660, 666 (E.D. Va. 1998).

      In this case, the claims against Nellie's are peripheral to the claims against Octane.
Nellie's is merely a distributor of Octane's equipment.  Nellie's is not likely to be found
to be infringing the patents at issue if Octane is absolved of infringement.  It is
not alleged that Nellie's designed or manufactured the infringing exercise machines, but that
it merely distributed them.  Icon argues that Nellie's may have induced its customers to
infringe its patent on a method of controlling exercise machines, separate from any
liability Nellie's may incur from selling Octane's allegedly infringing machines.
However, the method described in the patent is merely adjusting the resistance of an
exercise machine to vary the intensity of a workout.  ('120 Patent at 13-14.)  It is unlikely
that oral instruction on this matter by Nellie's staff would infringe if similar instruction
included in the Octane users' manual did not.

      The main issue in this case is whether the machines designed by Octane and
distributed by Nellie's infringe Icon's patents on similar devices.  Octane is the party in
the best position to provide evidence of the design and nature of the device and the
process of designing it.  This issue is likely to be resolved in the action between Octane
and Icon—two national designer/manufacturers—not in the action between Icon and
Nellie's, that is merely a distributor doing business solely in California.  Therefore,
Nellie's is a peripheral defendant to this case and can be severed.

      **2) Transfer**

      Defendants move to transfer this action to the District of Minnesota subject to 28
U.S.C. § 1404(a), which states: "For the convenience of parties and witnesses, in the
interest of justice, a district court may transfer any civil action to any other district or
division where it might have been brought."  28 U.S.C. § 1404(a).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. SACV 08-00437-CJC(RNBx)                    Date: November 5, 2008
                                                    Page 4

---

Two findings are required to for proper transfer: (1) that the transferee district court is one where the action might have been brought; and (2) the convenience of the parties and witnesses, and the interest of justice favor transfer. *Hatch v. Reliance Insurance Co.*, 758 F.2d 408, 414 (9th Cir. 1985). District courts have discretion to adjudicate motions for transfer on an individualized, case-by-case basis. *Jones v. GNC Franchising Co.*, 211 F.3d 495, 498 (9th Cir. 2000). The Ninth Circuit has held that a "defendant must make a strong showing of inconvenience to warrant upsetting the plaintiff's choice of forum" because a plaintiff's choice of forum is afforded substantial weight. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986).

**A) Jurisdiction and Venue**

This action might have been brought in the District of Minnesota because the District of Minnesota has subject matter and personal jurisdiction over Octane and it is a proper venue for this action. There is subject matter jurisdiction in this case because it involves a federal question of patent law. 28 U.S.C. § 1331. Octane is also subject to personal jurisdiction in the District of Minnesota. Octane has significant contacts with the state of Minnesota to justify jurisdiction. Octane is a company that is domiciled in Minnesota and has its facilities there. Finally, Minnesota is an appropriate venue for the action. A civil action that is not founded solely on diversity may be brought in "a judicial district in which a substantial part of the events . . . giving rise to the claim occurred." 28 U.S.C. § 1391(b). In this case, the machines alleged to infringe Octane's patents were designed in and distributed from Minnesota. Thus, a substantial part of the events giving rise to this patent dispute occurred in Minnesota.

**B) Convenience and Justice**

Transfer to Minnesota is also appropriate because it "promotes the convenience of parties and witnesses" and furthers "the interests of justice." The relevant factors to be considered in analyzing the convenience of a particular forum are: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. SACV 08-00437-CJC(RNBx)                    Date: November 5, 2008
                                                                         Page 5

---

witnesses, and (8) the ease of access to sources of proof.  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000) (*citing Stewart*, 487 U.S. at 29).

    These factors militate in favor of transfer to Minnesota.  Minnesota is a more convenient forum for this case than California.  Octane designed and received the allegedly infringing devices within that state.  The relevant witnesses, including in-house and outside design staff and consultants for Octane are located in Minnesota, as are the pertinent documents.  (Decl. of Timothy Porth, ¶¶ 3-5.)  Octane has only two employees in California; both are salespeople who work out of their homes.  (*Id.* ¶ 4.)  Further, Minnesota is likely no more inconvenient to plaintiffs than California.  Icon is located in Utah.  (Compl. ¶ 1.)  Although Icon states it has numerous employees in sales and distribution in California, it has not submitted evidence showing that its witnesses for trial reside here.  Nor has it submitted evidence that it keeps its relevant documents in California.  Because the relevant evidence and witnesses are apparently not in California, it is unlikely that Minnesota will be a less convenient forum for Icon than California.  Although the plaintiff's choice of venue is ordinarily afforded deference, the bulk of this suit bears very little relation to California and the Court sees no reason for keeping it here.

    Transferring the action to Minnesota also furthers the interests of justice.  The governing law in this case is federal patent law; any district is equally competent with this body of law.  There is also a similar case filed in Minnesota, so the interests of judicial economy favor transferring this case there so the parties can resolve all of their disputes in one forum.

## CONCLUSION

    For the foregoing reasons, Defendants' motions to sever and transfer to the District of Minnesota are GRANTED.  The parties are instructed to notify the Court by November 17, 2008, apprising the Court as to whether the claims against Nellie's will be added to the case pending in the District of Minnesota.

jls

MINUTES FORM 11
CIVIL-GEN                                                    Initials of Deputy Clerk MU

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Icon Health & Fitness, Inc.,
a Delaware corporation,

                    Plaintiff,

          v.                              **MEMORANDUM**
                                          **OPINION AND ORDER**
                                          Civil No. 09-319 ADM/SRN

Octane Fitness, LLC,
a Minnesota limited liability company; and
Nellie's Exercise Equipment, Inc.,
a California corporation,

                    Defendants.
_____

C.J. Veverka, Esq., David R. Wright, Esq., H. Craig Hall, Jr., Esq., Larry R. Laycock, Esq., and
Mark W. Ford, Esq., Workman Nydegger, Salt Lake City, UT; and Jeanette M. Bazis, Esq., and
Lawrence M. Shapiro, Greene Espel, P.L.L.P., Minneapolis, MN, on behalf of Plaintiff.

Matthew L. Cutler, Esq., Randy J. Soriano, Esq., Rudolph A. Telscher, Jr., Esq., Harness, Dickey
& Pierce, P.L.C., St. Louis, MO; and Michael A. Lindsay, Esq., Dorsey & Whitney, L.L.P.,
Minneapolis, MN, on behalf of Defendant Octane Fitness, LLC.
_____

# I.  INTRODUCTION

On October 21, 2010, a Markman hearing was held before the undersigned United States

District Judge in this patent infringement action by Plaintiff Icon Health & Fitness, Inc. ("Icon")

against Defendant Octane Fitness, LLC ("Octane").[1]  Icon alleges that Octane infringed claims

1-5, 7, and 9-11 of U.S. Patent No. 6,019,710 (the "'710 patent").  Octane denies the

_____

[1]  An unrepresented party, Nellie's Exercise Equipment, Inc. ("Nellie's"), an Octane
distributor, is also a Defendant in this litigation.  See Docket.  Nellie's and Octane filed
substantially identical counterclaims [Docket Nos. 10, 12, 57].  However, Nellie's counsel
withdrew in June 2009, and Nellie's has not participated in subsequent court proceedings,
including the claim construction process.  Mot. To Withdraw as Counsel [Docket No. 83]; see
generally Docket.  As Nellie's former counsel represented that the causes of action against
Nellie's are not expected to advance, the Court will proceed with claim construction based on the
arguments propounded by Icon and Octane.  Mot. To Withdraw as Counsel.

infringement allegations and counterclaims for a declaratory judgment of non-infringement, invalidity, and unenforceability of the '710 patent.

## II. BACKGROUND

The '710 patent, entitled "Exercising Device with Elliptical Movement," covers an elliptical exercise machine designed to take up less floor space than prior art models and to allow for adjustable stride length.  Pl.'s Opening Mem. Supp. Claim Constr. [Docket No. 131] Ex. A (""710 patent").   The invention also employed a simpler mechanical design than prior art designs.  Id.  Figure 1 from the '710 patent is shown as Figure 1, below.



FIG. 1

The elliptical machine described in the '710 patent includes a frame with a base configured to rest on a ground surface and a support stand upstanding from the base. '710 patent, col.2 ll.1-4; see, supra, Figure 1 (reproduced above). A hand rail extends from the top of the support stand to each side of the base, and a display board is mounted on top of the hand rail above the support stand. Id. at ll.4-6. The machine also includes two foot rails, spaced apart, that are each connected to the support stand by a stroke rail (see, supra, Figure 1 (no. 70)) and a rotatable crank arm (see, supra, Figure 1, (no. 98)). Id. at ll. 5-6.

During operation, an exerciser places one foot on each foot rail and moves his or her feet back and forth so that the front end of each foot rail moves in a substantially elliptical path. Id. at ll.23-26. When the exerciser's feet move in an elliptical pattern, it simulates a running motion. Id. at ll.28-29.

To create an elliptical machine that would occupy a smaller space, the inventors of the '710 patent placed the foot-rail linking mechanism in front of the device rather than in the back of the device. '710 patent, col.1 ll.30-35; see, infra, Figure 2. In the '710 patent, a stroke rail is attached to the forward end of a foot rail and connected to the frame via: 1) a pin mounted within a C-shaped channel (the "C-channel") (see, infra, Figure 3 (no. 84)) on the support stand; and 2) a collar (see, infra, Figure 2 (no. 106)) encircling a pin (see, infra, Figure 2 (no. 104)) projecting from a rotatable crank arm (see, infra, Figure 2 (no. 98)), which is connected to an axle (see, infra, Figure 2 (no. 92)) extending through the support stand. See, infra, Figure 2 (stroke rail highlighted).



**Figure 2**

The '710 patent describes two types of stroke rails. The first type, depicted in Figures 1 and 2, is a unitary stroke rail that is not capable of varying in length. See '710 patent, Figs. 1, 5; Pl.'s Opening Mem. Supp. Claim Constr. at 14. The second type of stroke rail has the capability to increase or decrease in length via manual adjustment or motorized adjustment. See '710 patent, Figs. 5, 6; see, infra, Figure 3 (manual), Figure 4 (motorized).

**Figure 3**



**Figure 4**

At issue in this litigation are claims 1-5, 7, and 9-11 of the '710 patent.  The parties

submitted a Joint Claim Construction Statement [Docket Nos. 85, 87, 88], identifying several

disputed claim terms and phrases.  The Court will construe two claim terms and three claim phrases.

## III.  DISCUSSION

### A.    Standard of Review

Claim construction is a matter of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).  In construing claims, courts should look first to intrinsic evidence, which includes the claims, the specification, and the prosecution history.  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."  Phillips v. AWH Corp., 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (quotation and citations omitted).  However, a patentee can choose to be "his or her own lexicographer by clearly setting forth an explicit definition for a claim term."  Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999).  Claim terms "should be construed consistently with [their] appearance in other places in the same claim or other claims of the same patent."  Rexnord Corp. v. The Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).  In addition, the specification is usually "dispositive; it is the single best guide to the meaning of a disputed term."  Vitronics, 90 F.3d at 1582.  Courts are nonetheless cautioned not to import limitations from the specification into the claims.  Phillips, 415 F.3d at 1323; The Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998).

While courts can consider extrinsic evidence to educate themselves about the patent and technology at issue, it is improper to rely on extrinsic evidence in construing claims unless, after consideration of all the intrinsic evidence, ambiguity remains.  Mantech Envtl. Corp. v. Hudson

Envtl. Servs., Inc., 152 F.3d 1368, 1373 (Fed. Cir. 1998); Vitrionics, 90 F.3d at 1584.  Extrinsic

evidence is "evidence which is external to the patent and file history, such as expert testimony,

inventor testimony, dictionaries, and technical treatises and articles."  Vitrionics, 90 F.3d at

1584.  Dictionaries may be useful to courts in understanding the ordinary and customary

meaning of words, and courts may "rely on dictionary definitions when construing claim terms,

so long as the dictionary definition does not contradict any definition found in or ascertained by

a reading of the patent documents."  Phillips, 415 F.3d at 1322-23.

**B.    "Stroke Rail"**

Icon submits that the term "stroke rail" does not need to be construed.  Alternatively,

Icon proposes the following construction: "A structure comprised of one or more parts that is

attached to a foot rail and connected to the frame."  Pl.'s Opening Mem. Supp. Claim Constr.

[Docket No. 131] Ex. B ("Disputed Claims Chart").  For its part, Octane submits the following

construction: "A linear or curved bar, which can be made to vary in length, extending from a foot

rail to a frame on an elliptical machine."  Id.

First, the parties agree that the term "stroke rail" is a term formulated by the patentees

and has no meaning to a person of ordinary skill in the art.  However, to conclude, as Icon urges,

that the stroke rail is "a structure comprised of one or more parts" would impermissibly broaden

the scope of the '710 patent.  Icon's broad construction excludes other inventors from the use of

infinite combinations of parts that link a footrail and a frame on an elliptical machine.  See

Phillips, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (stating that the words of the patent claim define

the invention to which a patentee is entitled the right to exclude).  The Court need not look

further than the claims and the specification to discover that "stroke rail" cannot be so broadly

construed.  See Vitrionics, 90 F.3d at 1582.  The embodiments of the stroke rail described in the

patent claims and depicted in the specification are relatively simple, with the most complex

embodiment consisting of a rail and a motorized extender.  The intrinsic evidence, then, makes

clear that the term "stroke rail" in the '710 patent cannot encompass the complex possibilities

implicated by the general phrase "one or more parts" in Icon's proposed construction.

Still, the Court agrees with Icon's argument that it serves no meaningful purpose to

substitute the word "bar" for the word "rail," as Octane urges.  Additionally, substituting the

word "may" for the word "can" in Octane's proposed construction ensures the construction

encompasses both a unitary stroke rail and an adjustable stroke rail.   Thus, the Court construes a

"stroke rail" to be:  A linear or curved rail, which may be made to vary in length, extending from

a foot rail to a frame on an elliptical machine.

## C.    "Linear Reciprocating Displacement"

Octane submits that the term "linear reciprocating displacement" does not require

construction.  Disputed Claims Chart at 3.  In contrast, Icon proposes the following construction:

"A change in position from a first point to a second point followed by a change in position from

the second point back to the first point, where the change in position from one point to the other

results in a net change in position along a line.  Linear reciprocating displacement does not

require movement along a linear path."  Id.

Octane argues that "linear means linear," and that the ordinary and customary meaning of

"linear reciprocating displacement" is movement back and forth in a straight line.  Def.'s Resp.

Br. [Docket No. 134] at 22-23.  An examination of the '710 patent's claims and specification

make clear that one end of a stroke rail slides back and forth (i.e., reciprocates) in a linear path

by means of a straight "C-channel."  '710 patent, col.2 ll.12-13, col.4 ll.3-17, col.5 ll.46-48, and

col.6 ll.14-18; Figs. 1-6; see, supra, Figures 1-3.   The claims describe how the first end of the

stroke rail moves back and forth within the C-channel, creating elliptical movement of the second end of the stroke rail.  Id.  Nothing in the '710 patent indicates that the first end of the stroke rail should move in anything other than a straight line.   There is no evidence that the patentees intended the C-channel to be non-linear, or that the first end of the stroke rail be connected to the support stand by anything other than a straight C-channel.

In response, Icon points to various dictionary definitions of the term "linear reciprocating displacement."  However, dictionary definitions are extrinsic evidence.  As the construction of the claim term "linear reciprocating displacement" is resolved based on intrinsic evidence – the ordinary and customary meaning of the claim language and the specification – examination of extrinsic evidence is unnecessary and improper.  See Mantech, 152 F.3d at 1373; see also Phillips, 415 F.3d at 1312-13 ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.").  Accordingly, the Court concludes that no construction of "linear reciprocating displacement" is necessary.

**D.     Means-Plus-Function Claim Phrases**

The remaining disputed claim elements are subject to a means-plus-function analysis.  Means-plus-function claim elements are interpreted according to 35 U.S.C. § 112, ¶ 6:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

"Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction and . . . a question of law."  Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n, 161 F.3d 696, 702 (Fed. Cir. 1998).  The claim phrases construed below are written in

means-plus-function form, and the parties agree that all three claim phrases are to be construed

as a means-plus-function elements.

> **1.    "Means for connecting each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path."**

> > **i.    Function**

Icon proposes the following function: "connecting each stroke rail to the frame in a

manner that results in displacement of the second end of each stroke rail in a substantially

elliptical path if the first end undergoes linear reciprocating displacement." Disputed Claims

Chart at 2. Octane proposes that the function recited in this element, "connects each stroke rail

to the frame such that linear reciprocating displacement of the first end of each stroke rail results

in displacement of the second end of each stroke rail in a substantially elliptical path," requires

no construction because the plain and ordinary meanings of the terms used to describe the

function are sufficiently clear. Disputed Claims Chart at 2-3. The Court agrees. See Phillips,

415 F.3d at 1312-13. Thus, no construction of the function is necessary.

> > **ii.    Corresponding Structure**

Icon proposes the following corresponding structure: "An axle mounted to a pair of crank

arms, a pin projecting from each crank arm, and a collar encircling each pin. The axle is

mounted to the frame and each collar is attached to a stroke rail." Disputed Claims Chart at 2.

Octane proposes a much narrower description of the corresponding structure, referencing the

numbered parts depicted in Figure 1 of the '710 patent (see, supra, Figure 1):

> > 1) Pin 76 (and the corresponding pin on the opposite side of the frame from pin 76, that is not labeled);

> > 2) Nut 78 (and the corresponding nut on the opposite side of the frame from nut 78, that is not labeled);

3) Flared head 82 (and the corresponding flared head on the opposite side of the frame from flared head 82, that is  not labeled);

4) C-shaped channel 84 (and the corresponding C-shaped channel on the opposite side of the frame from C-shaped channel 84, that is not labeled);

5) Axle 92;

6) Crank arms 98 and 100;

7) Nuts 94 and 96;

8) Pins 104 and 105 (pin 105 is not labeled in the Figures of the '710 patent);

9) Collars 106 and 107 (107 is not labeled in the Figures of the '710 patent);

10) Spot welds that hold the two collars, referenced in 9) above, to the stroke rails 66 and 68; and

11) Nuts/washers at the end of pins 104 and 105.

Id. at 2-3.

The function of this claim phrase is to connect the stroke rail to the frame in such a way as to cause the first end of the stroke rail to undergo linear reciprocating displacement (which then causes the second end of the stroke rail to move in an elliptical path).  The Federal Circuit teaches that the corresponding structure must include all structure that "actually performs the recited function."  Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 296 F.3d 1106, 1119 (Fed. Cir. 2002); Asyst Techs., Inc. v. Empak, Inc., 268 F.3d 1364, 1371 (Fed. Cir. 2001).  Thus, the corresponding structure here must simultaneously connect the stroke rail to the frame and cause the first end of the stroke rail to undergo linear reciprocating displacement.

The parties agree, and the Court accepts, that the corresponding structure includes an axle mounted to the frame and also mounted to a pair of crank arms, a pin projecting from each crank

arm, and a collar encircling each pin that is attached to a stroke rail.  The parties disagree as to whether the following are corresponding structure:  1) the C-channel, corresponding pin, and flared head; 2) the spot welds connecting the collar to the stroke rail, and 3) various nuts and washers.

The Court finds that the corresponding structure that performs the recited function must include the C-channel and corresponding pin.  Linear reciprocating displacement of the first end of the stroke rail is caused when the pin, which is connected to the stroke rail, moves up and down within the straight C-channel.  Icon argues that because claims 8 and 12 of the patent articulate that one end of the stroke rail is "slidably attached," the "claim differentiation" doctrine dictates that the C-channel cannot be corresponding structure.  However, the Federal Circuit has held that the doctrine of claim differentiation cannot override means-plus-function construction required by 35 U.S.C. § 112, ¶ 6.  Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1538 (Fed. Cir. 1991) ("Claim differentiation is a guide, not a rigid rule.  If a claim will bear only one interpretation, similarity will have to be tolerated.") (quoting Autogiro Co. of Am. v. United States, 384 F.2d 391, 404 (Ct. Cl. 1967)).  Thus, although the C-channel and corresponding pin may be articulated in claims 8 and 12, the C-channel and corresponding pin are not excluded as the corresponding structure for this means-plus-function claim element.  See id. ("[A] means-plus-function limitation is not made open-ended by the presence of another claim specifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure.").

Additionally, the flared head (or the equivalent thereof) must also be included in the corresponding structure because, without it, the pin would slip out of the C-channel (instead of reciprocating in a linear fashion.)  See '710 patent, col.4 ll.14-16 (stating flared head is "slidably

captured within a C-shaped channel"); Cardiac Pacemakers, 296 F.3d at 1119.  Similarly, the

nuts and washers (or the equivalent thereof) connecting the pin to the first end of the stroke rail

must be included in the corresponding structure.   Cardiac Pacemakers, 296 F.3d at 1119.

        The same reasoning applies equally to 1) the spot welds attaching the collar to the stroke

rail and 2) the nuts and washers connecting the pin to the collar.  Without the spot welds, or their

equivalents, the collar would not be attached to the stroke rail.  As the connection between the

collar and the stroke rail is required to produce any movement at all, let alone linear

reciprocating displacement, the spot welds are corresponding structure.  Similarly, the nuts and

washers (or the equivalents thereof) are required to keep the pin within the collar.  Icon argues

that the corresponding structure cannot be limited by the term "spot welds" because the '710

patent's detailed description of the preferred embodiments states that the collars are "spot

welded *or otherwise secured*" to the stroke rails. '710 patent, col.4 ll.50-56 (emphasis added).

In so arguing, Icon attempts to impermissibly broaden its patent claim.  See, e.g., Halliburton

Energy Svcs., Inc., v. M-I LLC, 514 F.3d 1244, 1256 n.7 (Fed. Cir. 2008) (noting that § 112, ¶ 6

"was meant to preclude the over breadth inherent in open-ended functional claims . . . which

effectively purport to cover any and all means so long as they perform the recited functions");

see also Neopost Industrie B.V. v. PFE Int'l, Inc., No. 04-5047, 2005 WL 6266289, *4 (N.D. Ill.

Apr. 26, 2005) (stating "general, catch-all statement cannot eviscerate the requirement that a

means-plus-function limitation is 'sharply limited' to the structures disclosed in the written

description and their equivalents" and refusing to "impermissibly entitle" plaintiff to "claims that

are 'unbounded by any reference to structure' in the written description.") (quoting Medical

Instrumentation and Diagnostics Corp. v. Elektra AB, 344 F.3d 1205, 1211 (Fed. Cir. 2003)).

The only undisclosed structures that can be included within the construction of a

means-plus-function limitation are the structural equivalents expressly contemplated by § 112 ¶ 6. Id. Thus, the spot welds and the nuts and washers connecting the pin to the collar (or the equivalents thereof) are also corresponding structure.

In summary, the Court adopts Octane's proposed construction for this means-plus-function claim phrase. See Disputed Claims Chart at 2-3.

**2.    "Means for selectively varying the size of the substantially elliptical path that the second end of each stroke rail travels."**

The parties represented at the hearing that they agree the function, "selectively varying the size of the substantially elliptical path that the second end of each stroke rail travels," needs no construction.

However, Icon proposes the following construction for the corresponding structure: "(1) An arm with holes along a portion of its length that can be aligned with a pin and a hole in a stroke rail; or (2) an electric motor driving a gear that engages teeth on a bar to move an adjustment arm." Again, Octane counters with a significantly narrower proposed construction:

> There are two embodiments disclosed in the '710 patent that contain structure that corresponds to this function. The first embodiment is referred to herein as the "Manual Adjustment Arm Embodiment" and is shown in Figure 5.
>
> The structure from this embodiment that corresponds to the above-referenced function is:
>
> 1) Adjustment arm 142 (and the corresponding adjustment arm on the opposite side of the frame from adjustment arm 142, that is not shown in the Figures of the '710 patent);
>
> 2) Plurality of holes 148 (and the corresponding plurality of holes on the adjustment arm located on the opposite side of the frame from adjustment arm 142, that is now shown in the Figures of the '710 patent);

3) Complementary hole 150 located in stroke rail 66 (and the corresponding complimentary [sic] hole in stroke rail 68, that is not shown in the Figures of the '710 patent);

4) Pin 152 (and the corresponding pin located on the opposite side of the frame from pin 152, that is now [sic] shown in the Figures of the '710 patent);

5) Pin 76 (and the corresponding pin on the opposite side of the frame from pin 76, that is not labeled);

6) Nut 78 (and the corresponding nut on the opposite side of the frame from nut 78, that is not labeled);

7) Flared head 82 (and the corresponding flared head on the opposite side of the frame from flared head 82, that is not labeled; and

8) C-shaped 84 (and the corresponding C-shaped channel on the opposite side of the frame from C-Shaped channel 84, that is not labeled).

Disputed Claims Chart at 3-4.

The second embodiment is referred to herein as the "Motorized Adjustment Arm Embodiment" and is shown in Figure 6. The structure from this embodiment that corresponds to the above-reference function is:

1) Electric motor 154 (and the corresponding electric motor located on the opposite side of the frame from electric motor 154, that is not shown in the Figures of the '710 patent);

2) Bracket 156 (and the corresponding bracket located on the opposite side of the frame from bracket 156, that is not shown in the Figures of the '710 patent);

3) Gear 158 (and the corresponding gear located on the opposite side of the frame from gear 158, that is not shown in the Figures of the '710 patent);

4) Elongated engagement bar 160 (and the corresponding elongated engagement bar located on the opposite side of the frame from elongated engagement bar 160, that is not shown in the Figures of the '710 patent);

5) Teeth 164 (and the corresponding teeth located on the opposite side of the frame from teeth 164, that are not shown in the Figures of the '710 patent);

6) Adjustment arm 142 (and the corresponding adjustment arm located on the opposite side of the frame from adjustment arm 142, that is not shown in the Figures of the '710 patent);

7) Rod that connects elongated engagement bar 160 to adjustment arm 142 (and the corresponding rod located on the opposite side of the frame from the rod that connects elongated engagement bar 160 to adjustment arm 142, that is not shown in the Figures of the '710 patent);

8) Bias mechanism that biases engagement bar 160 against gear 158 (and the corresponding bias mechanism on the opposite side of the frame from engagement bar 160 and gear 158, that is not shown in the Figures of the '710 patent);

9) Pin 76 (and the corresponding pin on the opposite side of the frame from pin 76, that is not labeled);

10) Nut 78 (and the corresponding nut on the opposite side of the frame from nut 78, that is not labeled);

11) Flared head 82 (and the corresponding flared head on the opposite side of the frame from flared head 82, that is not labeled); and

12) C-shaped channel 84 (and the corresponding C-shaped channel on the opposite side of the frame from C-shaped channel 84, that is not labeled).

Id. at 4-6.

First, Icon and Octane disagree as to whether the nuts, washers, spot welds, C-channel, corresponding pin and flared head are corresponding structure.  Applying the reasoning set forth in Part D(1)(ii), supra, the nuts, washers, and spot welds described by Octane, or the equivalents thereof, are corresponding structure.  Cardiac Pacemakers, 296 F.3d at 1119.

However, the C-channel is not corresponding structure because it does not perform the recited function of "selectively varying the size of the substantially elliptical path that the second

end of each stroke rail travels." As discussed above, the C-channel is corresponding structure for the function of creating linear reciprocating displacement. The C-channel does not, however, vary the size of the elliptical path that the stroke rail travels. For both the manual and motorized embodiments, the method of varying the size of the elliptical path consists of increasing or decreasing the length of the stroke rail. '710 patent, col.2 ll. 47-51, col.6 ll.28-42. ("By extending or retracting the adjustment arm within the corresponding stroke rail, the effective length of the stroke rail is varied. By varying the effective length of the stroke rail, the stride over which the foot rails travel is varied.") The C-channel, corresponding pin, and flared head do not change the length of the stroke rail. Therefore, they are not corresponding structure. See Cardiac Pacemakers, 296 F.3d at 1119 ("[C]orresponding structure need not include all things necessary to enable the claimed invention to work.").

Next, Icon and Octane disagree as to the level of specificity required to describe the corresponding structure for the manual adjustment and the motorized adjustment alternatives. Icon proposes the corresponding structure for the manual adjustment embodiment be the following: "An arm with holes along a portion of its length that can be aligned with a pin and a hole in a stroke rail." The Court construes the corresponding structure for the manual adjustment embodiment to be: An adjustment arm with holes along a portion of its length that can be aligned with a pin and a complementary hole in a stroke rail.

Icon proposes the corresponding structure for the motorized adjustment embodiment alternative be the following: "An electric motor driving a gear that engages teeth on a bar to move an adjustment arm." The Court construes the corresponding structure for the motorized adjustment embodiment to be: An electric motor driving a gear that engages teeth on an elongated engagement bar to move an adjustment arm. The electric motor is mounted to the

stroke rail by a bracket, and the adjustment arm is connected to the elongated engagement bar by a rod.

**3.    "Means for coupling each crank arm to a corresponding stroke rail so as to enable free rotation of the axle."**

The parties agree that the function, "coupling each crank arm to a corresponding stroke rail so as to enable free rotation of the axle," requires no construction, as the plain and ordinary meanings of the terms used to describe the function are sufficiently clear.

Again, the parties disagree as to the corresponding structure. Icon proposes the following construction for corresponding structure: "A pair of collars, each encircling a pin. Each pin projects from a crank arm and each collar is attached to a stroke rail." Octane proposes the following construction:

> The structure from the specification of the '710 patent that corresponds to this function is:
>
> 1) Pins 104 and 105 (pin 105 is not labeled in the Figures of the '710 patent);
>
> 2) Collars 106 and 107 (collar 107 is not labeled in the Figures of the '710 patent);
>
> 3) Spot welds that hold the two collars, referenced in 2) above, to the stroke rails 66 and 68; and
>
> 4) Nuts/washers at the end of pins 104 and 105.

Consistent with the reasoning set forth above, the Court adopts the following construction for the corresponding structure that performs the recited function of "coupling each crank arm to a corresponding stroke rail so as to enable free rotation of the axle": A pair of collars, each encircling a pin. Each pin projects from a crank arm and each collar is attached to a stroke rail via spot welds or their equivalents. Nuts and washers, or the equivalents thereof, are positioned at the end of the pins.

## IV.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that, in interpreting the '710 patent, the contested terms be construed in

accordance with this Order.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 22, 2010.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Icon Health & Fitness, Inc.,
a Delaware corporation,

        Plaintiff,

  v.                                    **MEMORANDUM**
                                      **OPINION AND ORDER**

                                      Civil No. 09-319 ADM/SER

Octane Fitness, LLC,
a Minnesota limited liability company; and
Nellie's Exercise Equipment, Inc.,
a California corporation,

        Defendants.

_____

C.J. Veverka, Esq., David R. Wright, Esq., H. Craig Hall, Jr., Esq., Larry R. Laycock, Esq., and
Mark W. Ford, Esq., Workman Nydegger, Salt Lake City, UT; and Jeanette M. Bazis, Esq., and
Lawrence M. Shapiro, Esq., Greene Espel, P.L.L.P., Minneapolis, MN, on behalf of Plaintiff.

Matthew L. Cutler, Esq., Rudolph A. Telscher, Jr., Esq., Harness, Dickey & Pierce, P.L.C., St.
Louis, MO; and Michael A. Lindsay, Esq., Dorsey & Whitney, L.L.P., Minneapolis, MN, on
behalf of Defendant Octane Fitness, LLC.

_____

## I.  INTRODUCTION

On March 29, 2011, a hearing was held before the undersigned United States District

Judge in this patent infringement action by Plaintiff Icon Health & Fitness, Inc. ("Icon") against

Defendant Octane Fitness, LLC ("Octane").  Icon alleges that Octane infringed claims 1-5, 7,

and 9-11 of U.S. Patent No. 6,019,710 (the "'710 patent").  Octane denies the infringement

allegations and moves for summary judgment of non-infringement.  Octane also moves to strike

portions of Icon's expert report.  For the following reasons, the motion to strike is denied and the

motion for summary judgment of non-infringement is granted.

## II. BACKGROUND[1]

The '710 patent, entitled "Exercising Device with Elliptical Movement," covers an elliptical exercise machine designed to take up less floor space than prior art models and to allow for adjustable stride length.

The elliptical machine described in the '710 patent includes a frame with a base configured to rest on a ground surface and a support stand arising from the base. A hand rail extends from the top of the support stand to each side of the base, and a display board is mounted on top of the hand rail above the support stand. The machine also includes two foot rails, spaced apart, that are each connected to the support stand by a stroke rail and a rotatable crank arm.

During operation, an exerciser places one foot on each foot rail and moves his or her feet back and forth so that the front end of each foot rail moves in a substantially elliptical path. When the exerciser's feet move in an elliptical pattern, it simulates a running motion.

To enable their elliptical machine to occupy a smaller space, the inventors placed the foot rail linking mechanism in front of the device rather than in the back of the device. This linking mechanism, sometimes called a "linkage system," connects the foot rails to the frame so as to allow for elliptical motion. A stroke rail (see highlighted portion of Figures 1 and 2, below) is attached to the forward end of a foot rail and connected to the frame via (1) a pin mounted within a C-shaped channel (the "C-channel") (see Figure 2, no. 84) on the support stand; and (2) a collar (see Figure 1, no. 106) encircling a pin (id., no. 104) projecting from a rotatable crank arm (id., no. 98), connected to an axle (id., no. 92) extending through the support stand.

---

[1] A description of the invention is set forth more fully in the Court's Order of December 22, 2010 [Docket No. 144]. The '710 patent is attached as Exhibit 1 to the Declaration of Matthew L. Cutler [Docket No. 158].



| **Figure 1** | **Figure 2** |

The patent describes two types of stroke rails. The first type, depicted in Figure 1, is a unitary stroke rail that does not vary in length. The second type of stroke rail can increase or decrease in length via manual adjustment (Figure 2) or motorized adjustment (not pictured).

At issue in this litigation are patent claims 1-5, 7, and 9-11, all directed to the elliptical machine's linkage system. Those claims were construed in this Court's Order of December 22, 2010 [Docket No. 144] ("Claim Construction Order").

### III.  DISCUSSION

**A.    The Law of Patent Infringement**

The determination of infringement is a two-step process. First, the claims are construed; second, the construed claims are compared to the allegedly infringing product. See IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429  (Fed. Cir. 2000).  The first step, a question

of law, <u>id.</u>, has already been performed.  The second step, infringement, is a question of fact; however, where no reasonable jury could find infringment, summary judgment is appropriate. <u>Id.</u>

"To establish infringement, every limitation set forth in a patent claim must be found in an accused product or process exactly or by a substantial equivalent."  <u>Laitram Corp. v. Rexnord, Inc.</u>, 939 F.2d 1533, 1535 (Fed. Cir. 1991).  Where the claim limitations appear exactly, the accused product literally infringes.  Where features substantially equivalent to the claim limitations appear in the accused product, the accused product infringes under the doctrine of equivalents.  Icon claims both types of infringement apply here.

### 1. Literal infringement

Literal infringement requires that every limitation set forth in a patent claim be found in the accused device.  <u>Elkay Mfg. Co. v. Ebco Mfg. Co.</u>, 192 F.3d 973, 980 (Fed. Cir. 1999).  If any limitation is missing, there is no literal infringement.  <u>Id.</u>

When a claim is presented in means-plus-function form, as several of the '710 patent claims are, the analysis is slightly different.  A means-plus-function claim "recite[s] a specified function to be performed rather than the structure, material or acts for performing that function." <u>IMS Tech.</u>, 206 F.3d at 1429-30.  "Such limitations are construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  <u>Id.</u>, <u>citing</u> 35 U.S.C. § 112, ¶ 6 (internal quotation omitted).

For a means-plus-function claim, the analysis for literal infringement "requires that the relevant structure in the accused device perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification."  <u>Odetics, Inc. v.</u>

Storage Tech. Corp., 185 F.3d 1259, 1267 (Fed. Cir. 1999).  This is a narrower version of what is

often referred to as the "tripartite test," or the "function, way, or result" test, developed in the

context of the doctrine of equivalents.  See id.  In the context of a means-plus-function claim, the

word "equivalent" indicates the relevant structure must perform the identical function in

substantially the same way to achieve substantially the same result.  Id.

    To determine if there has been literal infringement of a means-plus-function claim, the

Court first considers whether the identical function is performed.  IMS Tech., 206 F.3d at 1430.

If so, the Court determines "whether the accused device uses the same structure, materials or acts

found in the specification, or their equivalents."  Id.  The Court must analyze the differences

between the structure claimed in the patent, and the proposed equivalent.  See Odetics, 185 F.3d

at 1268.  "[T]he claim limitation is the overall structure corresponding to the claimed function."

Id.  As "structures with different numbers of parts may still be equivalent under § 112, ¶ 6[,]" id.,

it is neither necessary nor appropriate to deconstruct the corresponding structure into its

component parts, and look for an exact match.

    Decisions of the Federal Circuit establish when structures are, and are not, substantially

equivalent.  For example, a patent on a circular saw for concrete claimed the function of

"supporting the surface of the concrete" while it was being sawed.  Chiuminatta Concrete

Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1306 (Fed. Cir. 1998).  The court found

the patent claimed a "hard and predominantly flat" structure called a "skid plate" that skidded

across the concrete surface, while the accused structure was a "soft, compressible, and round" set

of rubber wheels that rolled over the surface.  Id. at 1309.  Because one skidded and the other

rolled, and because the two structures supported the concrete surface in substantially different

ways, they were not equivalent.  Id.

By contrast, equivalence was found in <u>Odetics</u>, a case dealing with automated

videocassette library storage devices.  There, the claimed function was to rotate a bin when force

was applied.  <u>Odetics</u>, 185 F.3d at 1264.  The corresponding structure was a gear with teeth; the

accused structure was a set of pins protruding from the bottom of the bin.  <u>Id.</u> at 1265, 1269-70.

In both instances, force applied to the structure caused the bin to rotate; as a result, the structures

were equivalent, which supported a finding of literal infringement.  <u>Id.</u> at 1270.

When considering equivalence, the context of the invention controls, because "two

structures that are equivalent in one environment may not be equivalent in another" – for

example, "if performing functions other than the claimed function."  <u>IMS Tech.</u>, 206 F.3d at

1436.  Thus the context of the claimed invention informs the analysis of how substantial the

differences are.  Where "the disclosed physical structure is of little or no importance to the

claimed invention, there may be a broader range of equivalent structures than if the physical

characteristics of the structure are critical in performing the claimed function in the context of

the claimed invention."  <u>Id.</u>  So, for example, where a patent for controlling a machine tool

claimed an "interface means" for transferring and recording data onto "an external medium," but

did not specify a format or mechanism for recording or retrieving data, a reasonable factfinder

might find the differences between a cassette tape and a floppy disk to be insubstantial.  <u>Id.</u> at

1430, 1437.  "That two structures may perform unrelated– and, more to the point, unclaimed–

functions differently or not at all is simply not pertinent to the measure of § 112 ¶ 6 equivalents."

<u>Odetics</u>, 185 F.3d at 1271.

Another test for equivalence is the "known interchangeability" test.  The known

interchangeability test "looks to the knowledge of a skilled artisan to see whether that artisan

would contemplate the interchange as a design choice."  <u>Interactive Pictures Corp. v. Infinite</u>

Pictures, Inc., 274 F.3d 1371, 1383 (Fed. Cir. 2001).  Expert testimony that alternatives are

known to be interchangeable may support a finding of equivalence.  Id. at 1382; see also

Caterpillar, Inc. v. Deere & Co., 224 F.3d 1374, 1380 (Fed. Cir. 2000) (question of fact on

equivalence where evidence showed accused mechanism "was a known alternative" structure

that "had, in fact, been substituted" by patentee for the structure disclosed in the patent); IMS

Tech., 206 F.3d at 1437 (same, where evidence showed floppy disk drive and tape cassette were

known to be equivalent for data transferring and recording functions); Al-Site Corp. v. VSI

Intern., Inc., 174 F.3d 1308, 1316 (Fed. Cir. 1999) (same, where expert testified that glue and

rivet were interchangeable structures when used to close a loop on an eyeglass display).

### 2. Doctrine of Equivalents Infringement

Even without literal infringment, it is possible for a device to infringe if the accused

device includes the substantial equivalent of every claim limitation.  See Sage Prods., Inc. v.

Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997).  The key question is whether the

differences are "insubstantial."  Id.  "The doctrine of equivalents prevents an accused infringer

from avoiding infringement by changing only minor or insubstantial details of a claimed

invention while retaining their essential functionality."  Id. at 1424.  As the Federal Circuit has

observed,

> The doctrine of equivalents is necessary because one cannot predict the future.
> Due to technological advances, a variant of an invention may be developed after
> the patent is granted, and that variant may constitute so insubstantial a change
> from what is claimed in the patent that it should be held to be an infringement.
> Such a variant, based on after-developed technology, could not have been
> disclosed in the patent.

Chiuminatta, 145 F.3d at 1310.

The equivalence analysis largely mirrors the analysis for literal infringement of a means-

plus-function claim.  The test for equivalent structure is the same: whether the structure performs

a function in the same way with the same result.  See id. at 1311 (holding lack of equivalent

structure under § 112, ¶ 6 mandates same finding under doctrine of equivalents).  But where the

means-plus-function analysis requires identical functions, the doctrine of equivalents requires

only that the functions be substantially similar.  Interactive Pictures, 274 F.3d at 1382.  The

known interchangeability test also applies in the context of the doctrine of equivalents.  See id.;

see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 36 (1997).

What constitutes substantially equivalent function again is illustrated by reviewing the

opinions of the Federal Circuit.  In a case involving digital image processors, a jury considered

whether an image processing system infringed a claimed "image transform processor means."

Interactive Pictures, 274 F.3d at 1382.   The two image processing systems transformed different

types of digital input signals into the same type of image.  As the Federal Circuit observed, "A

difference of inputs to a signal processing element resulting in the same output necessarily

implies a difference in function performed by the element."  Id.  However, the jury concluded

that the difference in function was insubstantial, and the Federal Circuit found no basis to reverse

that finding as a matter of law.  Id.

In another case, the court considered an electronic circuit switch designed to allow a

television to receive signals from both a VCR and a television antenna.  The patent claimed a

"means . . .  for establishing a second signal path [from the TV to the antenna] . . . said second

signal path being disrupted" when the VCR was turned on.  Gen. Elec. Co. v. Nintendo Co., 179

F.3d 1350, 1354 (Fed. Cir. 1999).  The accused switch contained transistors which established

"an alternative path of lower resistance allowing the antenna signal to flow to ground rather than

to the television," effectively bypassing, but not disrupting, the signal path to the television.  Id.

at 1355.  The functions were not identical, and, because one altered the signal path while the

other did not, they also were not equivalent.  Id. at 1356.  See also Kahn v. Gen. Motors Corp.,

135 F.3d 1472, 1478 (Fed. Cir. 1998) (in AM stereo receivers, function of reducing distortion in

first input signal is not substantially equivalent to function of removing second input signal).

The application of the doctrine of equivalents is not without legal limitations, which raise

questions of law for the court.  See Warner-Jenkinson, 520 U.S. at 39 n.8.  One arises when the

patentee argues for an equivalent which, if accepted, would vitiate an element of the original

claim.  Known as the "all elements rule," the "all limitations rule," or the "doctrine of vitiation,"

the doctrine holds that "each element contained in a patent claim is deemed material to defining

the scope of the patented invention," and that the doctrine of equivalents "is not allowed such

broad play as to effectively eliminate [an] element in its entirety."  DePuy Spine, Inc. v.

Medtronic Sofamor Danek, Inc., 469 F.3d 1005, 1016-17 (Fed. Cir. 2006) (citing Warner-

Jenkinson, 520 U.S. at 29-30).  So, even if two functions or structures may in fact be equivalent,

they cannot be found equivalent as a matter of law if doing so would effectively read a claim

limitation out of a claim or render it meaningless.  Tronzo v. Biomet, Inc., 156 F.3d 1154, 1160

(Fed. Cir. 1998).  Thus where a patentee proposes a theory of equivalence which "effectively

eliminate[s] a limitation in its entirety," such a theory is legally insufficient to prove

infringement as a matter of law.  DePuy Spine, 460 F.3d at 1017.

For example, where a patent for an artificial hip socket specifically claimed a particular

conical shape, and differentiated other shapes in the prior art as inferior, the patentee could not

later claim infringement on the theory that other shapes were equivalent - even when that theory

was supported by expert testimony.  Tronzo, 156 F.3d at 1159-60.  In another case involving

folding bus seats, an accused seat that was "rotatably mounted" to its base was not equivalent to

a patented seat that was "slidably mounted" to its base.  Freedman Seating Co. v. Am. Seating

Co., 420 F.3d 1350, 1361 (Fed. Cir. 2005). Because sliding is "not a subtle difference in degree,

but rather . . . a difference in kind" from rotation, no reasonable jury could find the two

equivalent without vitiating the "slidably mounted" limitation. See id. at 1362 (internal

quotation omitted). Similarly, no reasonable jury could find a rod extending horizontally to be

equivalent to a rod extending "vertically up"; doing so would read the limitation "vertically up"

out of the patent. See Nautilus Group, Inc. v. Icon Health & Fitness, Inc., Civ. No. C02-

2420RSM, 2005 WL 1902498, *6 (W.D. Wash. May 25, 2005) (unpublished), aff'd without

opinion, 191 F. Appx. 960 (Fed. Cir. Aug. 17, 2006). If a factfinder must ignore a claim

limitation to find equivalence, then as a matter of law, the differences are not insubstantial.

The reach of the doctrine of equivalents is also limited by the prior art. See Interactive

Pictures, 274 F.3d at 1380. Just as a patentee cannot assert equivalents that would read a

limitation out of the patent, a patentee also cannot assert equivalents that would encompass, or

"ensnare," the prior art. See Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d

1314, 1322 (Fed. Cir. 2009) (holding "ensnarement" defense to infringement is a question of

law). This is because "a patentee should not be able to obtain, under the doctrine of equivalents,

coverage which he could not lawfully have obtained from the PTO by literal claims." Wilson

Sporting Goods Co. v. David Geoffrey & Assocs., 904 F.2d 677, 684 (Fed. Cir. 1990), overruled

in part on other grounds by Cardinal Chem. Co. v. Morton Intern., Inc., 508 U.S. 83, 92 n.12

(1993). In a crowded field of prior art, the scope of equivalents may be limited. See Abbott

Labs. v. Dey, L.P., 287 F.3d 1097, 1105 (Fed. Cir. 2002). "[W]hen a device that incorporates

the purported equivalent is in fact the subject of a separate patent, a finding of equivalency,

while perhaps not necessarily legally foreclosed, is at least considerably more difficult to make

out." Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 493 F.3d 1368, 1379-80 (Fed.

Cir. 2007).  The accused infringer bears the burden of identifying prior art which would be

encompassed by the asserted range of equivalents, at which point the patentee must show that its

proposed equivalent does not encompass the prior art.  Streamfeeder, LLC v. Sure-Feed Sys.,

Inc., 175 F.3d 974, 983 (Fed. Cir. 1999).  The patentee must propose "a hypothetical claim that

is sufficiently broad in scope to *literally* encompass the accused product or process."  Ultra-Tex

Surfaces, Inc. v. Hill Bros. Chem. Co., 204 F.3d 1360, 1364 (Fed. Cir. 2000).

> If that [hypothetical] claim would have been allowed by the PTO over the prior
> art, then the prior art does not bar the application of the doctrine of equivalents.
> Conversely, if that claim would not have been allowed, the prior art bars
> application of the doctrine and infringement by equivalence may not be found.

Id. at 1364-65 (internal citations omitted).

With these principles in mind, the Court turns to the motion to strike and the

infringement analysis.

**B.     Motion to Strike Expert Testimony**

Octane moves to strike the portions of the opinion of Icon's expert, Dr. Jahan Rasty, that

pertain to infringement by equivalents.  For the following reasons, the motion is denied.

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data; (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed. R. Evid. 702.  To be admissible, therefore, proposed expert testimony based on scientific,

technical or other specialized knowledge must meet three prerequisites: it must be relevant,

reliable, and offered by a qualified witness.  See Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686

(8th Cir. 2001).

Dr. Rasty has a doctoral degree in mechanical engineering and a master's degree in business administration.  He has been a tenured professor of mechanical engineering for over 22 years, currently heads a university research laboratory, and has published numerous peer-reviewed studies based on the results of his research.  Rasty Decl. [Docket No. 173] Ex. 1 ("Rasty Expert Report") at 2; see also Hall Decl. [Docket No. 170] Ex. A.  Octane argues that Dr. Rasty's lack of experience designing and manufacturing elliptical machines makes him "unable to competently testify" as to whether Octane's machines have structures equivalent to those disclosed in the '710 patent.  Octane Daubert Mem. [Docket No. 152] at 6.  However, an expert may be qualified based on "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  There is no dispute Dr. Rasty has all of these credentials in areas related to mechanical engineering.  "Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."  Robinson v. GEICO Gen. Ins. Co., 447 F.3d 1096, 1100 (8th Cir. 2006).  There is no basis to exclude Dr. Rasty's testimony on the grounds that he is not qualified.

The next question is whether Dr. Rasty's testimony is relevant.  Relevance means simply that the testimony will "assist the jury in determining *any* fact at issue in the case."  Smith v. Ford Motor Co., 215 F.3d 713, 721 (7th Cir. 2000).  Octane contests portions of Dr. Rasty's opinion directed to equivalent structure.  In the context of proving equivalence, the Federal Circuit has held that an expert must provide "particularized testimony" on a "limitation-by-limitation basis" as to "the insubstantiality of the differences" in function, way, and result. Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1567 (Fed. Cir. 1996). Generalized or conclusory testimony will not suffice.  Id.

Equivalence is a question of fact at issue in the case, and accordingly Dr. Rasty's testimony may be relevant if it is sufficiently particularized. Octane argues it is not. However, Dr. Rasty's report analyzes each of the disputed claims on a limitation-by-limitation basis, addressing the differences in function, way and result, as well as the alternative test of known interchangeability. See, e.g., Rasty Expert Report at 8 (addressing claim 1(e)). The report reflects Dr. Rasty was aware of the applicable legal tests and employed the proper claim constructions (with the exception of "linear reciprocating displacement," which will be excluded as discussed below). Id. at 4. The Court finds no basis to exclude Dr. Rasty's equivalence testimony on the grounds of relevance.

The final inquiry is whether Dr. Rasty's testimony is reliable. To be admissible, Dr. Rasty's testimony must be "based upon sufficient facts or data" and "the product of reliable principles and methods," which have been applied "reliably" to the facts of the case. See Fed. R. Evid. 702. When considering reliability, the focus is on "principles and methodology, not on the conclusions that they generate." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (1993). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." Smith, 215 F.3d at 718.

Trial courts have discretion not only to determine whether an expert's testimony is reliable, but also "in deciding *how* to test an expert's reliability." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999). Toward that end, the Supreme Court has proposed four non-exclusive factors that may be considered, including (1) whether the expert's method can be, or has been, tested; (2) whether the method has been subjected to peer review and publication;

(3) the method's known or potential rate of error; and (4) whether the method is generally accepted.  See Lauzon, 270 F.3d at 686-87, citing Daubert, 509 U.S. at 593-94.

Here, Octane does not challenge Dr. Rasty's testimony on any of these grounds.  Rather, it argues that Dr. Rasty neglected to give sufficient weight to what it considers to be "the important factors to consider in designing a marketable elliptical exercise machine," including "manufacturability, cost, smoothness, noise, and size of the machine."  Octane Daubert Mem. at 6.  Octane asked Dr. Rasty whether he had considered the "advantages" of Octane's design in these areas. Cutler Summary Judgment Decl. [Docket No. 158] Ex. 16 ("Rasty Dep.") at 137.  Dr. Rasty replied that he "didn't really see differences that were worth mentioning."  Id. at 138.

Octane also observes that Dr. Rasty's opinions contradict those of an Icon fact witness, William Dalebout, who testified about design and manufacturing issues with the invention described in the '710 patent.  Octane Daubert Mem. at 7; Cutler Daubert Decl. [Docket No. 153] Ex. 5 at 36-37.  Discrepancies in witnesses' testimony, however, would go to credibility, not admissibility.  See Lauzon, 270 F.3d at 695 n.9.

Octane has not shown that Dr. Rasty's testimony falls "outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts."  Kumho Tire, 526 U.S. at 153.  To the extent Dr. Rasty's testimony may include inaccuracies, discrepancies or conclusions lacking support, these would be proper subjects for cross-examination.  See Daubert, 509 U.S. at 596.   Accordingly, Octane's motion to strike the portions of Dr. Rasty's testimony on equivalence is denied.

**C.       Motion for Summary Judgment of Non-infringement**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c));[2] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)(same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(same).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party and draws all justifiable inferences in its favor.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation omitted).

Icon argues the linkage system in Octane's Q45 and Q47 machines infringes claims 1-5, 7, and 9-11 of the '710 patent.  Of these, the only independent claim is Claim 1.  If Octane can show Claim 1 is not infringed, then none of the claims which depend on Claim 1 are infringed.  See Streamfeeder, 175 F.3d at 984.  Accordingly, both sides focus their attention on three disputed elements of Claim 1: 1(c), 1(d) and 1(e).  Because the analysis of claim 1(d) is dispositive, it will be addressed first.

**1.  Claim 1(d)**

The patent claims a **"means for connecting each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement**

_____

[2] Federal Rule of Civil Procedure 56 was amended effective December 1, 2010; the summary judgment standard was previously located in Rule 56(c).

**of the second end of each stroke rail in a substantially elliptical path."** '710 patent, claim

1(d).[3]  The function is "connecting each stroke rail to the frame such that linear reciprocating

displacement of the first end of each stroke rail results in displacement of the second end of each

stroke rail in a substantially elliptical path."  The Court declined to construe the terms of this

claim, including "linear reciprocating displacement," and so those words take their "ordinary and

customary meaning as understood by a person of ordinary skill in the art at the time of the

invention." Wavetronix v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1355 (Fed. Cir. 2009).

Icon proposed a construction of "linear reciprocating displacement" which did not

require "movement along a linear path."  This construction was rejected.  Claim Construction

Order at 8.  Nonetheless, Icon argues that the first end of the stroke rail undergoes linear

reciprocating displacement, relying on a portion of Dr. Rasty's report which uses the rejected

construction.  See Icon Mem. Opp. S.J. [Docket No. 171] at 21, citing Rasty Expert Report at 7.

Because it is based on an erroneous claim construction, Dr. Rasty's opinion on this point is not

admissible.  See Texas Instruments, 90 F.3d at 1565 (expert testimony based on incorrect claim

construction cannot support finding of infringement under proper construction).  His opinion

therefore cannot create a question of fact on whether the first end of the proposed stroke rail in

Octane's machines undergoes linear reciprocating displacement.

––––––––––––––––––––

[3] The Court declined to construe the function associated with claim 1(d), but described it
as "to connect the stroke rail to the frame in such a way as to cause the first end of the stroke rail
to undergo linear reciprocating displacement (which then causes the second end of the stroke rail
to move in an elliptical path)." Claim Construction Order at 10.  Icon treats this description as a
construction, and urges the Court to modify it so that there is no need for the connecting means
to "cause" one end of the stroke rail to undergo linear reciprocating displacement.  Icon Mem.
Opp. S.J. [Docket No. 171] at 20.  The description is not a construction.  Because the words in
this claim take their ordinary meaning, construction is not necessary.

Given the exclusion of Dr. Rasty's opinion on this point, there is no evidence that any part of Octane's machines undergoes linear reciprocating displacement. Indeed, when considering the issue using the proper construction, Dr. Rasty acknowledges that "the first end of the stroke rails . . . reciprocate along a slightly arcuate path rather than along a straight path." Rasty Expert Report at 12. Without linear reciprocating displacement, there can be no literal infringement under § 112, ¶ 6, because the functions are not identical. The difference between movement in a straight line and movement in an arc is a "difference in kind," not merely a "difference in degree." See Freedman Seating, 420 F.3d at 1360. Icon's linkage system translates linear reciprocating displacement into elliptical motion. Octane's linkage system translates arcuate displacement into elliptical motion. Two different inputs yield the same output, which strongly suggests that a different function is being performed. Compare Interactive Pictures, 274 F.3d at 1382. On these facts, no reasonable jury could find the functions to be identical. There is no literal infringement of claim 1(d).

The Court next considers whether the functions are substantially equivalent so as to allow infringement under the doctrine of equivalents. Dr. Rasty suggests that in this context, movement in a slight arc is equivalent to movement in a straight line, because "substituting straight-path reciprocation with reciprocation along a slight arc has no meaningful effect on the elliptical path traveled by the second end of the stroke rail. . . . Both provide lateral constraint of the motion of the first end of the stroke rail and convert circular motion derived from the axle to elliptical motion at the second end." Rasty Expert Report at 12.

The Court does not agree. To find the functions equivalent, it is necessary to read the word "linear" out of claim 1(d), a result prohibited by the doctrine of vitiation. Had Icon sought

to claim different types of reciprocating displacement, it might simply have omitted the word "linear"; it chose not to do so, and is bound by that choice.

In addition, the requirement of linear reciprocating displacement is critical to the context of this invention.  The prior art field is crowded.  See '710 patent at 1 (listing 27 prior art references).  In a Notice of Allowability, the U.S. Patent and Trademark Office specifically identified linear reciprocating displacement as a reason why the '710 patent was allowable over the prior art.  See Cutler S.J. Decl. [Docket No. 158] Ex. 13.  Dr. Rasty has also acknowledged that linear reciprocating displacement is one reason why the linkage system disclosed in the '710 patent was patentable over the prior art.  Rasty Dep. at 139.

Movement in an arc is not a recent development in mechanics; indeed, Octane has identified a patent prior to the '710 patent which discloses an elliptical linkage system that translates arcuate motion into elliptical motion.  See U.S. Patent No. 5,707,321, Cutler S.J. Decl. [Docket No. 158] Ex. 18 (the "'321 patent").  This is not a case in which the doctrine of equivalents is necessary to protect a patentee from infringement via a technology unknown at the time of the patent application.  For all these reasons, Icon may not rely on the doctrine of equivalents to prove that, for purposes of an elliptical linkage system, movement in an arc is substantially equivalent to movement in a straight line.

Because the functions are neither identical nor substantially similar, claim 1(d) is not infringed as a matter of law.  The Court will nevertheless proceed to consider whether Octane's machines have equivalent structure.

In a means-plus-function claim, the "corresponding structure must include all structure that actually performs the recited function."  Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 296 F.3d 1106, 1119 (Fed. Cir. 2002).  The claim construction order identifies this structure as

(1) an axle mounted to both the frame and a pair of crank arms; (2) a pin projecting from each crank arm; (3) a collar encircling each pin that is attached to a stroke rail; (4) the C-channel and corresponding flared-head pin; and (5) spot welds, nuts and washers used to attach these structures together.  Claim Construction Order at 11-14.

Dr. Rasty acknowledges that Octane's machines do not have identical structure, yet suggests they are equivalent because they restrain unwanted lateral movement in substantially the same way (through the use of rigid metal structures) with substantially the same result (elliptical movement at the second end of the stroke rail).  Rasty Expert Report at 13.  Focusing specifically on the "way" element, Dr. Rasty proposes that the C-channel and flared-head pin structure of claim 1(d) is equivalent to a part of Octane's machines called a rocker link or stability link, because "trapping a moving object in a track and tethering a moving object to a ridged pivoting are known to be interchangeable ways to limit the object from moving in an undesirable direction while, at the same time, allowing movement of the object in a desired direction."  Id. at 13-14.

The Court finds the structures are not equivalent as a matter of law.  A structure which may be equivalent in one context may not be equivalent in another, see IMS Tech., 206 F.3d at 1436, and the structure's performance of unclaimed functions is not pertinent to the analysis.  See Odetics, 185 F.3d at 1271.  While the C-channel and the rocker link may be equivalent for the function of restraining unwanted lateral movement, this is not the function claimed in the patent.  Instead, the claimed function is connecting the stroke rail to the frame so that linear reciprocating displacement of the first end of the stroke rail results in elliptical motion at the second end.

In this context, the structures do not perform the function in the same way.  By sliding back and forth within the C-channel, the flared-head pin allows the first end of the stroke rail to undergo linear reciprocating displacement which is converted to elliptical motion at the second end.  Because the C-channel and flared-head pin are critical to the function of allowing the first end of the stroke rail to undergo linear reciprocating displacement, the range of equivalents is correspondingly narrow.  As already noted, no part of Octane's machines undergoes linear reciprocating displacement.  Instead, the rocker link allows the actuator casting to pivot in an arc.  No reasonable jury could find the structures equivalent as a matter of law.

Claim 1(d) of the patent is not infringed as a matter of law.   For this reason, Octane is entitled to summary judgment of non-infringement.  However, the Court will proceed to consider the remaining disputed claim elements.

### 2.  Claim 1(c)

Claim 1(c) identifies **"a pair of stroke rails each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail."**  '710 patent, claim 1(c).  The term "stroke rail" is not defined in the patent, and has no meaning for a person of ordinary skill in the art.  The Court has construed it to mean "a linear or curved rail, which may be made to vary in length, extending from a foot rail to a frame on an elliptical machine."  Claim Construction Order at 8.

The parties dispute whether Octane's machines have a "stroke rail."[4]  Octane argues that "no part of Octane's linkage extends from a foot rail to the frame."  Octane Mem. S.J. [Docket No. 157] at 22.  Icon responds that two parts of Octane's linkage system, the actuator casting and the intergrated screw motor, are a "stroke rail" which "extends from a foot rail to a frame" via the rocker link.  Icon Mem. Opp. S.J. [Docket No. 171] at 11-12.  Octane replies that the rocker link is "part of Octane's multi-part linkage system; it is not a connecting part" and ought not to count as part of a stroke rail.  Octane S.J. Reply [Docket No. 183] at 4.

A stroke rail may not consist of an unlimited number of parts; a proposed construction to that effect was specifically rejected as impermissibly broadening the scope of the patent.  Claim Construction Order at 8.   Yet a stroke rail "may be made to vary in length," which contemplates a multi-part structure.  A reasonable jury could find that additional elements used to vary the length of a stroke rail are part of the stroke rail.  However, other intervening parts unrelated to varying the length of the stroke rail cannot reasonably be considered part of the stroke rail.

So viewed, the elements which Icon characterizes as a stroke rail cannot literally infringe claim 1(c).  Even if Octane's actuator casting and integrated screw motor could together be considered a "linear or curved rail," and even if that rail "may be made to vary in length," no reasonable jury could find the stroke rail "extends from a foot rail to a frame" because of the intervening rocker link.  If the rocker link varied the length of the stroke rail, arguably it might

---

[4] Icon argues Octane conceded its Q47 linkage had a stroke rail.  Icon Mem. Opp. at 6. Octane's initial claim construction chart, dated August 26, 2009, states that as to claim 1(c), "Octane admits that the Q47 Machine contains this element."  Veverka Decl. [Docket No. 172], Ex. 1 at 2.  On June 1, 2010, Octane filed a supplemental claim construction chart providing as to claim 1(c), "Octane's Q47 Machine does not contain this element."  Id., Ex. 2 at 2.  Octane offers no explanation for the discrepancy.  Because since June 2010 Octane appears to have consistently argued the absence of a stroke rail, and because Icon did not argue the alleged concession at claim construction, the Court finds that the concession was withdrawn by Octane well before this motion was filed.

be considered part of the stroke rail; but it does not.  It is a separate, independently moving, intervening element of the linkage system interposed between the frame and the proposed stroke rail, and its presence prevents the stroke rail from extending to the frame.  Accordingly no reasonable jury could find literal infringement of claim 1(c).

The next question is whether claim 1(c) is infringed under the doctrine of equivalents. Octane argues the "basic structure" of its linkage system was disclosed in the '321 patent, and as prior art lies beyond the reach of the doctrine of equivalents as a matter of law.  Octane Mem. S.J. at 27-31; see '321 patent.  Octane has the burden of proffering evidence of prior art that is encompassed by Icon's proposed range of equivalents.  See Streamfeeder, 173 F.3d at 983. Octane has met its burden.

Icon, however, has failed to propose a hypothetical claim that encompasses Octane's machines.  As the patentee with the ultimate burden to show infringement by equivalents, it is Icon's burden to propose a hypothetical claim for analysis in response to Octane's motion for summary judgment of non-infringement.  See id. at 982; see also Ultra-Tex Surfaces, 204 F.3d at 1364.  Instead, Icon argues the '321 patent fails to read on the '710 patent, and specifically is missing the equivalent of claim 1(e).  Icon Mem. Opp. S.J. at 27-28.  This analysis establishes that the '321 patent does not anticipate the literal '710 patent claims – a point not in dispute. Icon's analysis does not address whether the '321 patent anticipates Icon's proposed *equivalent* to those claims.

There is no literal infringement as to claim 1(c).  Because Icon has not proposed a hypothetical claim to support its argument that its proposed range of equivalents is not ensnared by the '321 patent, the Court finds claim 1(c) is not infringed under the doctrine of equivalents.

### 3.  Claim 1(e)

The Court has previously held that the function set forth in claim 1(e), **"selectively varying the size of the substantially elliptical path that the second end of each stroke rail travels,"** needs no construction.  Claim Construction Order at 14.  For the motorized embodiment, which is the only one arguably infringed, the corresponding structure is "[a]n electric motor driving a gear that engages teeth on an elongated engagement bar to move an adjustment arm.  The electric motor is mounted to the stroke rail by a bracket, and the adjustment arm is connected to the elongated engagement bar by a rod."  Claim Construction Order at 17-18.

For purposes of this Motion Octane does not dispute the functions are identical:  Octane's machines are able to selectively vary the substantially elliptical path traveled by the second end of the proposed stroke rail.   However, Octane argues its machines have no structure equivalent to the adjustment arm and connecting rod outlined in claim 1(e).  Octane notes the "tube-within-a-tube" structure contemplated by the '710 patent presents many disadvantages as compared to Octane's integrated screw mechanism.  Octane Mem. S.J. at 15.

Dr. Rasty proposes that the electric motor and integrated screw used in Octane's machines vary the elliptical path in substantially the same way to achieve substantially the same result.  Specifically, "[b]oth mechanisms transform the rotary motion of an electric motor to transverse motion.  The gear of the rack and pinion traverses the teeth of the associated bar in a very similar way that the nut of a power screw traverses the threads of the associated screw."  Rasty Expert Report at 14.  According to Dr. Rasty, both mechanisms "increase/decrease the effective distance between two pivot points which in turn varies the size of the substantially

elliptical path." Id.  Furthermore, "[i]n mechanics, power screws and rack and pinion devices are known to be interchangeable systems in many applications." Id.

To defeat the argument on equivalence, Octane responds with functions not claimed in the patent – for example, creating a smaller operating envelope at the front of the machine, as well as reducing manufacturing and mechanical challenges associated with the structure in the patent.  Octane highlights the differences between the '710 design and its machines in performing these functions.  See Octane Mem. S.J. at 35-37.

As already noted, what is equivalent in one context may not be equivalent in another, and differences in performing unclaimed functions are not relevant to an equivalence analysis. Claim 1(e) is drawn more broadly than claim 1(d), and does not by its terms require a tube-within-a-tube structure.   Neither does it appear that the physical characteristics of this structure are critical to the claimed function of selectively varying the elliptical path.  There is no evidence that the PTO considered the tube-within-a-tube structure to be a reason to allow the '710 patent over the prior art.  Dr. Rasty has testified that a rack-and-pinion structure is mechanically equivalent to a motorized screw for the purposes of selectively varying the elliptical path. Octane's expert, Steven Lenz, does not appear to dispute the point, testifying instead that a motorized screw is superior technology which has largely replaced rack-and-pinion structure on modern exercise machines.  Veverka Decl. [Docket No. 172] Ex. 7 at 22-27; Ex. 8 at 153-56.

There is an issue of fact as to whether Octane's integrated screw motor is equivalent to the structures corresponding to claim 1(e).  However, because claim 1(d) is not infringed as a matter of law, Octane is entitled to summary judgment of non-infringement.

## V.  CONCLUSION

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Octane's motion to strike portions of Dr. Rasty's expert report

[Docket No. 150] be **DENIED**, and Octane's motion for summary judgment of non-infringement

[Docket No. 155] be **GRANTED**.

LET JUDGMENT BE ENTERED ACCORDINGLY.

BY THE COURT:

_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 17, 2011.

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Icon Health & Fitness, Inc.,
a Delaware corporation,

                    Plaintiff,

        v.

                                        **MEMORANDUM OPINION
                                        AND ORDER**

                                        Civil No. 09-319 ADM/SER

Octane Fitness, LLC,
a Minnesota limited liability company; and
Nellie's Exercise Equipment, Inc.,
a California corporation,

                    Defendants.

_____

C.J. Veverka, Esq., David R. Wright, Esq., H. Craig Hall, Jr., Esq., Larry R. Laycock, Esq., and Mark W. Ford, Esq., Workman Nydegger, Salt Lake City, UT; and Jeanette M. Bazis, Esq., and Lawrence M. Shapiro, Esq., Greene Espel, P.L.L.P., Minneapolis, MN, on behalf of Plaintiff.

Matthew L. Cutler, Esq., Rudolph A. Telscher, Jr., Esq., Harness, Dickey & Pierce, P.L.C., St. Louis, MO; and Michael A. Lindsay, Esq., Dorsey & Whitney, L.L.P., Minneapolis, MN, on behalf of Defendant Octane Fitness, LLC.

_____

# I. BACKGROUND

This is a patent infringement case concerning the linkage systems on elliptical exercise

machines. On December 22, 2010, the Court construed the disputed claims of U.S. Patent No.

6,019,710 (the "'710 patent") [Docket No. 144]. Based on these constructions, on June 17,

2011, the Court issued a Memorandum Opinion & Order granting summary judgment of non-

infringement in favor of Defendant Octane Fitness, LLC ("Octane") [Docket No. 187]. Plaintiff

Icon Health & Fitness, Inc. ("Icon") appealed these rulings to the Federal Circuit [Docket No.

200]. The facts are set forth more fully in the Court's prior orders, and will not be repeated here.

Octane, the prevailing party on summary judgment, now moves for an award of attorney's fees under 35 U.S.C. § 285.  Icon opposes the motion.  For the following reasons, Octane's motion is denied.[1]

## II.  DISCUSSION

A court "may award reasonable attorney fees to the prevailing party" in exceptional patent cases, both to compensate the prevailing party for its litigation expenses, and also to deter the filing of baseless infringement suits.  See 35 U.S.C. § 285; Automated Bus. Cos. v. NEC America, Inc., 202 F.3d 1353, 1355 (Fed. Cir. 2000); Mathis v. Spears, 857 F.2d 749, 753 (Fed. Cir. 1988).  A two-step analysis is required.  Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1327 (Fed. Cir. 2003).  First, the prevailing party must establish by clear and convincing evidence that the case is exceptional; if so, the court may award fees as a matter of discretion. Id.  Courts award attorney fees to prevailing accused infringers only when "necessary to prevent 'a gross injustice' to the accused infringer."  Id. at 1329 (citations omitted).  The second step need not be reached because this case is not exceptional.

"[A]bsent misconduct during patent prosecution or litigation," a case is exceptional "only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless.'"  iLOR, LLC, v. Google, Inc., 631 F.3d 1372, 1377 (Fed. Cir. 2011) (quoting Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005)).  Both

---

[1] Octane has moved for leave to file a reply brief [Docket No. 213], and has attached the proposed brief as an exhibit.  The motion will be denied.  The arguments set forth in the proposed reply are largely repetitive of those presented in Octane's main brief, and any new arguments are without legal support.  Octane's decision to seek advice from its counsel is wholly irrelevant to the question of whether Icon's conduct makes this case exceptional under 35 U.S.C. § 285.

requirements must be established by clear and convincing evidence.  Brooks Furniture, 393 F.3d at 1382.  If either requirement is not met, the case is not exceptional.  Id. at 1381.   Here, neither requirement is met.

Patent litigation is objectively baseless when a party's assertions are "so unreasonable that no reasonable litigant could believe [they] would succeed."  iLOR, 631 F.3d at 1378.

This determination "requires an objective assessment of the merits" based on the record made in the infringement proceedings.  Id. at 1377-78.  The patentee's "[s]tate of mind is irrelevant" to this objective inquiry.  Id. at 1377.  So is the fact that the patentee's arguments were unsuccessful.  "Claim interpretation is not always an exact science, and it is not unusual for parties to offer competing definitions of even the simplest claim language."  iLOR, 631 F.3d at 1379 (internal quotation omitted).  A proposed claim construction is not frivolous if not precluded by the language of the claim or the disclosures in the specification.  See id. at 1378. Similarly, the mere fact that a court found no infringement is not sufficient to establish the action was objectively baseless.  See MTS Sys. Corp. v. Hysitron Inc., 639 F. Supp. 2d 996, 1002 (D. Minn. 2009), aff'd, 370 Fed. Appx. 111 (Fed. Cir. 2010) (unpublished).

Octane argues Icon's infringement action was objectively baseless because the Court rejected Icon's arguments that (1) several elements of Octane's machines collectively comprised a "stroke rail" which "extends from a foot rail to a frame;" (2) "linear reciprocating displacement" did not require movement in a linear path; and (3) several elements of Octane's machines infringed the '710 patent literally and under the doctrine of equivalents.  In Octane's view, the Court's rulings should have been a foregone conclusion to anyone who visually

inspected its machines' linkage system, making Icon's infringement assertions "unreasonable and unsupportable."  Octane Mem. [Docket No. 196] at 15.

The Court does not agree that the conclusions were so easily reached.   Icon argued that several parts of Octane's linkage system collectively comprised a "stroke rail" that "extend[ed] from a foot rail to a frame," as required by claim 1(c).  See '710 Patent [Docket No. 158, Ex. 1] at col. 7 ll. 16-19.  "Stroke rail" has no definition in the patent or in the industry, but the specification clearly indicates it is comprised of more than one part.  Indeed, the meaning of "stroke rail" was so unclear that for several months Octane conceded its Q47 machine had a "stroke rail" – until it withdrew that concession in an amended claim construction chart.  Icon's argument that Octane's machines had a "stroke rail," although not ultimately persuasive, was not frivolous.

Icon also argued for a construction of the term "linear reciprocating displacement" in claim 1(d) that did not require "movement along a linear path."  Octane argues such a construction was at odds with both the plain meaning of "linear," the intrinsic evidence of the patent, and the notice of allowance, which identified "linear reciprocating displacement" as a reason why the patent was allowable over prior art.  Icon's proposed construction was rejected.

Although the Court remains confident in its construction of claim 1(d), the rejected construction is not frivolous.  Claim 1(d) is a means-plus-function claim, claiming the function of "connecting each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path."  '710 Patent at col. 7 ll. 20-24.  Icon argued that the "means for connecting" element needed only to be "capabl[e] of converting 'linear reciprocating

displacement' into elliptical motion." Icon Claim Constr. Brief [Docket No. 131] at 23. Icon

also argued that the "very slight arcuate motion" present in Octane's machine was substantially

equivalent to linear motion, and that "the same mechanism" which converted the slight arcuate

motion into elliptical motion "would also convert precisely linear motion at the first end of the

stroke rail to elliptical motion at the second end of the stroke rail." Id. at 24 (emphasis omitted).

In support of its argument, Icon relied on several Federal Circuit decisions suggesting that

means-plus-function claims required structure merely capable of performing the function, rather

than structure that actually performed the function. Id. at 25. Relying on expert testimony and

technical dictionaries, Icon also argued the word "displacement" would not have been

understood by those skilled in the art to require movement along a straight-line path. Id. at 27-

28. Although ultimately unsuccessful, Icon's arguments were not objectively baseless.

At the summary judgment stage, Icon argued that claim 1(d) was literally infringed

because structures in Octane's machine "convert linear reciprocating displacement at the first

end of the actuator-casting stroke rail into a 'substantially elliptical path' at the second end of the

stroke rail." Icon Mem. Opp. S. J. [Docket No. 175] at 21. In support, Icon relied on page 7 of

its expert's report, which employed the proposed construction of "linear reciprocating

displacement" that was rejected by the Court. Id. Icon now characterizes this assertion as "not

an argument that Octane's machines had 'linear reciprocating displacement' but rather an

argument that the claim did not require a structure that created linear reciprocating displacement,

only a structure that performed the claimed 'connecting' function." Icon Mem. Opp. Fees

[Docket No. 205] at 7 n.1. This assertion suggests Icon did not intend to be misleading in its

summary judgment argument, but merely to reargue a point that had been previously decided

against it.  Although arguably confused and repetitive, and ultimately unavailing, Icon's summary judgment argument was not objectively baseless.

In the context of design patents, a visible difference in design may foreclose an infringement action.  See Brooks Furniture, 393 F.3d at 1383.  Here, however, a visible difference is not determinative.  Infringement is determined by comparing the accused devices to the properly-construed claims and specifications of the patent.  See IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1429 (Fed. Cir. 2000).  Icon represents, and the Court has no reason to doubt, that it purchased and inspected a Q47 machine prior to filing suit, and that it secured opinions from experts and counsel that the machine infringed its patent.  The visible differences between the linkage systems of both machines did not make it unreasonable to rely on testing and opinions as to infringement.  While Icon's arguments on claim construction and infringement proved to be unpersuasive, again, the arguments are not objectively baseless.

Because Icon's case was not objectively baseless, the inquiry could end here.  However, Octane's argument that Icon brought suit in bad faith will be briefly addressed.  Subjective bad faith means "the plaintiff's case must have no objective foundation, and the plaintiff must actually know this."  iLOR. 631 F.3d at 1377.  For example, a patentee who had "actual knowledge that the [infringement] suit was baseless" and also "complete[ly] fail[ed] to conduct pre-suit investigation in the form of appropriate testing to establish infringement" may demonstrate subjective bad faith.  See MTS Sys., 639 F. Supp. 2d at 1002 (citing Eltech Sys. Corp. v. PPG Indus., Inc., 903 F.2d 805, 808 (Fed. Cir. 1990)).  Similarly, a patentee who stipulated that the accused device did not infringe, but refused to dismiss the suit, and opposed defendant's motion for summary judgment of noninfringment, so that it might obtain discovery about defendant's other potentially infringing products, was acting in bad faith.  Automated Bus.

Cos., 202 F.3d at 1354.  By contrast, evidence that a patentee has sought reasonable expert

evaluation of the accused device, and opinions of counsel, weighs against a finding of subjective

bad faith.  See Brooks Furniture, 393 F.3d 1383.  Subjective bad faith does not exist where

infringement can reasonably be disputed.  Id. at 1384.  "Infringement is often difficult to

determine, and a patentee's ultimately incorrect view of how a court will find does not of itself

establish bad faith."  Id.

    Here, as evidence of bad faith, Octane offers (1) an email exchange between two Icon

sales executives suggesting the litigation was undertaken as a matter of commercial strategy; and

(2) the fact that Icon is a bigger company which never commercialized the '710 patent.  These

circumstances do not establish by clear and convincing evidence that Icon undertook its lawsuit

in bad faith.

    The emails tend to show that in late August 2008, some five months after this action was

originally filed in the Central District of California [Docket No. 57, Ex. 1], an Icon employee

with the title of Vice President of Global Sales reported to two other employees, "We are suing

Octane.  Not only are we coming out with a great product to go after them, but throwing a

lawsuit on top of that."  Octane Mem. [Docket No. 196] at 1.  The next day, one of the recipients

forwarded the email to a third party, with the message, "Just clearing the way and making sure

you guys have all your guns loaded! Look below!"  Id. at 2.  In September 2009, more than a

year later, the sender of the original message apparently responded to an inquiry from the sender

of the second message ("Subject: RE: I heard we are suing Octane!") stating, "Yes – old patent

we had for a long time that was sitting on the shelf.  They are just looking for royalties."  Id.

    Viewed in the light most favorable to Octane, these remarks are stray comments by

employees with no demonstrated connection to the lawsuit.  The statements do not reflect advice

to Icon by its counsel or experts, nor are they evidence of Icon's official position on the merits of the lawsuit.  A company salesman's opinion of a lawsuit does not tend to prove that the company's leadership and counsel pursued the lawsuit in bad faith.  There is no evidence the remarks were ever seen, much less adopted by, those in a position to decide whether to pursue an infringement action against Octane.

Even if the emails suggest Icon commenced this lawsuit to gain a competitive advantage against a smaller company, that fact does not make the lawsuit frivolous.  "A duly granted patent is a grant of the right to exclude all infringers, not just those of comparable size."  Brooks Furniture, 393 F.3d at 1384.  Neither is it relevant that Icon never commercialized the '710 patent.  Simply bringing suit to gain a competitive advantage is not evidence of bad faith.  "Enforcement of patent rights that are reasonably believed to be infringed does not entail special penalty when the patentee is unsuccessful."  Id.  In sum, even if this action were objectively baseless – which it is not – neither the email exchange, nor the relative size of the parties, nor Icon's decision not to commercialize the '710 patent, are clear and convincing evidence of subjective bad faith on Icon's part.  This case is not exceptional, and an award of attorney's fees is not warranted.

### III.  ORDER

Based upon the foregoing, and all of the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Octane's motion for an award of attorney's fees [Docket No. 194] is

**DENIED**.  Octane's motion for leave to file a reply brief [Docket No. 213] is also **DENIED**.

BY THE COURT:



_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  September 6, 2011.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ICON HEALTH & FITNESS, INC.,**
*Plaintiff-Appellant,*

v.

**OCTANE FITNESS, LLC,**
*Defendant-Cross-Appellant.*

---

2011-1521, -1636

---

Appeals from the United States District Court for the District of Minnesota in Case No. 09-CV-0319, Judge Ann D. Montgomery.

---

Decided: October 24, 2012

---

LARRY R. LAYCOCK, Workman Nydegger, of Salt Lake City, Utah, argued for plaintiff-appellant. On the brief were DAVID R. WRIGHT, C.J. VEVERKA, and DAVID R. TODD.

RUDOLPH A. TELSCHER, JR., Harness, Dickey & Pierce, PLC, of St. Louis, Missouri, argued for defendant-cross appellant. With him on the brief was KARA R. FUSSNER.

---



SCANNED
JAN - 7 2013
U.S. DISTRICT COURT MPLS

ICON HEALTH v. OCTANE FITNESS                                        2

Before RADER, *Chief Judge*, NEWMAN and LOURIE, *Circuit Judges*.

LOURIE, *Circuit Judge*.

ICON Health & Fitness, Inc. ("ICON") appeals from the final judgment of the United States District Court for the District of Minnesota, which granted summary judgment of noninfringement of claims 1–5, 7, and 9–10 of U.S. Patent 6,019,710 (the "'710 patent"). *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, No. 09-319 ADM/SER, 2011 WL 2457914 (D. Minn. Jun. 17, 2011) (the "*Summary Judgment Op.*"). Octane Fitness, LLC ("Octane") cross-appeals the court's denial of a motion to find the case exceptional under § 285. Because the court did not err in its underlying claim construction, in granting summary judgment of noninfringement, and in denying the motion to find the case exceptional, we *affirm*.

### BACKGROUND

The '710 patent, owned by ICON, is directed to an elliptical machine that allows for adjustable stride length. The patent claims at issue focus on the "linkage system" connecting the foot rail to the frame via the "stroke rail."

3                              ICON HEALTH v. OCTANE FITNESS



FIG. 5

    As described in the specification and shown in Figure 5 above, the stroke rail (66) is attached to the frame in three places: to the forward end of a foot rail (72, 50); to a rotatable crank arm connected to an axle (90); and to the frame via a pin mounted within a C-shaped channel, encircling the pin (76, 84). The stride length is adjusted by changing the length of the stroke rail using either manual adjustment (slots and pins, *e.g.*, 142) or a motor with a gear as shown in Figure 6:

ICON HEALTH v. OCTANE FITNESS                                    4



FIG. 6

ICON filed a complaint against Octane alleging that
Octane's elliptical machines infringe claims 1, 2–5, 7, and
9–11 of the '710 patent.  Octane sells two families of
elliptical machines, the Q45 and Q47; those machines and
their linkage systems are licensed under U.S. Patent
5,707,321 (the "Maresh patent"), which is prior art to the
'710 patent.  The primary differences between the Q45
and Q47 models and the '710 patent that are relevant in
the current appeal are that (1) Octane's machines do not
use a C-shaped channel and pin to attach to the frame,
instead using a "rocker link" (a lever-based design); and
(2) Octane's alleged "stroke rail" has multiple parts,
including a motor, and is not a single rail.

Claim 1 is representative of the contested claims:

1. An exercise apparatus comprising:

(a) a frame configured for resting on a ground sur-
    face;

(b) a pair of spaced apart foot rails each having a first end and an opposing second end, each foot rail being configured to receive a corresponding foot of a user;

(c) a pair of *stroke rails* each having a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail;

(d) *means for connecting* each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path; and

(e) means for selectively varying the size of the substantially elliptical path that the second end of each stroke rail travels.

'710 patent col. 7 ll. 11–26 (emphases added).

The court construed "stroke rail" to be "a linear or curved rail, which may be made to vary in length, extending from a foot rail to a frame on an elliptical machine," and which can be both a "unitary stroke rail and an adjustable stroke rail" with multiple parts "used to vary the length of the stroke rail." *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, No. 09-319 ADM/SER, 2010 WL 5376209, at *3 (D. Minn. Dec. 22, 2010) (the "*Claim Construction Op.*"). The court construed "means for connecting" as a means-plus-function limitation, identifying the corresponding structure as including both the C-shaped channel and pin structure as well as the crank arm structure. *Id.* at *5–6 (adopting Octane's proposed list of structures). The court found no need to construe the function of the means. *Id.* at *4.

ICON HEALTH v. OCTANE FITNESS                                    6

On summary judgment, the district court concluded that the "stroke rail" and "means for connecting" limitations were absent in the Q45 and Q47 machines and granted summary judgment of noninfringement. The court held that the Q45 and Q47 did not have a stroke rail that "extends from a foot rail to the frame," but instead has an intervening rocker link. The court also held that the accused devices could not infringe under the doctrine of equivalents because the linkage system used was present in the prior Maresh patent and ICON did not propose a hypothetical claim that did not encompass Maresh. As for the "means for connecting" limitation, the court found that there was no evidence that the Q45 and Q47 machines underwent linear displacement. The court also found that there was no infringement by equivalence because linear displacement was required by the claims and was critical to the invention as stated both by the examiner in the reasons for allowance and by ICON's expert, and also because the arc-like movement of the rocker link was present in the prior Maresh patent. The court also held that the rocker link was not an equivalent structure to the C-shaped channel. The court denied a subsequent motion to find the case exceptional. ICON timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

I.

We review *de novo* the district court's grant of summary judgment, drawing all reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Hologic, Inc. v. SenoRx, Inc.*, 639 F.3d 1329, 1334 (Fed. Cir. 2011). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).   Infringement,
whether literal or under the doctrine of equivalents, is a
question of fact, which we review on appeal from a grant
of summary judgment of non-infringement without defer-
ence.   *Schindler Elevator Corp. v. Otis Elevator Co.*, 593
F.3d 1275, 1281 (Fed. Cir. 2010).   We address claim
construction as a matter of law, which we review without
formal deference on appeal, although we give respect to
the reasoning of the district courts.   *See Cybor Corp. v.
FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en
banc).

### A.

ICON argues that the district court erred in constru-
ing "means for connecting" and in its summary judgment
determination of noninfringement.   According to ICON,
the phrase for "means for connecting" is a means-plus-
function limitation, where the function is "connecting,"
and the crank arm attached to the middle of the stroke
rail is the corresponding structure.   As the accused de-
vices have both of these features, ICON argues that it was
error to grant summary judgment of noninfringement.
Alternatively, ICON argues that if the "means for con-
necting" includes the C-shaped channel and pin, then the
accused devices still have an equivalent structure: the
rocker link that moves in a substantially straight path.

Octane responds that the claim term "means for con-
necting" requires "linear reciprocating displacement" and
that the only structure disclosed in the patent that per-
forms that function is the C-shaped channel design.
Octane contends that the claim requires the motion to be
"linear" and notes that the rocker link in the accused
products moves in an arcuate manner.   Because Octane's
devices do not contain a structure similar to the C-shaped
channel and do not move in a linear manner, Octane

ICON HEALTH v. OCTANE FITNESS                              8

argues that the district court properly granted summary judgment of noninfringement.

Neither party disputes that "means for connecting" is a means-plus-function limitation. Additionally, the claim language makes clear that the function of the "means for connecting" is to connect "each stroke rail to the frame such that linear reciprocating displacement of the first end of each stroke rail results in displacement of the second end of each stroke rail in a substantially elliptical path." '710 patent col. 7 ll. 19–23. To identify the proper structure, we look for the structure disclosed in the specification that actually performs the recited function. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002).

We agree with the district court that the corresponding structure here must both connect the stroke rail to the frame and allow the first end to undergo linear displacement. There are two structures recited in the specification that connect the stroke rail to the frame. First, the specification clearly identifies the crank arm attached to the middle of the stroke rail as part of that structure. '710 patent col. 4 ll. 26–51. Second, the specification also describes another attachment at the first end of the stroke rail to the frame via the C-shaped channel and pin structure. *Id.* at col. 4 ll. 3–17. While that second connection is not specifically identified as a "means for connecting" in the specification, it is required to enable the claimed function, including the linear displacement of the first end. Indeed, the C-shaped channel and pin structure attached to the first end is necessary "to simultaneously enable annular rotation and linear displacement of the first end 70," as previously shown in Figure 5 above (76, 84). *Id.* at col. 4 ll. 3–6. These two connections work in tandem both to connect the stroke rail to the frame and to allow the linear displacement of the first end of the stroke

9                              ICON HEALTH v. OCTANE FITNESS

rail to result in a substantially elliptical path of the
second end.

ICON argues that the C-shaped channel and pin can-
not constitute a connecting means because it is described
in the specification as the "attaching means." ICON relies
on the specification's lack of discussion of the C-shaped
channel and pin structure in the "connecting means"
paragraph to argue that the connecting means cannot
include the C-shaped channel and pin. However, that
argument is without merit. No claim uses the phrase
"attaching means" or "means for attaching" to describe
the C-shaped channel. Instead, the claim language uses
"attached" and "connected" interchangeably. For exam-
ple, claim 24 states that "the crank arm" is "attached to
the first stroke rail . . . being attached so as to enable
rotation of the crank arm." *Id.* at col. 9 ll. 6–9. That is
the same crank arm that the specification states is part of
the "connecting means." Regardless, it is the combination
of the C-shaped channel and pin, and the crank arm, that
performs the recited function. That the C-shaped channel
is also described as the "attaching means" does not
change that fact for the purposes of section 112(6). Ac-
cordingly, the district court did not err in construing the
term "means for connecting."

Applying that construction, it is undisputed that the
accused products do not contain the C-shaped channel
and pin structure. Octane's products instead employ a
"rocker link" that is a bar pivotally attached at one end to
the end of the stroke rail and pivotally attached at the
other end to the frame. When in motion, the rocker link
rotates around its frame-anchored end in an arcuate
motion. ICON argues that the slightly arcuate motion of
the rocker link is equivalent to the linear motion of the C-
shaped channel. However, arcuate motion, at least in this
case, is not equivalent to linear motion.

ICON HEALTH v. OCTANE FITNESS                    10

ICON's expert testified at his deposition that the linkage system was patentable in part because it "convert[s] the reciprocating motion of one end *along a linear path* to [an] essentially elliptical path . . . ." J.A. 1729 (emphasis added). Indeed, the examiner, in his reasons for allowance, made a similar statement in distinguishing prior art:

> The prior art fails to show or teach applicant's claimed exercise apparatus comprising . . . a pair of stroke rails each having one end hingedly connected to a respective foot rail and *having the opposite end connected to the frame for linear reciprocating movement* and for producing an elliptical path.

J.A. 1697 (emphasis added). If ICON had wanted the claim to cover other types of nonlinear motion, such as an arcuate path, it could have simply omitted the term "linear" to broaden the claims. In the context of these claims, the structure of a lever design that moves in an arcuate pattern is not equivalent to a C-shaped channel design that locks in a pin to move in a straight line.

ICON also argues that because claims 8 and 22 state that the first end of a stroke rail is "slidably attached" to the frame, the "means for connecting" in claim 1 cannot also include the same slidably attached structure under the theory of claim differentiation. That supposition is incorrect. In *Laitram Corp.*, the plaintiff argued that a means-plus-function limitation, "means for joining," could not include a structure of a "cross member" because another dependent claim specifically required such a cross member. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed. Cir. 1991). We disagreed and stated:

> A means-plus-function limitation is not made open-ended by the presence of another claim spe-

cifically claiming the disclosed structure which underlies the means clause or an equivalent of that structure. If [plaintiff's] argument were adopted, it would provide a convenient way of avoiding the express mandate of section 112(6).

*Id.* In other words, claim differentiation cannot override the effect of section 112(6). As noted in *Laitram Corp.*, the scope of the limitation literally covers structures described in the specification and equivalents thereof not withstanding the existence of dependent claims.

In summary, as the supposed equivalents in the accused products do not perform the same function by moving in a linear fashion and do not contain a structure equivalent to the C-shaped channel and pin, the accused products cannot literally infringe the claims. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267 (Fed. Cir. 1999). Moreover, the lack of equivalent structure for the "means for connecting" limitation for literal infringement also precludes finding equivalence under the doctrine of equivalents. *See Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311 (Fed. Cir. 1998) ("[A] finding of non-equivalence for § 112, ¶ 6, purposes should preclude a contrary finding under the doctrine of equivalents.").

## B.

ICON also argues that the court erred in its construction of "stroke rail" and thus in its determination that the accused devices do not infringe the '710 patent. Specifically, ICON contends that "stroke rail" does not require extension "from a foot rail to a frame" and can include additional parts, such as a motor or a rocker link on the accused products. ICON proposes an alternative construction that requires, at most, that the stroke rail be

ICON HEALTH v. OCTANE FITNESS                                    12

"attached to a foot rail" and "connected to the frame" without regard to the number of intervening parts.

Octane responds, noting that the specification and claim language both describe the stroke rail as extending from the foot rail to the frame. In particular, Octane contends that every time the word "stroke rail" is used in the specification, it references number 66 or 68 in the figures, a bar that is shown extending from the foot rail to the frame. Octane also notes that in allowing the claims the examiner stated that the stroke rails each have one end connected to the foot rail and to the opposite end connected to the frame. Finally, Octane points out that ICON's definition would broaden the scope of the '710 patent to an infinite combination of parts between the stroke rail and frame. We agree with Octane that the district court did not err in its construction of "stroke rail" or its subsequent grant of summary judgment of noninfringement.

Starting with the language of the claims themselves, the stroke rails "each hav[e] a first end and an opposing second end, the second end of each stroke rail being hingedly attached to the first end of a corresponding foot rail." '710 patent col. 7 ll. 16–19. That claim language requires a direct attachment of one end of the stroke rail to the foot rail.

The other end (the "first" end) of the stroke rail is described in the next limitation via a "means for connecting": "means for connecting each stroke rail to the frame" in such a way that allows for "linear reciprocating displacement of the first end." *Id.* at col. 7 ll. 19–23. The specification describes only one such location and type of connection to the frame that allows linear reciprocating displacement of the first end of the stroke rail. The specification states that "[e]ach stroke rail also has a first

13                              ICON HEALTH v. OCTANE FITNESS

end slidably attached to the support stand of the frame."
*E.g., id.* at col. 2 ll. 10–13. That connection is depicted in
each figure as the C-shaped channel and pin. Consistent
with that understanding, the examiner found the claims
novel over the prior art in his reasons for allowance in
part because the stroke rails have "one end hingedly
connected to a respective foot rail and having the opposite
end connected to the frame." J.A. 1697. Thus, the claims,
when read in light of the specification, require that a
stroke rail extend from the foot rail to the frame, with
each end attached to the frame using a hinge on one end
and a C-shaped channel on the other. The district court
was therefore correct to require that the stroke rail ex-
tend from the foot rail to the frame.

The accused products, to the extent they have a stroke
rail, connect one end of that stroke rail to the frame using
a number of parts including a motor, an integrated screw,
a swing arm, a bracket holding the motor, and other
pieces. The other end is connected to the frame using the
previously discussed rocker link. We agree with the
district court that the rocker link "is a separate, inde-
pendently moving, intervening element of the linkage
system interposed between the frame and the proposed
stroke rail, and its presence prevents the stroke rail from
extending to the frame." *Summary Judgment Op.*, 2011
WL 2457914, at *12. It is undisputed that the rocker link
is not part of the stroke rail and is not a means for con-
necting as discussed above. Thus, because the alleged
stroke rail extends from the rocker link, not the frame,
there was no genuine material issue of fact that the
accused products do not contain a stroke rail that extends
from the foot rail to the frame.

As for the doctrine of equivalents, we have previously
held that a patentee also cannot assert equivalents that
would encompass—or "ensnare"—the prior art.     *See*

ICON HEALTH v. OCTANE FITNESS                    14

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009); *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed. Cir. 1990) ("[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims."), *overruled in part on other grounds by Cardinal Chem. Co. v. Morton Intern., Inc.*, 508 U.S. 83 (1993). Octane contends that its linkage system is covered by the Maresh patent, and, as prior art, such a linkage system lies beyond the reach of the doctrine of equivalents as a matter of law.

In circumstances such as these, where there is evidence that prior art would be included in an asserted range of equivalents, the patentee must show that its proposed equivalent does not encompass the prior art. *Streamfeeder, LLC v. Sure-Feed Sys., Inc.*, 175 F.3d 974, 983 (Fed. Cir. 1999). Here, Octane presented evidence that ICON's asserted range of equivalents would encompass the Maresh patent, a conclusion with which the district court agreed. *Summary Judgment Op.*, 2011 WL 2457914, at *12. ICON, in response, argued that the Maresh patent does not anticipate the '710 patent because it is missing the "means for selectively varying" limitation. However, even a cursory read of the Maresh patent shows a discussion of altering the elliptical path by changing the length of the linkage system parts. Maresh patent, col. 10 ll. 13–19 ("To change the shape of the elliptical path . . . adjust and change the length of any or all of the three dynamic links (cranks, connector links, and rockers)."). Thus, ICON has failed to meet its burden of persuasion. The district court was correct in determining that the equivalents alleged by ICON are outside the scope of the '710 patent because they ensnare the prior art; thus the accused products do not infringe the claims.

15                          ICON HEALTH v. OCTANE FITNESS

II.

Octane argues in its cross-appeal that the court ap-
plied an overly restrictive standard in refusing to find the
case exceptional under § 285.  Octane relies on ICON's
allegedly unreasonable claim  construction positions, its
privilege assertions over its pre-suit investigation, and e-
mails allegedly supporting bad faith litigation in an effort
to "go after" Octane.  In addition, Octane seeks to lower
the standard for exceptionality to "objectively unreason-
able" to rebalance what it alleges as the power of large
companies over smaller companies in patent infringement
litigation.  However, we have reviewed the record and
conclude that the court did not err in denying Octane's
motion to find the case exceptional.  We have no reason to
revisit the settled standard for exceptionality.

CONCLUSION

We have considered the parties' remaining arguments
and conclude that they are without merit.  For the forego-
ing reasons, the judgment of the district court is

**AFFIRMED**

CERTIFIED COPY
I HEREBY CERTIFY THIS DOCUMENT
IS A TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE.

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

By: L Whittaker Date: 1.3.12

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

———————————

**ICON HEALTH & FITNESS, INC.,**
*Plaintiff-Appellant,*

v.

**OCTANE FITNESS, LLC,**
*Defendant-Cross-Appellant.*

———————————

2011-1521, -1636

———————————

Appeals from the United States District Court for the District of Minnesota in No. 09-CV-0319-ADM-SER, Judge Ann D. Montgomery.

———————————

Decided: August 26, 2014

———————————

LARRY R. LAYCOCK, Maschoff Brennan Laycock Gilmore Israelsen & Wright, of Salt Lake City, Utah, for plaintiff-appellant. With him on the brief was DAVID R. WRIGHT.

RUDOLPH A. TELSCHER, JR., Harness Dickey & Pierce, PLC, of St. Louis, Missouri, for defendant-cross-appellant. With him on the brief was KARA R. FUSSNER.

———————————

2                    ICON HEALTH & FITNESS v. OCTANE FITNESS

Before NEWMAN, MAYER,[*] and LOURIE, *Circuit Judges.*

PER CURIAM.

This case has returned to us on remand from the Supreme Court of the United States. In its earlier appearance in this court, ICON Health & Fitness, Inc. ("ICON") appealed from the decision of the United States District Court for the District of Minnesota, which granted summary judgment that two families of elliptical machines sold by Octane Fitness, LLC ("Octane") did not infringe certain claims of ICON's U.S. Patent 6,019,710 (the "'710 patent") (Appeal No. 2011-1521). *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, No. 09-0319, 2011 WL 2457914 (D. Minn. June 17, 2011). Octane cross-appealed from the district court's denial of a motion to find the case exceptional and to award attorney fees pursuant to 35 U.S.C. § 285 (Appeal No. 2011-1636). *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, No. 09-0319, 2011 WL 3900975 (D. Minn. Sept. 6, 2011).

We affirmed on the merits, concluding that the district court did not err in its underlying claim construction or in granting summary judgment of noninfringement. *ICON Health & Fitness, Inc. v. Octane Fitness, LLC*, 496 F. App'x 57, 58 (Fed. Cir. 2012). On cross-appeal, we also affirmed the district court's denial of Octane's motion to find the case exceptional and to award attorney fees, declining at that time to revisit our standard for exceptionality first articulated in *Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005). *ICON*, 496 F. App'x at 65.

Octane filed a petition for writ of certiorari in the Supreme Court on the § 285 issue, which the Court granted.

---

[*]    Pursuant to Fed. Cir. Rule 47.11, Circuit Judge Mayer has been designated to replace Circuit Judge Rader, now retired, on this panel.

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 571 U.S. __, 134 S. Ct. 49 (2013). Simultaneously with its decision in *Highmark Inc. v. Allcare Health Management System, Inc.*, 572 U.S. __, 134 S. Ct. 1744, 1749 (2014), which vacated our judgment in that case and changed the standard of review of a § 285 determination on appeal, the Court reversed this court's decision in Octane's cross-appeal, changed the standard for determination of an "exceptional case," and remanded for further proceedings consistent with its opinion. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. __, 134 S. Ct. 1749, 1758 (2014). Supreme Court review of the judgments on the merits with respect to claim construction and noninfringement was not requested, and those judgments remain undisturbed. *See ICON*, 496 F. App'x at 58–65.

However, in order for the district court to apply the Supreme Court's guidance from *Octane* and *Highmark* to the facts of this case, we vacate the district court's denial of Octane's motion to find the case exceptional and to award attorney fees, and remand for further consideration of the § 285 motion.

## I

ICON owns the '710 patent directed to an elliptical machine that allows for adjustable stride length. ICON sued Octane, alleging that Octane's Q45 and Q47 elliptical machines infringed claims 1–5, 7, and 9–10 of the '710 patent. The district court granted Octane's motion for summary judgment, concluding that Octane's machines did not infringe the '710 patent either directly in view of the court's construction of certain claim limitations or under the doctrine of equivalents. *ICON*, 2011 WL 2457914, at *8–14.

Octane subsequently moved the district court to find the case exceptional under the "totality of the circumstances" and to award attorney fees under § 285. Def.'s Mem. Supp. Mot. Att'y Fees & Costs, No. 09-0319, 2011

WL 11734262 (D. Minn. July 18, 2011), J.A. 2633–34
(citing *Yamanouchi Pharm. Co. v. Danbury Pharmacal,
Inc.*, 231 F.3d 1339, 1346–47 (Fed. Cir. 2000)). Octane
argued that ICON's infringement action was objectively
baseless because the district court had rejected ICON's
purportedly frivolous contentions relating to the construc-
tion of certain means-plus-function claim limitations and
infringement of Octane's accused elliptical machines.
Octane asserted that ICON's allegations were "unreason-
able and unsupportable" because the court's noninfringe-
ment determination "should have been a foregone
conclusion to anyone who visually inspected its ma-
chines." *ICON*, 2011 WL 3900975, at *2 (citations omit-
ted). Octane also argued that ICON's case was brought in
subjective bad faith as supposedly evidenced by: (i) an e-
mail exchange between two ICON sales executives sug-
gesting that the litigation was undertaken as a matter of
commercial strategy; and (ii) the fact that ICON is a
larger company that never commercialized its '710 patent.
*Id.* at *4.

The district court applied our then-authoritative test,
which required Octane to show by clear and convincing
evidence that ICON's claim was objectively baseless and
brought in subjective bad faith. *See Brooks Furniture*,
393 F.3d at 1381–82. The court found both that "[t]his
case is not exceptional, and an award of attorney's fees is
not warranted." *ICON*, 2011 WL 3900975, at *4.

The court specifically determined that, although ulti-
mately unsuccessful, ICON's rejected claim construction
arguments and infringement contentions were not objec-
tively baseless, frivolous, or unreasonable. *Id.* at *2–3.
The court concluded that the claim construction issues
were not easily resolved and stated that it did not agree
with Octane that the conclusions relating to noninfringe-
ment were so easily reached and that it had no reason to
doubt ICON's pre-suit investigation because "[t]he visible
differences" between Octane's machines and the patented

invention "did not make it unreasonable to rely on testing and expert opinions as to infringement." *Id.* at *2–3.

Although noting that "the inquiry could end [t]here," the district court further determined that ICON had not brought suit in bad faith and that attorney fees were not warranted. *Id.* at *3–4. The district court therefore denied Octane's § 285 motion.

## II

On Octane's cross-appeal, we affirmed the district court's denial of Octane's motion to find the case exceptional and to award attorney fees, finding no clear error in the district court's factual findings or conclusions and declining at that time to reconsider the standard for exceptionality articulated in *Brooks Furniture*. *Id.* at 65.

On petition for writ of certiorari from that aspect of our decision of October 24, 2012, from which we denied rehearing on December 27, 2012, Octane challenged only the propriety of our standard for finding a patent case exceptional under *Brooks Furniture*; Octane did not challenge the factual findings and conclusions underlying the district court's denial of its § 285 motion.

The Supreme Court abrogated both the clear and convincing evidence standard and the two-part test for objective baselessness and subjective bad faith of *Brooks Furniture*. *Octane*, 134 S. Ct. at 1757–58. The Court held that within the context of § 285 "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* at 1756. The Court further concluded that "[d]istrict courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Id.* The Court explained that there is no precise rule or formula

for making those determinations and noted that district courts should exercise "equitable discretion" in considering a nonexclusive list of factors that could include "'frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)). The Supreme Court also observed that "a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757.

The Supreme Court's decision in *Octane* did not, however, revoke the discretion of a district court to deny fee awards even in exceptional cases. Long before *Brooks Furniture*, we held that "an exceptional case does not require in all circumstances the award of attorney fees." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986); *see also Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1215 (Fed. Cir. 1987) ("After the district court determines that a case is exceptional, there remains in every case its freedom to exercise its discretion informed by the court's familiarity with the matter in the litigation and the interest of justice." (internal quotations omitted)). Indeed, in the companion case *Highmark*, the Court held that "[b]ecause § 285 commits the determination whether a case is 'exceptional' to the discretion of the district court, that decision is to be reviewed on appeal for abuse of discretion" and that district courts should have discretion in "all aspects of [the] § 285 determination." *Highmark*, 134 S. Ct. at 1748–49.

Accordingly, affording the district court in this case its full discretion following the Supreme Court's decision in *Highmark* and in view of the new standard for determining whether a case is exceptional as articulated by the Court in *Octane*, we vacate the district court's judgment

ICON HEALTH & FITNESS v. OCTANE FITNESS                    7

denying Octane's motion both to find the case exceptional and to award attorney fees under § 285.  We remand that issue to the district court for application in the first instance of the new standard whether, under the totality of the circumstances, this case "stands out from others with respect to the substantive strength" of ICON's litigation position or was litigated in an unreasonable manner. *Octane*, 134 S. Ct. at 1756.

### CONCLUSION

In view of the foregoing, we vacate the district court's denial of Octane's motion to find the case exceptional and to award attorney fees pursuant to 35 U.S.C. § 285 and remand for further consideration of that issue.  The decisions relating to claim construction and noninfringement of ICON's '710 patent, as recited in our previous opinion, are not affected by this remand.

**VACATED IN PART AND REMANDED**

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–1184

_____

## OCTANE FITNESS, LLC, PETITIONER *v*. ICON HEALTH & FITNESS, INC.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 29, 2014]

JUSTICE SOTOMAYOR delivered the opinion of the Court.*

Section 285 of the Patent Act authorizes a district court to award attorney's fees in patent litigation. It provides, in its entirety, that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U. S. C. §285. In *Brooks Furniture Mfg., Inc.* v. *Dutailier Int'l, Inc.*, 393 F. 3d 1378 (2005), the United States Court of Appeals for the Federal Circuit held that "[a] case may be deemed exceptional" under §285 only in two limited circumstances: "when there has been some material inappropriate conduct," or when the litigation is both "brought in subjective bad faith" and "objectively baseless." *Id.,* at 1381. The question before us is whether the *Brooks Furniture* framework is consistent with the statutory text. We hold that it is not.

### I

### A

Prior to 1946, the Patent Act did not authorize the awarding of attorney's fees to the prevailing party in

_____

*JUSTICE SCALIA joins this opinion except as to footnotes 1–3.

Opinion of the Court

patent litigation.  Rather, the "American Rule" governed: "'[E]ach litigant pa[id] his own attorney's fees, win or lose . . . .'"  *Marx* v. *General Revenue Corp.*, 568 U. S. ___, ___ (2013) (slip op., at 9).  In 1946, Congress amended the Patent Act to add a discretionary fee-shifting provision, then codified in §70, which stated that a court "may in its discretion award reasonable attorney's fees to the prevailing party upon the entry of judgment in any patent case." 35 U. S. C. §70 (1946 ed.).[1]

Courts did not award fees under §70 as a matter of course.  They viewed the award of fees not "as a penalty for failure to win a patent infringement suit," but as appropriate "only in extraordinary circumstances."  *Park-In-Theatres, Inc.* v. *Perkins*, 190 F. 2d 137, 142 (CA9 1951). The provision enabled them to address "unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of similar force," which made a case so unusual as to warrant fee-shifting.  *Ibid.*; see also *Pennsylvania Crusher Co.* v. *Bethlehem Steel Co.*, 193 F. 2d 445, 451 (CA3 1951) (listing as "adequate justification[s]" for fee awards "fraud practiced on the Patent Office or vexatious or unjustified litigation").

Six years later, Congress amended the fee-shifting provision and recodified it as §285.  Whereas §70 had specified that a district court could "in its discretion award reasonable attorney's fees to the prevailing party," the revised language of §285 (which remains in force today) provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  We have observed, in interpreting the damages provision of the Patent Act, that the addition of the phrase "exceptional

---

[1] This provision did "not contemplat[e] that the recovery of attorney's fees [would] become an ordinary thing in patent suits . . . ."  S. Rep. No. 79–1503, p. 2 (1946).

Opinion of the Court

cases" to §285 was "for purposes of clarification only."[2] *General Motors Corp.* v. *Devex Corp.*, 461 U. S. 648, 653, n. 8 (1983); see also *id.,* at 652, n. 6. And the parties agree that the recodification did not substantively alter the meaning of the statute.[3]

For three decades after the enactment of §285, courts applied it—as they had applied §70—in a discretionary manner, assessing various factors to determine whether a given case was sufficiently "exceptional" to warrant a fee award. See, *e.g., True Temper Corp.* v. *CF&I Steel Corp.,* 601 F. 2d 495, 508–509 (CA10 1979); *Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.,* 452 F. 2d 579, 597 (CA7 1971); *Siebring* v. *Hansen*, 346 F. 2d 474, 480–481 (CA8 1965).

In 1982, Congress created the Federal Circuit and vested it with exclusive appellate jurisdiction in patent cases. 28 U. S. C. §1295. In the two decades that followed, the Federal Circuit, like the regional circuits before it, instructed district courts to consider the totality of the circumstances when making fee determinations under §285. See, *e.g., Rohm & Haas Co.* v. *Crystal Chemical Co.,* 736 F. 2d 688, 691 (1984) ("Cases decided under §285 have noted that 'the substitution of the phrase "in exceptional cases" has not done away with the discretionary feature'");

––––––––––

[2] The Senate Report similarly explained that the new provision was "substantially the same as" §70, and that the "'exceptional cases'" language was added simply to "expres[s] the intention of the [1946] statute as shown by its legislative history and as interpreted by the courts." S. Rep. No. 82–1979, p. 30 (1952).

[3] See Brief for Petitioner 35 ("[T]his amendment was not intended to create a stricter standard for fee awards, but instead was intended to clarify and endorse the already-existing statutory standard"); Brief for Respondent 17 ("When it enacted §285, as the historical notes to this provision make clear, Congress adopted the standards applied by courts interpreting that statute's predecessor, §70 of the 1946 statute. Congress explained that §285 'is substantially the same as the corresponding provision in' §70").

*Yamanouchi Pharmaceutical Co., Ltd.* v. *Danbury Pharmacal, Inc.*, 231 F. 3d 1339, 1347 (2000) ("In assessing whether a case qualifies as exceptional, the district court must look at the totality of the circumstances").

In 2005, however, the Federal Circuit abandoned that holistic, equitable approach in favor of a more rigid and mechanical formulation. In *Brooks Furniture Mfg., Inc.* v. *Dutailier Int'l, Inc.*, 393 F. 3d 1378 (2005), the court held that a case is "exceptional" under §285 only "when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions." *Id.,* at 1381. "Absent misconduct in conduct of the litigation or in securing the patent," the Federal Circuit continued, fees "may be imposed against the patentee only if both (1) the litigation is brought in subjective bad faith, and (2) the litigation is objectively baseless." *Ibid.* The Federal Circuit subsequently clarified that litigation is objectively baseless only if it is "so unreasonable that no reasonable litigant could believe it would succeed," *iLOR, LLC* v. *Google, Inc.*, 631 F. 3d 1372, 1378 (2011), and that litigation is brought in subjective bad faith only if the plaintiff "actually know[s]" that it is objectively baseless, *id.,* at 1377.[4]

---

[4]In *Kilopass Technology, Inc.* v. *Sidense Corp.*, 738 F. 3d 1302 (CA Fed 2013)—decided after our grant of certiorari but before we heard oral argument in this case—the Federal Circuit appeared to cut back on the "subjective bad faith" inquiry, holding that the language in *iLOR* was dictum and that "actual knowledge of baselessness is not required." 738 F. 3d, at 1310. Rather, the court held, "a defendant need only prove reckless conduct to satisfy the subjective component of the §285 analysis," *ibid.,* and courts may "dra[w] an inference of bad faith from circumstantial evidence thereof when a patentee pursues claims that are devoid of merit," *id.,* at 1311. Most importantly, the Federal Circuit stated that "[o]bjective baselessness alone can create a sufficient

Finally, *Brooks Furniture* held that because "[t]here is a presumption that the assertion of infringement of a duly granted patent is made in good faith[,] . . . the underlying improper conduct and the characterization of the case as exceptional must be established by clear and convincing evidence." 393 F. 3d, at 1382.

### B

The parties to this litigation are manufacturers of exercise equipment. The respondent, ICON Health & Fitness, Inc., owns U. S. Patent No. 6,019,710 ('710 patent), which discloses an elliptical exercise machine that allows for adjustments to fit the individual stride paths of users. ICON is a major manufacturer of exercise equipment, but it has never commercially sold the machine disclosed in the '710 patent. The petitioner, Octane Fitness, LLC, also manufactures exercise equipment, including elliptical machines known as the Q45 and Q47.

ICON sued Octane, alleging that the Q45 and Q47 infringed several claims of the '710 patent. The District Court granted Octane's motion for summary judgment, concluding that Octane's machines did not infringe ICON's patent. 2011 WL 2457914 (D Minn., June 17, 2011). Octane then moved for attorney's fees under §285. Applying the *Brooks Furniture* standard, the District Court denied Octane's motion. 2011 WL 3900975 (D Minn., Sept. 6, 2011). It determined that Octane could show neither that ICON's claim was objectively baseless nor that ICON had brought it in subjective bad faith. As to objective baselessness, the District Court rejected Octane's

––––––––––

inference of bad faith to establish exceptionality under §285, unless the circumstances as a whole show a lack of recklessness on the patentee's part." *Id.*, at 1314. Chief Judge Rader wrote a concurring opinion that sharply criticized *Brooks Furniture*, 738 F. 3d, at 1318–1320; the court, he said, "should have remained true to its original reading of" §285, *id.*, at 1320.

argument that the judgment of noninfringement "should have been a foregone conclusion to anyone who visually inspected" Octane's machines. *Id.,* \*2. The court explained that although it had rejected ICON's infringement arguments, they were neither "frivolous" nor "objectively baseless." *Id.,* \*2–\*3. The court also found no subjective bad faith on ICON's part, dismissing as insufficient both "the fact that [ICON] is a bigger company which never commercialized the '710 patent" and an e-mail exchange between two ICON sales executives, which Octane had offered as evidence that ICON had brought the infringement action "as a matter of commercial strategy."[5] *Id.,* \*4.

ICON appealed the judgment of noninfringement, and Octane cross-appealed the denial of attorney's fees. The Federal Circuit affirmed both orders. 496 Fed. Appx. 57 (2012). In upholding the denial of attorney's fees, it rejected Octane's argument that the District Court had "applied an overly restrictive standard in refusing to find the case exceptional under §285." *Id.,* at 65. The Federal Circuit declined to "revisit the settled standard for exceptionality." *Ibid.*

We granted certiorari, 570 U. S. __ (2013), and now reverse.

———————

[5] One e-mail, sent from ICON's Vice President of Global Sales to two employees, read: "'We are suing Octane. Not only are we coming out with a greater product to go after them, but throwing a lawsuit on top of that.'" 2011 WL 3900975, \*4. One of the recipients then forwarded that e-mail to a third party, along with the accompanying message: "'Just clearing the way and making sure you guys have all your guns loaded!'" *Ibid.* More than a year later, that same employee sent an e-mail to the Vice President of Global Sales with the subject, "'I heard we are suing Octane!'" *Ibid.* The executive responded as follows: "'Yes— old patent we had for a long time that was sitting on the shelf. They are just looking for royalties.'" *Ibid.* The District Court wrote that "in the light most favorable to Octane, these remarks are stray comments by employees with no demonstrated connection to the lawsuit." *Ibid.*

Opinion of the Court

## II

The framework established by the Federal Circuit in *Brooks Furniture* is unduly rigid, and it impermissibly encumbers the statutory grant of discretion to district courts.

## A

Our analysis begins and ends with the text of §285: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." This text is patently clear. It imposes one and only one constraint on district courts' discretion to award attorney's fees in patent litigation: The power is reserved for "exceptional" cases.

The Patent Act does not define "exceptional," so we construe it "'in accordance with [its] ordinary meaning.'" *Sebelius* v. *Cloer*, 569 U. S. ___, ___ (2013) (slip op., at 6); see also *Bilski* v. *Kappos*, 561 U. S. 593, ___ (2010) (slip op., at 6) ("In patent law, as in all statutory construction, '[u]nless otherwise defined, "words will be interpreted as taking their ordinary, contemporary, common meaning"'"). In 1952, when Congress used the word in §285 (and today, for that matter), "[e]xceptional" meant "uncommon," "rare," or "not ordinary." Webster's New International Dictionary 889 (2d ed. 1934); see also 3 Oxford English Dictionary 374 (1933) (defining "exceptional" as "out of the ordinary course," "unusual," or "special"); Merriam-Webster's Collegiate Dictionary 435 (11th ed. 2008) (defining "exceptional" as "rare"); *Noxell Corp.* v. *Firehouse No. 1 Bar-B-Que Restaurant*, 771 F. 2d 521, 526 (CADC 1985) (R. B. Ginsburg, J., joined by Scalia, J.) (interpreting the term "exceptional" in the Lanham Act's identical fee-shifting provision, 15 U. S. C. §1117(a), to mean "uncommon" or "not run-of-the-mill").

We hold, then, that an "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering

both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated. District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.[6]  As in the comparable context of the Copyright Act, "'[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'"  *Fogerty* v. *Fantasy, Inc.*, 510 U. S. 517, 534 (1994).

### B

### 1

The Federal Circuit's formulation is overly rigid.  Under the standard crafted in *Brooks Furniture*, a case is "exceptional" only if a district court either finds litigation-related misconduct of an independently sanctionable magnitude or determines that the litigation was both "brought in subjective bad faith" and "objectively baseless."  393 F. 3d, at 1381.  This formulation superimposes an inflexible framework onto statutory text that is inherently flexible.

For one thing, the first category of cases in which the Federal Circuit allows fee awards—those involving litigation misconduct or certain other misconduct—appears to extend largely to independently sanctionable conduct.  See *ibid.* (defining litigation-related misconduct to include "willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexa-

---

[6]In *Fogerty* v. *Fantasy, Inc.*, 510 U. S. 517 (1994), for example, we explained that in determining whether to award fees under a similar provision in the Copyright Act, district courts could consider a "nonexclusive" list of "factors," including "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.*, at 534, n. 19 (internal quotation marks omitted).

tious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions"). But sanctionable conduct is not the appropriate benchmark. Under the standard announced today, a district court may award fees in the rare case in which a party's unreasonable conduct—while not necessarily independently sanctionable—is nonetheless so "exceptional" as to justify an award of fees.

The second category of cases in which the Federal Circuit allows fee awards is also too restrictive. In order for a case to fall within this second category, a district court must determine *both* that the litigation is objectively baseless *and* that the plaintiff brought it in subjective bad faith. But a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award. Cf. *Noxell*, 771 F. 2d, at 526 ("[W]e think it fair to assume that Congress did not intend rigidly to limit recovery of fees by a [Lanham Act] defendant to the rare case in which a court finds that the plaintiff 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons' . . . . Something less than 'bad faith,' we believe, suffices to mark a case as 'exceptional' ").

ICON argues that the dual requirement of "subjective bad faith" and "objective baselessness" follows from this Court's decision in *Professional Real Estate Investors, Inc.* v. *Columbia Pictures Industries, Inc.*, 508 U. S. 49 (1993) (*PRE*), which involved an exception to the *Noerr-Pennington* doctrine of antitrust law. It does not. Under the *Noerr-Pennington* doctrine—established by *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961), and *Mine Workers* v. *Pennington*, 381 U. S. 657 (1965)—defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing decisionmaking by the government. *PRE*, 508 U. S., at 56. But under a "sham exception" to this doctrine, "activity 'ostensibly directed toward

influencing governmental action' does not qualify for *Noerr* immunity if it 'is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'"   *Id.,* at 51.   In *PRE,* we held that to qualify as a "sham," a "lawsuit must be objectively baseless" and must "concea[l] 'an attempt to interfere directly with the business relationships of a competitor . . . .'"   *Id.,* at 60–61 (emphasis deleted).   In other words, the plaintiff must have brought baseless claims in an attempt to thwart competition (*i.e.,* in bad faith).

In *Brooks Furniture,* the Federal Circuit imported the *PRE* standard into §285.   See 393 F. 3d, at 1381.   But the *PRE* standard finds no roots in the text of §285, and it makes little sense in the context of determining whether a case is so "exceptional" as to justify an award of attorney's fees in patent litigation.   We crafted the *Noerr-Pennington* doctrine—and carved out only a narrow exception for "sham" litigation—to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances.   See *PRE,* 508 U. S., at 56 ("Those who petition government for redress are generally immune from antitrust liability").   But to the extent that patent suits are similarly protected as acts of petitioning, it is not clear why the shifting of fees in an "exceptional" case would diminish that right.   The threat of antitrust liability (and the attendant treble damages, 15 U. S. C. §15) far more significantly chills the exercise of the right to petition than does the mere shifting of attorney's fees. In the *Noerr-Pennington* context, defendants seek immunity from a judicial declaration that their filing of a lawsuit was actually unlawful; here, they seek immunity from a far less onerous declaration that they should bear the costs of that lawsuit in exceptional cases.

2

We reject *Brooks Furniture* for another reason: It is so

demanding that it would appear to render §285 largely superfluous. We have long recognized a common-law exception to the general "American rule" against fee-shifting—an exception, "inherent" in the "power [of] the courts" that applies for "'willful disobedience of a court order'" or "when the losing party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .'" *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 258–259 (1975). We have twice declined to construe fee-shifting provisions narrowly on the basis that doing so would render them superfluous, given the background exception to the American rule, see *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 419 (1978); *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402, n. 4 (1968) (*per curiam*), and we again decline to do so here.

### 3

Finally, we reject the Federal Circuit's requirement that patent litigants establish their entitlement to fees under §285 by "clear and convincing evidence," *Brooks Furniture*, 393 F. 3d, at 1382. We have not interpreted comparable fee-shifting statutes to require proof of entitlement to fees by clear and convincing evidence. See, *e.g., Fogerty*, 510 U. S., at 519; *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384 (1990); *Pierce* v. *Underwood*, 487 U. S. 552, 558 (1988). And nothing in §285 justifies such a high standard of proof. Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard, see, *e.g., Béné* v. *Jeantet*, 129 U. S. 683, 688 (1889), and that is the "standard generally applicable in civil actions," because it "allows both parties to 'share the risk of error in roughly equal fashion,'" *Herman & MacLean* v. *Huddleston*, 459 U. S. 375, 390 (1983).

12   OCTANE FITNESS, LLC *v.* ICON HEALTH & FITNESS, INC.

Opinion of the Court

\*    \*    \*

For the foregoing reasons, the judgment of the United States Court of Appeals for the Federal Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on February 5, 2016.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  February 5, 2016                    /s/ Deanne E. Maynard

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This brief complies with the type-volume limitation of Rule 32(a) of the Federal Rules of Appellate Procedure because it contains 13,996 words.

Dated:  February 5, 2016                                  /s/ Deanne E. Maynard

dc-814729